**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,**<br><br>**Defendants.** | **CIVIL ACTION**<br><br>**NO: ____________**<br><br>**FORMERLY**<br>**COURT OF COMMON PLEAS**<br>**TRIAL DIVISION—CIVIL**<br><br>**NOVEMBER TERM, 2026**<br>**NO. 1288** |

**NOTICE OF REMOVAL**

**To the Honorable Judges of the United States District Court for the Eastern District of Pennsylvania.**

Pursuant to 28 U.S.C. § 1441, Defendants, the City of Philadelphia, Cherelle Parker, Ralph Dipietro, Bridget Collins-Greenwald, (together, "Petitioners"), through their undersigned counsel, respectfully petition for the removal of this action to the United States District Court for the Eastern District of Pennsylvania. In support thereof, Petitioners state the following:

1. On November 10, 2026, Plaintiff Pennsylvania Healthy Alternatives Association and MNG 2005, Inc. d/b/a Cbd Kratom ("Plaintiffs") initiated this action by complaint (the "Complaint") in the Court of Common Pleas in Philadelphia, November Term, 2026; No. 1288. (A true and correct copy of the Complaint is attached hereto at **Exhibit "A."**)

2. In Counts I, III, and VI-X, Plaintiff seeks relief pursuant to 42 U.S.C. § 1983 for alleged deprivations of Plaintiff's rights protected by the Constitution of the United States and or otherwise alleges violations of the Constitution of the United States. (*See* Exhibit A.)

3. Plaintiffs have also filed an Emergency Petition For A Special Injunction And Preliminary Injunction Pursuant To Pa. R. Civ. P. 1531 in the underlying state court action. (A true and correct copy of the motion package is attached hereto at **Exhibit "B."**)

4. 28 U.S.C. § 1331 states that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

5. The United States District Court for the Eastern District of Pennsylvania has original jurisdiction over the claim alleged by Plaintiff pursuant to 28 U.S.C. § 1331.

6. True and correct copies of this Notice of Removal with accompanying exhibits and separate Notice to State Court of Filing of Notice of Removal, a copy of which is attached hereto at **Exhibit "C,"** will be served upon the Plaintiff and filed with the Office of Judicial Records of the Court of Common Pleas of Philadelphia County, Pennsylvania, in accordance with the provisions of 28 U.S.C. § 1446(d).

7. In filing this Notice of Removal, Petitioners do not waive any available defenses in this action.

**WHEREFORE,** Petitioners respectfully request that the captioned Complaint be removed to the United States District Court for the Eastern District of Pennsylvania.

Respectfully submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Dated: November 12, 2026 BY: *<u>/s/ Bailey E. Axe</u>*
Melissa Medina, Divisional Deputy City Solicitor
Bailey E. Axe, Senior Attorney

Attorney ID No. 309686
One Parkway Building, 15th Floor
1515 Arch Street
Philadelphia, PA 19102-1595
Tel (215) 683-5024 and Fax (215) 683-5299

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,**<br><br>**Defendants.** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **CIVIL ACTION**<br><br>**NO: ____________**<br><br>**FORMERLY**<br>**COURT OF COMMON PLEAS**<br>**TRIAL DIVISION—CIVIL**<br><br>**NOVEMBER TERM, 2026**<br>**NO. 1288** |

**<u>NOTICE OF FILING OF NOTICE OF REMOVAL</u>**

TO: Patrick C. Campbell, Jr.
565 E. Swedesford Road, Suite 303
Wayne, Pennsylvania 19087

**PLEASE TAKE NOTICE THAT** on November 12, 2026, Defendants the City of Philadelphia, Cherelle Parker, Ralph Dipietro, Bridget Collins-Greenwald filed, in the office of the Clerk of the United States District Court for the Eastern District of Pennsylvania, a verified Notice of Removal.

A copy of this Notice of Removal is attached hereto and is also being filed with the Clerk of the Court of Common Pleas of Philadelphia County, pursuant to Title 28, United States Code, Section 1446(e).

Dated: November 12, 2026 BY: */s/ Bailey E. Axe*

Bailey E. Axe, Senior Attorney
Attorney ID No. 309686
One Parkway Building, 15th Floor
1515 Arch Street
Philadelphia, PA 19102-1595
Tel (215) 683-5024 and Fax (215) 683-5299

*Counsel for Defendants*

# EXHIBIT A

Filed and Attested by the
Office of Judicial Records
10 NOV 2026 01:18 pm
A. MALONIS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,

*Plaintiffs,*

v.

CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,

*Defendants.*

________ TERM, 2026

No. ______________

CIVIL ACTION

Assigned to: ______________

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO*

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defen derse de estas demandas expuestas en las paginas siguientes, usted tiene veinte dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.*

**Philadelphia Bar Association**
**Lawyer Referral and Information Service**
**One Reading Center**
**Philadelphia, Pennsylvania 19107 (215) 238-6333**
**TTY (215) 451-6197**

*LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.*

**Asociacion De Licenciados De Filadelfia**
**Servicio De Referencia E Informacion Legal**
**One Reading Center**
**Filadelfia, Pennsylvania 19107**
**Telefono: (215) 238-1701**

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
Patrick C. Campbell, Esquire
Attorney ID No.: 53350
565 E. Swedesford Road, Suite 303
Wayne, PA 19087
Tel.: (215) 977-4100
Fax: (215) 977-4107
Patrick.Campbell@lewisbrisbois.com

Counsel for Plaintiffs

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | | |
|---|---|---|
| PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,<br><br>*Plaintiffs*,<br><br>v.<br><br>CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,<br><br>*Defendants*. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | ________ TERM, 2026<br><br>No. ______________<br><br>CIVIL ACTION<br><br>Assigned to: ______________ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**<u>AND OTHER RELIEF</u>**

Plaintiffs Pennsylvania Healthy Alternatives Association ("PAHAA") and MNG 2005, Inc. ("MNG") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against the City of Philadelphia (the "City") and the above-named officials in their official capacities (collectively, "Defendants"), and allege as follows:



Case ID: 261101288
Control No.: 26112521

## INTRODUCTION

1. This action challenges a Philadelphia ordinance that throws out the baby with the bath water. The City Council (the "Council") said it was targeting illegal smoke shops that "fuel crime" and "expose our young people to dangerous products," such as concentrated and synthetic 7-OH[1] products. Instead of regulating those actors and products, the Council adopted Bill No. 260163 (the "Ordinance"), which effectively bans every hemp and kratom product in the City, including the tested, labeled, natural-leaf products that PAHAA's members, including MNG, sell only to age-verified adults.

2. The Ordinance's own safety measures (a 2% cap on 7-OH, a ban on synthetic alkaloids, laboratory testing, labeling, and a 21-and-over age limit) show the City knew how to regulate to achieve its intended objectives but ***and imposed a ban instead***.

3. The ban is because the Ordinance:

- Conditions the right to sell on FDA recognition, which is a legal and regulatory impossibility because it does not exist and no botanical product has a practical path to obtain it.
- Has an effective date of November 12, 2026, while the only permit pathway waits indefinitely on regulations the City has not and has no deadline to issue.
- Bars permits by imposing a setback within 500 feet of a long list of uses and in 184 designated areas, leaving virtually no viable retail location in Philadelphia.

---

[1] 7-OH, also known as 7-hydroxymitragynine, is an alkaloid compound.



Case ID: 261101288
Control No.: 26112521

4. Also, the Ordinance purports to be directed at "Intoxicating Substances"; however, alcohol, an intoxicating substance with far greater documented harms including underage use and abuse than the lawful products sold by PAHAA's members, is exempted.

5. The Council was warned that the FDA condition alone would operate as a *de facto* ban because it was unattainable, and the Council passed the bill unchanged. The result is a ban dressed up as regulation, in violation of the Pennsylvania Constitution and Pennsylvania law.

6. The Ordinance also adopts a chapter number, Chapter 9-6700, that the Philadelphia Code has already assigned to an unrepealed restaurant ordinance, leaving the public without fair notice of which law governs.

7. Starting November 12, 2026, lawful retailers shall face daily penalties with no permit process, no available permit, and no lawful way to comply, for an indefinite period.

8. Even if permits become available, 500-foot setbacks from schools, playgrounds, parks, recreation centers, libraries, and child-care uses, combined with 184 excluded zones and districts, eliminate virtually every commercially viable retail location, including but not limited to, those on which some of PAHAA's members currently operate, and is a *de facto* citywide ban.

9. The City may not extinguish a ***<u>lawful</u>*** business through an indefinite no-permit gap, a functionally prohibitory geographic scheme, and standardless restrictions that provide neither fair notice nor a meaningful avenue for relief.

10. Plaintiffs seek declaratory and injunctive relief before the Ordinance forces the closure of their Philadelphia stores, kills jobs, strands lawful inventory, destroys leasehold and compliance investments, and exposes them to mounting penalties for conduct the Ordinance's own permit provisions contemplate may lawfully occur.



Case ID: 261101288
Control No.: 26112521

## PARTIES

11. Plaintiff PAHAA is a Pennsylvania nonprofit corporation with an address at 443 E. Baltimore Pike, Media, Pa. 19063, whose application for Section 501(c)(6) status is pending. Its members are retailers, manufacturers, and wholesalers in the hemp-derived products industry in Pennsylvania, including at least six retail establishments in Philadelphia that sell lawful products affected by the Ordinance. PAHAA's members sell pure leaf kratom and PAHAA prohibits its members from selling 7-OH.

12. Plaintiff MNG 2005, Inc. d/b/a CBD Kratom ("MNG") is a Missouri corporation with its principal place of business at 12400 Olive Blvd., St Louis, Mo. 63141. Through subsidiaries, MNG operates three retail stores in Philadelphia (212 S 17th Street, 524 South Street, and 4040 City Avenue Suite 2B (the "Stores")), where it lawfully sells hemp products (drinkables, edibles, creams, tinctures, and smokables) and natural-leaf kratom products to adults. MNG is a member of PAHAA.

13. PAHAA's members have invested substantial resources in their Philadelphia operations, including leases, buildouts, inventory, employee training, vendor relationships, product-testing protocols, labeling systems, and consumer-compliance infrastructure.

14. PAHAA's members do not sell hemp or kratom products to anyone under eighteen, or under twenty-one for smokables, and they require identification from any customer who appears younger than thirty, a practice just as rigorous as Pennsylvania's age-verification requirements for alcohol and tobacco.

15. PAHAA's members have their products independently tested by accredited labs, many certified by the DEA, for impurities, provide QR codes on labels linking to the laboratory results, and label ingredients, dosage information, and warnings where appropriate.



Case ID: 261101288
Control No.: 26112521

16. Defendant City of Philadelphia is a municipal corporation organized under Pennsylvania law. Bill No. 260163 represents official municipal policy and, when effective, will be implemented and enforced by the City and its departments, agencies, officers, and employees.

17. Defendant Cherelle Parker is the Mayor of Philadelphia and is sued solely in her official capacity. The Mayor is responsible for supervising the executive branch of City government and for ensuring the administration and enforcement of the Philadelphia Code.

18. The Ordinance assigns the "Department" authority to issue implementing regulations and to administer material aspects of the permit, testing, labeling, fee, renewal, and enforcement regime. The Department is defined in Sec. 9-101 as the Department of Licenses and Inspections unless otherwise specified. The Ordinance does not otherwise specify a definition for Department.

19. Defendant Ralph DiPietro is the Co-Commissioner of the Philadelphia Department of Licenses and Inspections and is sued solely in his official capacity. The Co-Commissioner is responsible for the inspections, safety, and compliance functions implicated by the Ordinance, including enforcement against unpermitted business activity.

20. Defendant Bridget Collins-Greenwald is the Co-Commissioner of the Philadelphia Department of Licenses and Inspections and is sued solely in her official capacity. The Co-Commissioner is responsible for the Quality of Life functions implicated by the Ordinance, including enforcement against unpermitted business activity.

21. The official-capacity Defendants are proper parties for prospective declaratory and injunctive relief because each has, or upon the Ordinance's effective date will have, a direct connection to its implementation or enforcement.



Case ID: 261101288
Control No.: 26112521

## VENUE

22. Venue is proper in this Court because the cause of action arose in this county and the properties at issue are located in this county.

## FACTUAL ALLEGATIONS

### What are PAHAA members and "CBD Kratom" Retail Stores Are and How They Operate

23. MNG and its affiliates own and operate over 50 "CBD Kratom" retail stores across the United States and employ over 400 individuals.

24. The "CBD Kratom" concept was founded in 2016 after MNG's founders identified a need in the marketplace while searching for natural, non-pharmaceutical ways to deal with a relative's chronic pain.

25. PAHAA's members' retail stores focus on their customers' wellness through various products including, but not limited to, hemp-derived cannabinoid-based products, such as CBD (cannabidiol), in both topical/cosmetic and consumable forms, and natural leaf kratom, an herbal product derived from or comprising the leaf of a tree native to Southeast Asia.

26. PAHAA members' retail stores provide customers with safe products that offer effective alternative remedies to improve individualized wellness so that, as MNG's motto goes, they can "sleep well, wake well, and live well."

27. As part of that mission, PAHAA's members educate customers about how hemp and natural-leaf kratom products can support their well-being.

28. By way of example, MNG trains its employees for at least five weeks, with continuous education thereafter, in, among other things, how to consult with a customer about what product is best for that particular customer's needs.



Case ID: 261101288
Control No.: 26112521

29. MNG's CBD Kratom stores are newly renovated, well lit, clean, and secure, and products are kept out of the reach of customers, most behind locked cases, requiring the assistance of a sales consultant to gain access.

30. The CBD Kratom stores are mostly in desirable commercial locations such as Rittenhouse Square in Philadelphia, Media in Delaware County, the Financial District in New York City, and River North in Chicago.

31. Sales consultants are trained and instructed to require identification from any customer who does not appear to be at least 30 years of age and are trained to spot fake identification.

32. By way of comparison, the FDA's Tobacco Compliance and Enforcement Program for the sale of another legal product, tobacco, only requires persons to be asked for identification if they appear to be under the age of 30, with no identification training other than instructions to match the purchaser's face with the picture.

33. "Cannabis" in the context of PAHAA's members refers only to hemp, a botanical class of the plant cannabis sativa.

34. MNG has been in business for approximately ten years and has served hundreds of thousands of customers.

**<u>Hemp-Derived Products, Generally</u>**

35. The term "cannabis sativa" refers to a plant species that can be separated into two different types of flowering plants: hemp and marijuana.

36. By way of background, in December 2018, the Agriculture Improvement Act of 2018 (the "Farm Bill") was signed into law. It removed hemp from Schedule I of the Controlled Substances Act, legalized the cultivation, processing, distribution, possession, and sale of hemp



Case ID: 261101288
Control No.: 26112521

and hemp extracts, and directed the U.S. Department of Agriculture to promulgate regulations governing hemp.

37. The Farm Bill defined "hemp" as "the plant cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9-tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o.

38. The Farm Bill further amended the federal Controlled Substances Act to exclude "tetrahydrocannabinols in hemp" from the definition of "tetrahydrocannabinol," a Schedule I substance, and to exclude "hemp" from the definition of "marihuana." 21 U.S.C. §§ 802(16)(B), 812(c).

39. This statute was amended by Public Law 119-37, enacted November 12, 2025, and amendments to the definition of "hemp" are currently scheduled to become effective December 11, 2026.

40. The amendments add exclusions to the definition of hemp, including cannabinoids that "are not capable of being naturally produced" and any hemp-derived cannabinoid products (whether intermediate or final) that contain cannabinoids that "are capable of being naturally produced" but were "synthesized or manufactured outside the plant." See Public Law 119-37 (2025).

41. Accordingly, sales of certain hemp-derived cannabinoids, such as CBD, will remain legal under federal law after the amendments go into effect on December 11, 2026.

42. However, hemp is a $29 billion industry in the United States. The implementation date of those amendments is, therefore, anything but certain. There is bipartisan and White House support for legislation to regulate hemp products.



Case ID: 261101288
Control No.: 26112521

43. In 2019, the Pennsylvania Department of Agriculture's Controlled Plant and Noxious Weed Committee expressly adopted the federal definition of hemp and exempted hemp and products containing hemp-derived cannabinoids from the Commonwealth's criminal laws. 49 Pa.B. 1667 (Apr. 6, 2019).

44. The United States Drug Enforcement Administration ("DEA") has advised that "cannabinoids extracted from the cannabis plant that have a delta-9-THC concentration of not more than 0.3 percent on a dry weight basis meet the definition of 'hemp' and thus are not controlled under the [Controlled Substances Act]". Letter from DEA to Alabama Board of Pharmacy (Sept. 15, 2021), a true and correct copy of which is attached as Ex. A.

45. As intended by federal and state legislators, the hemp industry, from farmers to retail shop owners, has grown rapidly across the nation and in Pennsylvania since 2018, particularly in the manufacture and sale of hemp products such as oils, flower, topical creams, and infused edible products containing CBD and other cannabinoids.

46. In a memo to all members of the Pennsylvania State Senate, dated September 25, 2026, Senator Dawn Keefer (R-31) announced that she would be proposing state legislation to address hemp sales.

47. Key components of Senator Keefer's proposed legislation will be a) Department of Agriculture registration, b) independent testing and truthful labels, c) 21-and-over sales with ID checks, d) a ban on candy-style packaging and youth-targeted marketing. It also grandfathers existing Pennsylvania operators who can document lawful pre-enactment operations. Sen. Dawn Keefer, *Protecting Pennsylvania's Responsible Hemp Businesses and Keeping Harmful Products Away from Children*, Pa. Senate Co-Sponsorship Memo (Sept. 25, 2026), https://www.palegis.us/senate/co-sponsorship/memo?memoID=49288.



Case ID: 261101288
Control No.: 26112521

**PAHAA's Members' Hemp-Derived Products**

48. All of PAHAA's members hemp-derived products comply with the Farm Bill.

49. All of PAHAA's members' hemp-derived products contain a Δ-9 THC concentration of not more than 0.3 percent on a dry weight basis.

50. PAHAA's members voluntarily comply with the regulatory concerns relating to hemp sales.

51. Every hemp-derived product sold is tested for cannabinoid content, including CBD and delta-9 THC by independent, accredited third-party laboratories.

52. Such hemp-derived products prominently display ingredient labels, and most display a QR code that a customer can scan with a smartphone to view a Certificate of Analysis containing three to five pages of product testing results.

**Kratom Products, Generally**

53. PAHAA members also sell products derived from the leaf of kratom (Mitragyna speciosa), a plant native to Southeast Asia, which medical researchers have studied for use in, among other things, mitigating the opioid epidemic, pain relief, and treatment of anxiety, depression, PTSD, and other conditions.

54. Kratom has been used in Southeast Asia in teas for hundreds if not thousands of years as a relaxant.

55. A March 2020 study by the Department of Psychiatry and Behavioral Sciences at Johns Hopkins University School of Medicine, which surveyed over 2,700 kratom users, found that kratom is "typically ingested orally for treating pain and other medical conditions," that the typical kratom consumer is over forty years old and college educated, that ninety-one percent of consumers use it for pain management, and that the likelihood of kratom use being characterized



Case ID: 261101288
Control No.: 26112521

as even mildly abusive is less than ten percent. See Garcia-Romeu et al., *Kratom (Mitragyna speciosa): User demographics, use patterns, and implications for the opioid epidemic*, 208 Drug & Alcohol Dependence 107849 (Mar. 2020).

56. Natural-leaf kratom is not a controlled substance under federal law or Pennsylvania law.

57. Concerns with kratom are easily addressed through regulation. In fact, there is model legislation adopted by 17 states to date-the Kratom Consumer Protection Act ("KCPA").

58. On October 25, 2026 the Pennsylvania House of Representatives passed House Bill 2657 by a vote of 202-0. *See* H.B. 2657, Gen. Assemb., Reg. Sess. (Pa. 2025-2026), https://www.palegis.us/legislation/bills/2025/hb2657.

59. The KCPA, the industry's approved model legislation, generally includes some combination of:

- Age limit. No sales to people under 18 or, increasingly, under 21. Selling to a minor is usually a misdemeanor.
- Adulteration ban. Products may not contain substances that make them injurious, such as other drugs or controlled substances.
- Synthetic alkaloid ban. No synthetic mitragynine, synthetic 7-OH or other synthesized kratom alkaloids.
- 7-OH cap. A limit on how much 7-OH can be present, often 2% of the alkaloid fraction in earlier laws and lower in newer ones.
- Labeling. Ingredients, the processor's name and address, directions, and often the amount of mitragynine and 7-OH per serving, plus warnings.
- Registration. Processors or products must register with a state agency, sometimes with a lab certificate.
- Penalties. Fines, civil penalties or suspension of the right to sell, and in some states a private right for consumers to sue.



Case ID: 261101288
Control No.: 26112521

60. Pennsylvania's proposed legislation includes many provisions commonly found in KCPA. It a) restricts sales to adults 21+, b) requires product labeling and consumer warnings, c) prohibits synthetic or adulterated kratom products, d) limits high concentrations of 7-hydroxymitragynine (7-OH), and e) establishes state oversight through the Department of Health. *Id.*

61. In an FDA sponsored natural kratom leaf-controlled dosing study, the first of its kind, no deaths or "serious adverse events" were reported and drug-like effects, such as feeling high or sedated, did not occur until very high doses-12g or more. *See* C. Reissig et al, *A Pilot, Dose-Finding, Pharmacodynamic and Pharmacokinetic Study of Orally Administered Botanical Kratom*, J. Clin. Psychopharmacology (2026), https://doi.org/10.1097/jcp.0000000000002158.

**PAHAA's Members' Kratom Products**

62. Importantly, PAHAA's members, including MNG, sell only natural-leaf kratom products, tested by independent, accredited, third-party laboratories for alkaloids and labeled with all ingredients and provided with appropriate warnings.

63. PAHAA members sell only natural-leaf kratom products having an amount of 7-OH which is more than 2% or less of the overall alkaloid composition of the product.

64. Accredited third-party laboratories test the natural-leaf kratom products sold for kratom alkaloid content.

65. They do not sell 7-OH products.

66. PAHAA's members self-regulate—meaning they essentially comply with the provisions of the KCPA such as testing, labeling, age limits, adulteration and 7-OH bans.



Case ID: 261101288
Control No.: 26112521

**The Ordinance**

67. On March 5, 2026, Councilmember Gilmore Richardson introduced Bill No. 260163 in Philadelphia City Council. The Bill was referred to the Committee on Commerce and Economic Development. *See* Phila., Pa., Bill No. 260163 § 9-6703(4) (introduced Mar. 5, 2025) (signed Sept. 15, 2026).

68. Councilwoman Richardson described the Bill as aimed at what she described as "nuisance businesses", particularly "illegal smoke shops" that operate without community or zoning approval and "fuel" neighborhood crime. Hearing on Bills 260162, 260163 & 260465 Before the Phila. City Council Comm. on Commerce & Econ. Dev., 2026 Sess. 21:10-18. (May 21, 2026) (hereinafter "Committee Hearing Transcript").

69. The official legislative record of the City's proceedings concerning the Ordinance is located at Transcript Room - Committee Hearings (052126/Commerce) and Transcript Room - Council Sessions (060426), incorporated by reference and judicial notice thereof is requested.

70. The Councilwoman further described the object of the Bill to take aim at those businesses that "continue to exploit loopholes, disregard community concerns and operate in ways that put our neighborhoods and the well-being of our communities at stake" and that "[t]hey are putting profits over our safety." *Id.* at 23:1-12.

71. The Councilwoman said that only intoxicating products approved by the FDA should be sold in the City. She admitted that she had no concern with the actual health and wellness benefits of any of the products. *Id.* at 24:23-25:4.

72. On May 21, 2026, the Bill was amended in committee. As amended, it creates Chapter 9-6700 of The Philadelphia Code, titled "Intoxicating Substances." *See* Phila., Pa., Bill No. 260163, Proposed Amendments in Committee (May 21, 2026).



Case ID: 261101288
Control No.: 26112521

73. Confusingly, Chapter 9-6700 of The Philadelphia Code relating to restaurants already exists and has never been repealed, and is titled "Third-Party Restaurant Reservation Services." This section of the Code became effective April 7, 2026. *See generally* Phila., Pa., Code § 9-6700 (2026).[2] .

74. Section 9-6701(4) of the Ordinance defines "Intoxicating Hemp Product" as "[a]ny substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o)." *See* Phila., Pa., Bill No. 260163 § 9-6701(4) (June 4, 2026) (signed Sept. 15, 2026).

75. Section 9-6701(11) of the Ordinance broadly defines "Kratom Product" as an intermediate or final product intended for human or animal use, through any means of application or administration, that contains mitragynine or 7-hydroxymitragynine in any form and is derived from Mitragyna speciosa, is not capable of being naturally produced by the plant, or is capable of natural production but was synthesized or manufactured outside the plant. *Id.*

76. Section 9-6701(10) separately defines "Kratom Extract" as a food product containing any part of a kratom leaf that has been extracted and concentrated to provide more standardized dosing. *Id.*

[2] Bill 260163, as passed, provided that its provisions would be set forth at sections 9-6701 to 9-6705 of the Philadelphia Code. *See* Phila., Pa., Bill No. 260163 (June 4, 2026) (signed Sept. 15, 2026). A copy of the Ordinance as passed is attached as Ex. B. However, the provisions of Bill 260163 are placed in the electronic version of the Philadelphia Code at sections 9-6901 to 9-6905. Even more confusing, the electronic version of the Philadelphia Code provides a disclaimer that "These documents **should not** be relied upon as the definitive authority for local legislation. Additionally, the formatting and pagination of the posted documents varies from the formatting and pagination of the official copy." *See* Philadelphia Code Disclaimer, attached hereto as Ex. C. (emphasis added). Thus, for the purposes of this Complaint, Plaintiffs refer to the Ordinance as signed on September 15, 2025-section 9-6700, *et seq*.

77. Section 9-6702(1) of the Ordinance makes it unlawful to sell or offer for sale any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o). *Id.*

78. Section 9-6702(2) of the Ordinance makes it unlawful to sell or offer for sale a kratom product that: is mixed or packed in a manner that renders it injurious; contains residual solvents above the standards in the edition of United States Pharmacopeia/National Formulary 467 current on the paragraph's effective date; contains more than two percent 7-hydroxymitragynine in the alkaloid fraction; or contains a synthetic alkaloid or other synthetically derived kratom compound. *Id.*

79. Section 9-6702(3) of the Ordinance operates through the federal Food and Drug Administration ("FDA"). This section of the Ordinance makes it unlawful to sell or offer for sale an intoxicating substance that is "not considered appropriate for use as a dietary supplement or a safe food additive" or is not the subject of an application approved under specified provisions of the Federal Food, Drug, and Cosmetic Act ( the "FDCA"), 21 U.S.C. §§ 321, 331, 342, 348, or 355. *Id.*

80. Thus Section 9-6702(3) provides only three paths to the permittable sale of defined intoxicating substances in Philadelphia: being deemed appropriate for use as a dietary supplement under the FDCA, being deemed appropriate for use as a safe food additive under the FDCA, and being the subject of an application approved under the FDCA. These paths are all dead ends as they ban PAHAA members' otherwise legal products.

81. The FDCA does not regulate smokable kratom or hemp so long as there are no medical claims made for the products. Also, the FDA under the FDCA also has not approved either hemp or kratom as an ingredient of edible or drinkable products.



Case ID: 261101288
Control No.: 26112521

82. PAHAA members' pure leaf kratom and hemp, as smokable products which do not make medical claims, are not dietary supplements or food additives, so they are not regulated under the FDCA. Also, there is no possible application for approval under the FDCA because the FDCA does not apply to these products – they are not food. Thus, there is no path to permitted sales, and the Ordinance bans these products.

83. Also, any edible or drinkable hemp product which otherwise is currently permitted is effectively banned by the Ordinance. The FDA has not recognized any hemp product or kratom product as a lawful dietary supplement or safe food additive. Furthermore, the FDA and has not approved any kratom product or hemp product as a food additive under an application under 21 U.S.C. §342.

84. If PAHAA members file an application as required by the Ordinance, the FDA itself estimates it would take over 2 years to get approval. *See* Food & Drug Admin., Guidance for Industry: Questions and Answers About the Food Additive or Color Additive Petition Process (Apr. 2011), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-questions-and-answers-about-food-additive-or-color-additive-petition-process.

85. Since the Ordinance goes into effect on November 12, the PAHAA members' would never be able to get a timely approval from the FDA for its edible and drinkable products. Thus their sales of edible and drinkable products will be effectively banned.

86. The Ordinance therefore conditions every sale of otherwise permitted hemp and kratom on an approval of a federal application that either does not exist or can only be obtained through a multi-year administrative process.

87. Thus, the Ordinance, specifically Section 9-6702(3), functions as a categorical ban on all Intoxicating Substances, including tested and properly labeled natural-leaf kratom. *Id.*

88. The Ordinance repeats that same prohibition as a condition of permit eligibility in Section 9-6703(1)(c)(.1), so that no applicant could ever satisfy it. *Id.*

89. While the FDA has recommended a scheduling action on 7-OH, "it is not focused on natural kratom leaf products." *See* Hiding in Plain Sight: 7-OH Products, U.S. Food & Drug Admin., https://www.fda.gov/news-events/public-health-focus/hiding-plain-sight-7-oh-products; *see also* U.S. Food & Drug Administration, *FDA Takes Steps to Restrict 7-OH Opioid Products Threatening American Consumers* (Sept. 16, 2026), https://www.fda.gov/news-events/press-announcements/fda-takes-steps-restrict-7-oh-opioid-products-threatening-american-consumers.

90. In addition, Section 9-6702(1) of the Ordinance outright bans the sale of every "Intoxicating Hemp Product". Confusingly, Section 9-6703(4)(a) and (5)(a) prescribe testing and labeling standards for "Intoxicating Hemp products" sold by permitted retailers. *See* Phila., Pa., Bill No. 260163 § 9-6701(4) (June 4, 2026) (signed Sept. 15, 2026).

91. Those hemp testing and labeling provisions established by the Ordinance can never be applied to permitted retailers, because the products they govern are banned in all circumstances. *See id.*

92. Section 9-6703 of the Ordinance establishes an "Intoxicating Substance" retailer permit and requires a separate current permit for every retail location. It declares unpermitted retailing a nuisance as a matter of law. *See id.*

93. As demonstrated above, under Section 9-6703 of the Ordinance, current retailers simply cannot obtain a permit to sell hemp and kratom products. The Ordinance thereby bans retail sales of these products in Philadelphia.



Case ID: 261101288
Control No.: 26112521

94. Among other prerequisites, Section 9-6703(1)(c)(.5) of the Ordinance requires a valid commercial activity license, any otherwise required license or permit, a fixed location, and compliance with zoning. It also states that an applicant must maintain a valid permit to dispense medical marijuana from the Pennsylvania Bureau of Medical Marijuana "if required," without stating in the Ordinance under what circumstances a permit to dispense medical marijuana is required. *See id.*

95. Section 9-6703(1)(c)(.7)(.b) of the Ordinance bars a permit for a location within 500 feet of a regulated use under Section 14-603(13), a school through grade twelve or its recreation areas or playfields, a public playground, public swimming pool, public park, public recreation center, public library, or child-care use. *See id.*

96. Section 9-6703(1)(c)(.7) of the Ordinance separately identifies 184 street corridors, segments, business districts, and other designated areas in which a permit may not issue. The enumerated areas include major commercial locations such as portions of City Avenue, Germantown Avenue, Broad Street, Market Street, Chestnut Street, Walnut Street, South Street, Frankford Avenue, Kensington Avenue, Aramingo Avenue, Bustleton Avenue, and Castor Avenue, as well as Old City, Northern Liberties, Fishtown, the Center City District, and East Passyunk. *See id.*

97. A permit is location- and owner-specific, is not transferable, and remains valid only through December 31 of the calendar year for which it is issued. *Id.* at (1)(d). The Ordinance also provides for renewal and revocation. *Id.* at (2)

98. Section 9-6703 of the Bill requires products sold by a permitted retailer to be tested by a Drug Enforcement Administration-registered laboratory located in Pennsylvania and labeled in accordance with Department regulations.



Case ID: 261101288
Control No.: 26112521

99. This provision of the Ordinance also bans otherwise permitted retail sale of hemp and kratom because no Department labeling regulations have been adopted. *Id.* at (4).

100. Section 9-6704 of the Bill classifies each violation of Chapter 9-6700 as a Class III offense subject to the maximum fine in Section 1-109(3) of the Philadelphia Code, in addition to penalties under Section A-505.1 of the Philadelphia Administrative Code. Each day of a continuing violation is a separate offense. *Id.*

**The No-Permit Gap**

101. Section 2 of Ordinance No. 260163 provides: "This Ordinance shall be effective November 12, 2026, except that Section 9-6703 ('Permitted Sale of Intoxicating Substances') shall take effect upon the issuance of regulations by the Department." *Id.*

102. Those aforementioned regulations do not exist.

103. The Ordinance sets no date by which the Department must propose, adopt, or issue those regulations. *Id.* It supplies no default procedure through which a retailer may apply if regulations have not issued by November 12, 2026. *Id.*

104. As a result, on November 12, 2026, Section 9-6702's prohibitions and Section 9-6704's daily penalties become operative even if Section 9-6703 remains inoperative and no permit can be applied for, processed, or granted. That gap is another indefinite total ban.

105. The Ordinance contains no grandfathering, preexisting use provisions for an existing lawful retailer, no transition period for existing inventory or leases, no variance or waiver procedure, and no mechanism for recognition of a lawful previously approved nonconforming retail use.



Case ID: 261101288
Control No.: 26112521

**The Setbacks and Geographic Zone Exclusions**

106. Even after regulations issue, the overlapping 500-foot setbacks and 184 designated-zone exclusions, when mapped across Philadelphia, leave virtually no commercially viable retail locations. Upon information and belief, applying those exclusions to PAHAA's members' current stores makes PAHAA's members ineligible for permits at those locations and effectively requires Plaintiffs to cease their Philadelphia operations.

107. The setbacks and geographic use restrictions are not tied to individualized evidence concerning PAHAA's members' stores, products, operating practices, or history. *See id.* The Ordinance provides no process through which Plaintiffs can show that a particular location poses no material risk or that tailored operating conditions would address any identified concern. *See id.*

108. PAHAA's members, including MNG, have operated as lawful retailers and have developed substantial, reasonable investment-backed expectations in the continued use of their stores, inventory, leases, goodwill, and compliance systems, subject to lawful health and safety regulation.

109. PAHAA's members purchase and receive hemp and kratom products and related products through interstate channels of trade.

110. The Ordinance will prevent or materially burden those interstate transactions and will strand inventory lawfully acquired for retail sale.

111. To prepare for the November 12, 2026 effective date, PAHAA's members must make immediate and costly decisions about inventory, purchasing, staffing, lease obligations, relocation, and store closure. Injuries from these decisions are concrete and imminent and are directly traceable to Defendants' implementation and threatened enforcement of the Ordinance.



Case ID: 261101288
Control No.: 26112521

112. Without judicial relief, PAHAA's members face the closure of stores, loss of trained employees, customers and goodwill, impairment of contractual relationships, stranded inventory, unrecoverable compliance and buildout costs, and exposure to daily fines and other enforcement measures.

113. Each of PAHAA's members' Philadelphia stores, including MNG's three Stores, falls within one or more of the 500-foot setbacks or 184 designated-area exclusions, so the Ordinance bars their continued lawful retail use and will force them to close.

114. The Ordinance was not enacted as an amendment to the Philadelphia Zoning Code (Title 14 of The Philadelphia Code) and, upon information and belief, was not subjected to the review and procedures that apply to zoning legislation, including review and recommendation by the Philadelphia City Planning Commission. *See* Sec. 14-301(3) (c)(.2).

**The Ordinance Exempts Alcohol**

115. Section 9-6701(9) of the Bill defines "Intoxicating Substance" to mean "[a]ny Intoxicating Hemp Product or Kratom Product." *See* Phila., Pa., Bill No. 260163 § 9-6701(4) (June 4, 2026) (signed Sept. 15, 2026). Alcohol is not included as an "Intoxicating Substance" in the Ordinance.

116. Alcohol, however, is clearly an "intoxicating substance". It affects the central nervous system and can impair judgment, coordination, reaction time, perception, and decision-making

117. Products containing alcohol, an inherently intoxicating substance, are not required to carry QR codes linking consumers to batch-specific laboratory analyses.



Case ID: 261101288
Control No.: 26112521

118. By contrast, many hemp and kratom products, such as Plaintiffs' members products, already provide consumers with direct access to third-party test results through QR-code-enabled Certificates of Analysis.

119. According to the Center for Disease Control ("CDC"), alcohol use can lead to well documented health issues such as:

- Injuries—motor vehicle crashes, falls, drownings, and burns.
- Violence—homicide, suicide, sexual violence, and intimate partner violence.
- Alcohol poisoning—high blood alcohol levels that affect body functions like breathing and heart rate.
- Overdose—from alcohol use with other drugs, like opioids.
- Sexually transmitted infections or unplanned pregnancy—alcohol use can lead to sex without protection, which can cause these conditions.
- Miscarriage, stillbirth, or fetal alcohol spectrum disorder (FASD)—from alcohol use during pregnancy;
- Cancer;
- High blood pressure.
- Heart disease.
- Liver disease.
- Stroke.
- Alcohol use disorder—this affects both physical and mental health.
- Digestive problems.
- Weaker immune system—increasing your chances of getting sick.
- Mental health conditions, including depression and anxiety.
- Learning problems, and issues at school or work.
- Memory problems, including dementia.
- Relationship problems with family and friends

*See* Ctrs. for Disease Control & Prevention, *About Alcohol Use*, https://www.cdc.gov/alcohol/about-alcohol-use/index.html (last visited Nov. 6, 2026).

120. Again, according to the CDC:

- Young people (ages 12-20) in the United States use alcohol **more than other drugs**.
  - Drinking can have serious effects on their health and well-being.
  - Underage drinking can also put their safety—and the safety of those around them—at risk.



Case ID: 261101288
Control No.: 26112521

- People who are younger than 21 should not drink any alcohol.

*See* Ctrs. for Disease Control & Prevention, *Community Strategies to Prevent Underage Drinking*, https://www.cdc.gov/alcohol/underage-drinking/community-strategies.html (last visited Nov. 6, 2026) (emphasis added).

121. And, according to CDC data (*emphasis added*):

> Excessive alcohol use causes about **4,000** deaths among young people (under 21) each year. These deaths are from several alcohol-related causes, such as:
>
> - Motor vehicle crashes.
> - Violence and other injuries.
> - Suicide.
> - Drug overdoses.
> - Health issues from being exposed to alcohol during pregnancy.

*Id*.

122. CDC recommended solutions include a) reducing the number of outlets that sell alcohol b) increasing the distances between them, making alcohol more expensive through taxes and d) enforce laws currently on the books. *Id.*

123. And, while alcohol comes with warnings, it does not come with ingredient labels, COA analysis or dosing.

124. A high-profile example of the consumer health concerns because of the lack of transparency in alcohol are the tequila class actions against brands such as Casamigos and Don Julio where it is alleged that despite labels representing the products are made from 100% pure blue weber agave, independent laboratory testing found that they actually contain cane alcohol and cheaper alcohol substitutes.

125. In another example of the lack of transparency in the alcohol industry, a recent peer reviewed study found unacceptable amounts of PFAs (forever chemicals) in a number of different



Case ID: 261101288
Control No.: 26112521

beers. *See* Jennifer Hoponick Redmon *et al.*, *Hold My Beer: The Linkage Between Municipal Water and Brewing Location on PFAS in Popular Beverages*, 59 **Env't Sci. & Tech.** 8368 (2025).

126. Pennsylvania law does not bar municipalities from prohibiting the retail sale of alcohol. To the contrary, the Liquor Code's local-option provision authorizes the electors of any municipality to prohibit the granting of liquor licenses, malt and brewed beverage licenses, and the operation of State liquor stores within the municipality. 47 P.S. § 4-472(a). The Liquor Code also expressly preserves municipalities' authority to regulate zoning and to enforce local ordinances dealing with health and welfare issues. 47 P.S. § 4-493.1(a).

127. Pennsylvania municipalities have made extensive use of that authority. Upon information and belief, approximately 675 Pennsylvania municipalities are "dry" or partially "dry," prohibiting some or all retail alcohol sales within their borders, according to the Pennsylvania Liquor Control Board's list of dry municipalities See Pennsylvania Liquor Control Board website at https://www.pa.gov/agencies/lcb/licensing/resources-for-licensees/quota-system/wet-and-dry-municipalities.

128. The City has the ability to but has not sought to prohibit, or to impose comparable bans, exclusions or regulations on, the retail sale of alcohol. Alcohol may be sold throughout the City, including within the 184 corridors and districts in which the Ordinance forbids Plaintiffs to operate.

129. Scientific and public-health data show that hemp and kratom products, sold as PAHAA's members sell them, disclose ingredients, provide testing results so consumers can see impurity testing results, and present, at most, no greater risk of abuse or harm to individuals or the community, than the risk presented by alcohol.



Case ID: 261101288
Control No.: 26112521

130. MNG, PAHAA, and its members will continue to comply with their self-regulations. They will not sell products containing 7-OH (other than that occur naturally in natural leaf kratom in trace amounts) and their hemp products will comply with the definition of hemp in the 2018 Farm Bill, 7 USC 1639o(1) as amended from time to time.

131. Specifically, in addition to continuing to require identification from any customer who appears to be under thirty (30), using continue accredited independent third-party laboratory testing of every product it sells, and labeling every product, MNG is prepared to raise its minimum age to twenty-one (21) for all intoxicating hemp-derived and kratom products and will not sell any covered product to anyone under 21.

132. Moreover, Plaintiffs will continue to test for alkaloids and cannabinoids and provide ingredient labels and certificates of analysis.

**<u>The Legislative Record</u>**

133. The legislative record shows that PAHAA's members' businesses and products were not the issue.

134. Councilwoman Richardson's comments, detailed above, evidence a disregard for the legitimate business and services of PAHAA members.

135. The concerns from physicians who testified had to do with unregulated sales and sales tactics-such as selling intoxicating hemp products disguised as kids treats to unsuspecting minors. Committee Hearing Transcript at 54:19-62:23.

136. Supporting community activists, physicians, and industry experts called for regulation—not a ban-especially a ban that affects the rights of adult consumers. *Id.* at 64:2-16, 79:1-85:3, 124:10-131:21, 147:5-151:19, 205:11-211:10.



Case ID: 261101288
Control No.: 26112521

137. Pennsylvania Cannabis Coalition (i.e. Big Cannabis), a trade group representing Marijuana sellers, competitors with Plaintiffs, came out to trash hemp products-their competition. Id. at 141:2-146:19. Ignoring the fact the Bill was an obvious ban, this representative applauded the Bill because she characterized it as regulatory so consumers know what they put in their bodies and have confidence that the products are not being marketed to children. *Id.*

138. A supporting physician attributed the rise in kratom-related poison-center calls to "concentrated" 7-hydroxymitragynine ("7-OH") products-not natural leaf kratom. *Id.* at 51:21-52:8.

139. Another emergency room physician also argued for regulation of kratom-pointing out that he had no experience with minor's inadvertently overdosing on kratom and the incidence of adult overdose was low. *Id.* at 124:10-129:8. He pointed to the beneficial uses of kratom-especially for those wishing to stop using opioids-when used properly. *Id.* 130:13-131:21.

140. Council was told in clear and unmistakable terms that its FDA approval condition could never be met by any of these products because that approval pathway was only for drugs marketed as drugs-not for supplements. *Id.* at 207:17-20. Council was told that the proposed regulatory condition in the Bill made it a *de facto* ban. *Id.* at 208:9-12.

141. The City chose prohibition over regulation it could not enforce. Asked whether it had the resources to implement the Bill, the Department of Public Health answered, "Not currently." *Id.* at 35:21-36:6. The Bill sponsor conceded that "it would be nearly impossible for the City of Philadelphia to test every single product." *Id.* at 214:11-14.

142. PAHAA's members' products and practices essentially already address each stated harm. Independent testing addresses potency by testing for cannabinoids and alkaloids, ingredients, dosage, and warning labels and QR-codes provide consumer access to accredited

third-party lab results[3]; age gates and verification addresses youth access; members do not sell concentrated or synthetic 7-OH; and members operate licensed, fixed-location stores that are not sources of crime.

143. The Ordinance itself contains measures tailored to those harms: a two-percent cap on 7-OH, a ban on synthetic alkaloids, testing and labeling requirements, and a twenty-one-and-over age limit. But Section 9-6702(3), together with the no-permit gap and geographic exclusions, makes those measures meaningless by banning tested, labeled, age-restricted products along with the unregulated products that prompted the legislation.

144. Other lawmakers addressing the same concerns have distinguished between concentrated or synthetic 7-OH products and natural-leaf kratom. For example, legislation pending in Pennsylvania and New Jersey would prohibit 7-OH products without prohibiting natural-leaf kratom, and federal legislation introduced in September 2026 would specifically schedule synthetic 7-OH products above a specified threshold rather than kratom generally. See H.R. 10272, 119th Cong. (2026).

145. The Bill's own supporters distinguished PAHAA's members' products from those that prompted it. A Penn Medicine addiction physician testified that today's "highly concentrated extracts" are "far removed from the traditional leaf product." Committee Hearing Transcript at 50:23-51:3. And the Department of Public Health acknowledged that it "does not currently regulate kratom products." *Id.* at 35:21-24.

146. Opponents of the enactment of the Ordinance were many and vocal.

---

[3] By way of example, a certificate of analysis for every one of MNG's products can be found at it web site test results page :https://shopcbdkratom.com/pages/test-results?srsltid=AYCX9vLntxWL06uzFlitxqOisGVkM7vfhsSLYDJne8Qx5uWXvqfHhXng.



Case ID: 261101288
Control No.: 26112521

147. They pointed out to the Council during the June 4, 2026 meeting where it was presented for a vote that:

a. The Council was ignoring the science;

b. That kratom is only a partial agonist, meaning that while it affects the mu opioid receptor in the brain, it does not cause respiratory depression like opioids-much like chocolate and cheese;

c. It has many health and life saving benefits such as pain relief and help with addiction recovery;

d. That the Council was engaged in a smear campaign by linking legitimate adult kratom use for wellness benefits to crime and addiction; and

e. That one would not even recognize kratom users as they pass them on the street because they are fully functioning, productive members of society.

*See* Philadelphia City Council, Stated Meeting Tr. 235-38 (June 4, 2026) at 157:3-201:20.

148. One opponent said that as a person in recovery from substance use disorder, natural leaf kratom had saved his life and the life of countless others. *Id.* at 170:9-19.

149. The Council was in fact invited to visit one of the several CBD Kratom shops in the city to see that they are not the source of crimes or misdemeanors. *Id.* at 195:18-22.

150. The Council enacted the Bill knowing that Section 9-6702(3) would ban natural leaf kratom. The Global Kratom Coalition testified that the provision "risks functioning as a *de facto* ban on all natural kratom products," because Section 505 of the Federal Food Drug and Cosmetics Act is a drug-approval pathway that "no botanical product could meet," and that "this single regulation nullifies" the Bill's tailored safety provisions. Committee Hearing Transcript at 147:5-151:19.



Case ID: 261101288
Control No.: 26112521

151. The sponsor responded that her circulated amendments "will be all the amendments that we are considering at this time." *Id.* at 171:15-18. The Committee then approved the amendments and reported the Bill favorably without opposition. *Id.* at 235:19-238:14. At the June 4, 2026 Stated Meeting, after public comment urging Council to "remove the unregulated FDA requirements," Council passed the Bill 16 to 0 without doing so. *Id.* at 192:18-24, 235:15-238:15.

152. Council was provided a draft of legislation to regulate hemp and made aware of the KCPA, both of which address the concerns stated by the Ordinance's sponsor while at the same time permitting lawful businesses like Plaintiffs to remain open. They were ignored.

153. The amendments essentially proposed keeping the regulatory provisions of the Ordinance but removing the bans, the setbacks and the exclusionary zones.

**COUNT I— SUBSTANTIVE DUE PROCESS (Pa. Const. art. I, § 1)**

154. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

155. Article I, Section 1 of the Pennsylvania Constitution guarantees the inherent and indefeasible rights of acquiring, possessing, and protecting property and of pursuing one's own happiness, which include the right to engage in a lawful business or occupation.

156. A substantive due process challenge under the Pennsylvania Constitution is subject to means-end review, in which the court weighs the rights infringed by the law against the interest sought to be achieved and scrutinizes the relationship between the means and that end.

157. Under Pennsylvania's rational basis test a law that purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained, and the government may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.



Case ID: 261101288
Control No.: 26112521

158. The Ordinance fails that test. It is unduly oppressive and patently beyond the necessities of the case because it forces the closure of the PAHAA members' established Stores and effectively bans a lawful business citywide, when the Ordinance's own permit, testing, labeling, and age-restriction provisions demonstrate that the City's asserted concerns can be addressed by regulation short of a de facto ban.

159. The Ordinance's means lack a real and substantial relation to its stated objective of addressing intoxicating substances because it exempts alcohol, an intoxicating product of comparable or greater harm, and because its indefinite no-permit gap and near-total geographic exclusions bear no relationship to the safety of any particular product, store, or retailer.

160. The Ordinance is also patently beyond the necessities of the case because it prohibits products that already meet the City's stated safety objectives: PAHAA's members' products essentially meet the Ordinance's stated regulations-they are independently tested, fully labeled, digitally linked to accessible laboratory results, and sold only to age-verified adults.

161. To the extent that MNG or any other PAHAA member does not comply with the Ordinance's safeguards, MNG will comply with objectives of the Ordinance: MNG will raise its minimum age to twenty-one (21) for all intoxicating hemp-derived and kratom products, will not sell any covered product to anyone under 21, and will keep requiring identification from any customer who appears to be under thirty (30).

162. Moreover, MNG will not sell any kratom product containing 7-OH (other than that occurring naturally in natural-leaf kratom in trace amounts) and their hemp products will comply with the definition of hemp in the 2018 Farm Bill, 7 USC 1639o(1) as amended from time to time.



Case ID: 261101288
Control No.: 26112521

163. Prohibiting compliant products along with noncompliant ones imposes an unusual and unnecessary restriction on a lawful occupation and discards the lawful market to reach its unlawful fringe.

164. The Ordinance therefore violates Article I, Section 1 of the Pennsylvania Constitution on its face and as applied to Plaintiffs, and Plaintiffs are entitled to declaratory and injunctive relief.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that Bill No. 260163 is void or in the alternative grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees and costs;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT II — STATE-LAW PREEMPTION (Pennsylvania Law)**

165. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

166. Pennsylvania has established a comprehensive statewide framework governing industrial hemp through Act 92 of 2016, as amended, and related statewide statutes, regulations, licensing, testing, cultivation, processing, and enforcement requirements.



Case ID: 261101288
Control No.: 26112521

167. That framework reflects the Commonwealth's decision to regulate hemp on a uniform statewide basis and occupies the field or alternatively establishes state policies with which a municipality may not conflict.

168. The Ordinance conflicts with that statewide framework by redefining and prohibiting categories of hemp products by reference to evolving federal exclusions, imposing local testing and labeling conditions, and functionally excluding lawful hemp commerce from Philadelphia.

169. The First Class City Home Rule Act and the Philadelphia Home Rule Charter do not authorize the City to exercise powers contrary to, or preempted by, laws of statewide application. See 53 P.S. § 13133.

170. The Ordinance frustrates the General Assembly's objective of a uniform Commonwealth hemp regime and subjects state-authorized market participants and products to inconsistent local prohibitions.

171. Consumable products containing hemp or kratom are also governed by the Commonwealth's food-safety statutes on adulterated and misbranded food, including 3 Pa.C.S. § 5723 *et seq.*

172. The General Assembly has occupied this field. Alternatively, the Ordinance irreconcilably conflicts with state law and stands as an obstacle to the full purposes and objectives of the General Assembly.

173. Bill No. 260163 and Chapter 9-6700 are therefore preempted and invalid under Pennsylvania law, at least insofar as they regulate hemp products within the field occupied by, or in conflict with, the Commonwealth's hemp framework.



Case ID: 261101288
Control No.: 26112521

174. Plaintiffs are entitled to a declaration that the preempted provisions are invalid and to preliminary and permanent injunctive relief against their implementation and enforcement.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees and costs;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT III— EQUAL PROTECTION (Pa. Const. art. I, §§ 1 and 26)**

175. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

176. Article I, Sections 1 and 26 of the Pennsylvania Constitution guarantee equal protection of the laws and prohibit the Commonwealth and its political subdivisions from denying any person the enjoyment of a civil right or discriminating against any person in the exercise of a civil right.

177. The Ordinance classifies retailers of adult-use intoxicating products by product type. It singles out retailers of hemp and kratom products for a functional prohibition while leaving retailers of alcohol, an intoxicating adult-use product that presents comparable or greater risks, free to operate throughout the City, including in every area from which Plaintiffs are excluded.



Case ID: 261101288
Control No.: 26112521

178. The distinction cannot be justified on the ground that the City lacks authority over alcohol. Pennsylvania law authorizes municipalities to prohibit retail alcohol sales and preserves local health and welfare ordinances, and numerous Pennsylvania municipalities restrict or prohibit such sales. 47 P.S. §§ 4-472(a), 4-493.1(a).

179. Plaintiffs and alcohol retailers are similarly situated with respect to the Ordinance's stated purpose of regulating intoxicating products sold to adults. The classification lacks a reasonable ground of difference with a fair and substantial relationship to that purpose and is arbitrary under Pennsylvania's less deferential standard.

180. The Ordinance therefore denies Plaintiffs equal protection under the Pennsylvania Constitution on its face and as applied, and Plaintiffs are entitled to declaratory and injunctive relief.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.



Case ID: 261101288
Control No.: 26112521

**COUNT IV— INVALID *DE FACTO* ZONING AND DEPRIVATION OF PROPERTY RIGHTS (Pa. Const. art. I, § 1; Pennsylvania Law)**

181. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

182. Although styled as a licensing ordinance, the Ordinance's 500-foot setbacks and 184 designated-area exclusions dictate which uses may occur on which parcels of land within the City. The Ordinance therefore regulates the use of real property and operate as zoning in substance.

183. The sponsor confirmed the Ordinance's land-use purpose, describing its targets as shops that "operate without community zoning approval" and that "apply to be a grocery or a convenience store" before selling these products—"a cat-and-mouse game." Comm. Tr. at 21, 103–04.

184. Because zoning restricts and deprives a property owner of constitutionally protected property rights, it "can be sustained only if it is clearly necessary to protect the health or safety or morals or general welfare of the people." *Hopewell Twp. Bd. of Supervisors v. Golla*, 452 A.2d 1337, 1342 (Pa. 1982).

185. The Ordinance's location-based exclusions are not clearly necessary to protect the public. They eliminate virtually every commercially viable location in the City, are not tied to any evidence concerning Plaintiffs' Stores, and are not imposed on alcohol retailers whose products present comparable or greater risks.

186. Each of PAHAA's members' Philadelphia stores, including MNG's three Stores, is an existing, lawful use. Under Pennsylvania law, the right to continue a lawful use that predates a restrictive land-use regulation is constitutionally protected, and a municipality may not extinguish it without compensation, including through forced amortization. *See PA Northwestern Distributors, Inc. v. Zoning Hearing Bd.*, 584 A.2d 1372 (Pa. 1991).



Case ID: 261101288
Control No.: 26112521

187. The Ordinance contains no grandfathering, nonconforming-use, variance, or transition provision, and would immediately terminate the lawful use by MNG and the other members of PAHAA. In addition, by imposing land-use restrictions outside the Philadelphia Zoning Code and Charter, and their required procedures, the City has evaded the procedural protections that govern zoning legislation.

188. The Ordinance's exclusions are therefore invalid and unconstitutional under Article I, Section 1 of the Pennsylvania Constitution, on their face and as applied to Plaintiffs' stores. Plaintiffs are entitled to declaratory and injunctive relief, including a declaration that their stores may continue as lawful existing uses.

189. The Ordinance also, while clearly a zoning ordinance with setbacks and exclusionary zones that dictate uses of property, was not passed according the procedural requirements and safeguards for a zoning ordinance including, but not limited to, submission to the planning commission, public hearings and variances for pre-existing uses.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees and costs;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and



Case ID: 261101288
Control No.: 26112521

Grant such other and further relief as the Court deems just and proper.

**COUNT V INVALID *DE FACTO* ZONING AND DEPRIVATION OF PROPERTY RIGHTS BASED UPON IMPROPER NOTICE**
**(Pa. Const. art. I, § 1; Pennsylvania Law)**

190. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

191. As alleged , the Ordinance's setbacks and designated-area exclusions regulate the use of land and operate as zoning in substance.

192. The Ordinance is designated Chapter 9-6700 of The Philadelphia Code, a chapter already occupied by the restaurant ordinance enacted by Bill No. 250888-A, approved January 7, 2026, and effective April 7, 2026.

193. The restaurant ordinance was in force during the debate and passage of Bill No. 260163 and remains in force. The duplicate numbering makes it impossible for the public or Plaintiffs to accurately research or address the terms of the Ordinance.

194. Based upon the failure of the Ordinance to provide proper notice to the public, the Ordinance is void *ab initio*. *Kelly v. City of Philadelphia*, 382 Pa. 459 (1955).

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under;



Case ID: 261101288
Control No.: 26112521

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT VI — EQUAL PROTECTION**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**

195. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

196. The Ordinance expressly classifies businesses based on whether they sell "Intoxicating Substances".

197. It then defines that term to include Plaintiffs' product but to exclude alcohol.

198. Alcohol is a comparator product that presents at least comparable but more likely greater risks relating to intoxication, misuse, dependency, contamination, or youth access, yet their retailers remain eligible to operate under materially less prohibitory retail and location regimes.

199. Plaintiffs are similarly situated to those retailers in relevant respects, including retail sales to adult consumers, product-safety obligations, age-verification concerns, and the City's ability to address risks through licensing, testing, labeling, inspections, and enforcement.

200. The Ordinance's disparate treatment is not rationally related to its stated ends because less restrictive and more tailored rules are available and because the Ordinance's own permit provisions recognize that regulated sale can be lawful.

201. The classification sweeps together tested, labeled, age-restricted products and the unregulated, contaminated, or synthetic products that prompted the Ordinance, and treats them identically, even though only the latter present the harms the City identified.

202. There is no rational basis for imposing a functionally citywide exclusion and an indefinite no-permit period uniquely on hemp and kratom retailers while permitting comparator businesses to operate through ordinary licensing and compliance mechanisms.



Case ID: 261101288
Control No.: 26112521

203. The classification here is also based on mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable which fails rational basis review. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); and *W. Easton Two, LP v. Borough Council of W. Easton*, 489 F. Supp. 3d 333, 370 (E.D. Pa. 2020).

204. PAHAA's members are similarly situated to the City's alcohol retailers in every material respects relevant to the Ordinance's stated purpose of regulating "intoxicating substances" sold to adults:

- Both sell age-restricted, intoxicating products to adults.
- Both raise the same asserted concerns about youth access and misuse, and the City can address both through licensing, testing, labeling and enforcement.
- Alcohol's documented harms (intoxication, abuse, impaired driving, injury, and death) are comparable to, or greater than, those of PAHAA's members' tested, labeled products.

Yet alcohol may be sold throughout the City, including most if not all of the 184 corridors and districts from which PAHAA's members are barred, and Pennsylvania law subjects new alcohol licenses near schools only to a discretionary 300-foot review.

205. The Ordinance was also passed in a state of unsubstantiated and hysterical fears and animus.

206. By way of example, the sponsor referred to sellers as "illegal smoke shops" that "fuel crime" and "operate without community zoning approval".



Case ID: 261101288
Control No.: 26112521

207. None of those concerns describes PAHAA's members, including MNG, which are licensed, fixed-location retailers selling only tested, labeled, natural-leaf products to age-verified adults.

208. By banning Plaintiffs' products because of fears about other sellers and other products, the City has extended to lawful, compliant businesses the "vague, undifferentiated fears" that *Cleburne, and its progeny* holds cannot justify unequal treatment.

209. The Ordinance also undercuts its own rationale: its 7-OH cap, synthetic-alkaloid ban, testing, labeling, and age provisions show that regulated sale serves the City's goals, yet its FDA condition, no-permit gap, and geographic exclusions ban the very products those provisions regulate.

210. Council was warned of this result and enacted the Ordinance anyway. A classification that treats tested, labeled, age-restricted products the same as the unregulated, synthetic products that prompted the legislation, while exempting the more harmful product, alcohol, is not rationally related to any legitimate governmental interest and denies Plaintiffs equal protection of the laws.

211. Plaintiffs are thus entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT VII — SUBSTANTIVE DUE PROCESS**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**

212. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

213. The Fourteenth Amendment prohibits a municipality, acting under color of state law, from arbitrarily depriving a person of liberty or property.

214. Plaintiffs possess protected liberty and property interests in pursuing their lawful occupations and in the lawful use of their stores, leases, inventory, business assets, and established operations, subject to lawful regulation.

215. The Ordinance's timing structure is arbitrary and irrational because it activates prohibitions and daily penalties on a fixed date while postponing the only permit pathway until an event for which the City imposed no deadline.

216. The Ordinance's own permit, testing, and labeling provisions presuppose that compliant sales can occur consistently with public health and safety. Yet the regulatory gap makes such sales categorically impossible for an indefinite period regardless of a retailer's practices or a product's safety.



Case ID: 261101288
Control No.: 26112521

217. The Ordinance's prohibitions also reach products, like PAHAA's members' products that are independently tested, fully labeled, and sold only to adults, and therefore do not present the dosing, youth-access, or synthetic-concentrate harms on which the City relied. Prohibiting such products does not advance the City's stated objectives at all.

218. The cumulative geographic exclusions likewise bear no substantial, rational or any relationship to the asserted regulatory purpose insofar as they eliminate virtually every commercially viable site and operate as a *de facto* ban rather than a location-based safety regulation.

219. The undefined medical-marijuana-permit condition and absence of any variance or transition mechanism further disconnect the Ordinance's means from its asserted ends.

220. The challenged structure is not rationally related to a legitimate governmental interest, is arbitrary and oppressive, and violates substantive due process on its face and as applied to Plaintiffs.

221. Defendants will act under color of state law in implementing and enforcing the Ordinance, which is an official policy of the City. Plaintiffs are entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

222. The Ordinance's deprivation of Plaintiffs' interests is so arbitrary and egregious that it shocks the conscience.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT VIII — PROCEDURAL DUE PROCESS**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**

223. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

224. Plaintiffs have cognizable property interests in their existing lawful business operations, leases, inventory, commercial licenses, established locations, and associated goodwill, as well as in avoiding the imposition of daily civil penalties without constitutionally adequate procedures.

225. The Ordinance deprives PAHAA's members of those interests by rendering their current locations ineligible, foreclosing covered sales during an indefinite no-permit period, and threatening penalties and nuisance enforcement.

226. The Ordinance affords PAHAA's members no individualized notice or hearing before that deprivation, no operative application process during the regulatory gap, and no opportunity to demonstrate compliance through existing safety measures.



Case ID: 261101288
Control No.: 26112521

227. The Ordinance provides no grandfathered status, variance, waiver, transition procedure, or meaningful opportunity to challenge the application of the geographic exclusions to PAHAA's members' existing locations before closure or penalties.

228. The risk of erroneous or arbitrary deprivation is substantial because eligibility depends on extensive geographic rules, an undefined "if required" medical-marijuana condition, and regulations not yet issued, while additional or alternative procedures would impose minimal administrative burdens.

229. Post-enforcement review cannot adequately remedy the loss of an ongoing business, customer goodwill, leasehold value, and market position caused by forced closure.

230. Defendants' threatened deprivation of Plaintiffs' protected interests without constitutionally sufficient notice and opportunity to be heard violates procedural due process. Plaintiffs are entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;



Case ID: 261101288
Control No.: 26112521

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT IX — DORMANT COMMERCE CLAUSE (U.S. Const. art. I, § 8, cl. 3)**

231. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

232. The Commerce Clause protects the national market against local laws that impose burdens on interstate commerce clearly excessive in relation to their putative local benefits.

233. Hemp and kratom products move through interstate markets. MNG and other PAHAA members purchase covered products from outside Pennsylvania and receive them in Philadelphia for lawful retail sale.

234. By creating an indefinite period in which no retailer can obtain the permit contemplated by the Ordinance and by eliminating virtually all commercially viable retail sites, the Ordinance forecloses or materially reduces the Philadelphia market for interstate hemp and kratom products.

235. The resulting burdens include lost interstate sales, stranded inventory, disrupted supplier relationships, increased distribution and relocation costs, and exclusion of lawful out-of-state products from a major local market.

236. Those burdens are clearly excessive in relation to any putative local benefit because the City can advance consumer safety through materially less burdensome alternatives, including a timely permit process, product testing, accurate labeling, age verification, inspections, tailored location rules, and enforcement against adulterated or mislabeled products.

237. The Ordinance's permit provisions themselves identify workable regulatory alternatives and confirm that an indefinite and geographically comprehensive prohibition is unnecessary.



Case ID: 261101288
Control No.: 26112521

238. The Ordinance therefore violates the dormant Commerce Clause, on its face and as applied to Plaintiffs. Plaintiffs are entitled to declaratory and injunctive relief.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT X — VOID FOR VAGUENESS**
**(U.S. Const. amend. XIV)**

239. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

240. Due process requires a law carrying civil penalties and business-closing consequences to provide fair notice of the conduct it prohibits and objective standards sufficient to prevent arbitrary or discriminatory enforcement.

241. Section 9-6702(3) prohibits sale of an intoxicating substance "not considered appropriate for use as a dietary supplement or a safe food additive" but does not identify who must

do the considering, what evidence controls, when that judgment occurs, or how a retailer can determine whether a particular product satisfies the standard.

242. The cited provisions of the Federal Food, Drug, and Cosmetic Act do not convert the phrase "considered appropriate" into a clear, administrable rule for retailers or enforcement officers.

243. The Ordinance also incorporates by reference federal hemp definitions and "Exclusions" that may change over time, without stating which version governs, how changes will be communicated, or what transition period applies.

244. The phrase "if required" in the medical-marijuana-permit prerequisite similarly fails to identify the circumstances under which an otherwise lawful hemp or kratom retailer must hold a medical marijuana dispensary permit.

245. This phrase is ambiguous and in one reasonable interpretation makes the subject permits conditional upon regulations that do not exist yet.

246. These ambiguities leave Plaintiffs unable to determine in advance which inventory may lawfully be sold and invite inconsistent, subjective, and arbitrary enforcement backed by daily penalties.

247. Sections 9-6701(4), 9-6702(1), 9-6702(3), and the related permit criteria are unconstitutionally vague on their face and as applied to Plaintiffs. Plaintiffs are entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;



Case ID: 261101288
Control No.: 26112521

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT XIII — REGULATORY TAKING**
**(U.S. Const. amends. V and XIV; 42 U.S.C. § 1983)**

248. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

249. The Takings Clause, applicable to the City through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation.

250. PAHAA's members, including MNG, hold cognizable property interests in their leaseholds, inventory, fixtures, buildouts, equipment, and other assets committed to their Philadelphia retail locations.

251. Plaintiffs made substantial investments in reasonable reliance on the lawful status of their businesses and products, including long-term leases, store improvements, inventory, testing, labeling, training, and compliance systems.

252. The Ordinance's indefinite no-permit gap and geographic exclusions deprive those property interests of economically viable use for their intended retail purpose, strand inventory, and destroy or severely impair the value of location-specific improvements and leaseholds.



Case ID: 261101288
Control No.: 26112521

253. The economic impact on Plaintiffs is severe; the Ordinance interferes with distinct and reasonable investment-backed expectations; and the character of the governmental action is functionally equivalent to appropriating the value of Plaintiffs' established retail use for a public regulatory purpose while singling out a narrow class of businesses.

254. The Ordinance provides no amortization period, grandfathering, transferable development right, alternative site, compensation procedure, or other mechanism to mitigate that burden.

255. Plaintiffs' property rights include their ownership and leasehold interests in their locations and businesses, the right to use and enjoy those locations for the retail purposes for which they were acquired, and their investment-backed expectations.

256. As applied to Plaintiffs, the Ordinance effects a regulatory taking without just compensation in violation of the Fifth and Fourteenth Amendments. Plaintiffs are entitled to all relief available under 42 U.S.C. § 1983, including a declaration of unconstitutionality, appropriate injunctive relief, and nominal damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

*/s/ Patrick C. Campbell, Jr.*
Patrick C. Campbell, Jr.
PA State Bar No. 53350
565 E. Swedesford Road, Suite 303
Wayne, Pennsylvania 19087
215.977.4100

*Attorneys for Plaintiffs*

Dated: November 10, 2026



Case ID: 261101288
Control No.: 26112521

**VERIFICATION**

I, Craig Katz, hereby state I am employed by Plaintiff MNG 2005, Inc. as its Government Relations and Compliance Manager and authorized to make this verification on its behalf. While the forgoing document was prepared by counsel, and thus the language contained therein is that of counsel, the facts set forth in the document are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the provisions of 18 Pa.C.S.A. §4904 relating to unsworn falsifications to authorities.

Craig Katz

**Dated:** 11/6/2026

2

# EXHIBIT "A"

**U.S. Department of Justice**
Drug Enforcement Administration
8701 Morrissette Drive
Springfield, Virginia 22152

*www.dea.gov*

September 15, 2021

Donna C. Yeatman, R.Ph.
Executive Secretary
Alabama Board of Pharmacy
111 Village Street
Birmingham, Alabama 35242

Dear Dr. Yeatman:

This is in response to your letter dated August 19, 2021, in which you request the control status of delta-8-tetrahydrocannabinol ($\Delta^8$-THC) under the Controlled Substances Act (CSA). The Drug Enforcement Administration (DEA) reviewed the CSA and its implementing regulations with regard to the control status of this substance.

$\Delta^8$-THC is a tetrahydrocannabinol substance contained in the plant *Cannabis sativa L.* and also can be produced synthetically from non-cannabis materials. The CSA classifies tetrahydrocannabinols as controlled in schedule I. 21 U.S.C. 812, Schedule I(c)(17); 21 CFR § 1308.11(d)(31). Subject to limited exceptions, for the purposes of the CSA, the term "tetrahydrocannabinols" means those "naturally contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the substances contained in the cannabis plant and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant." 21 CFR § 1308.11(d)(31). Thus, $\Delta^8$-THC synthetically produced from non-cannabis materials is controlled under the CSA as a "tetrahydrocannabinol."

The CSA, however, excludes from control "tetrahydrocannabinols in hemp (as defined under section 1639*o* of Title 7)." Hemp, in turn, is defined as "the plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol [($\Delta^9$-THC)] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. 1639*o*(1).

Accordingly, cannabinoids extracted from the cannabis plant that have a $\Delta^9$-THC concentration of not more than 0.3 percent on a dry weight basis meet the definition of "hemp" and thus are not controlled under the CSA. Conversely, naturally derived cannabinoids having a $\Delta^9$-THC concentration more than 0.3 percent on a dry weight basis is controlled in schedule I under the CSA as tetrahydrocannabinols.[1]

[1] The Agricultural Improvement Act of 2018 (AIA), Pub. L. 115-334, § 12619, amended the CSA to remove "tetrahydrocannabinols in hemp" from control. See 21 U.S.C. § 812, Schedule I(c)(17). As noted, however, "hemp" is defined to "mean the *plant* Cannabis sativa L. and *any part of that plant*, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9-tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. 1639o (emphasis added). Thus, only tetrahydrocannabinol in or derived from the cannabis plant—not synthetic tetrahydrocannabinol—is subject to being excluded from control as a "tetrahydrocannabinol[] in hemp."

Case ID: 261101288
Control No.: 26112521

If you have any further questions, please contact the Drug and Chemical Evaluation Section at DPE@usdoj.gov or (571) 362-3249.

Sincerely,

Terrence L. Boos, Ph.D., Chief
Drug & Chemical Evaluation Section
Diversion Control Division

cc: Birmingham Office

# EXHIBIT "B"

# City of Philadelphia

(Bill No. 260163)

AN ORDINANCE

Amending Title 9 of The Philadelphia Code, entitled "Regulation of Businesses, Trades and Professions," to establish restrictions and regulations related to the sale of certain intoxicating substances and provide for associated penalties and enforcement, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Title 9 of The Philadelphia Code is amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

*  *  *

CHAPTER 9-100. GENERAL PROVISIONS

*  *  *

§ 9-105. Penalties.

(1) Except as otherwise provided in Chapters 9-600, 9-702, 9-800, 9-900, 9-1000, 9-1100, 9-1200, 9-1600, 9-4000, 9-4200, [and] 9-4400, *and 9-6700,* Sections 9-604, 9-622 and 9-623 of this Title, and subsection 11-707(1) of Title 11, any person who violates any provision of this Title or any regulation adopted hereunder shall, in addition to any other penalty indicated in this Title, pay a fine of no less than one hundred fifty dollars ($150) nor more than three hundred dollars ($300).

*  *  *

*CHAPTER 9-6700. INTOXICATING SUBSTANCES*

*  *  *

*§ 9-6701. Definitions.*

*(1) Container. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(2) Hemp. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(3) Hemp-Derived Cannabinoid Product. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(4) Intoxicating Hemp Product. Any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(5) Intoxicating Substance Retailer. A person who, in the usual course of business, purchases or receives Intoxicating Substances for the purpose of sale to a consumer.*

*(6) Intoxicating Substance Retailing. The sale or offer for sale of any Intoxicating Substance to a consumer.*

*(7) Industrial Hemp. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(8) Intermediate Hemp-Derived Cannabinoid Product. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(9) Intoxicating Substance. Any Intoxicating Hemp Product or Kratom Product.*

*(10) "Kratom Extract." A food product that contains any part of a leaf from mitragyna speciosa, commonly known as kratom, which has been extracted and concentrated to provide more standardized dosing.*

*(11) Kratom Product. Any intermediate or final product that is intended for human or animal use through any means of application or administration, such as inhalation or ingestion, and contains in any form mitragynine or 7 hydroxymitragynine that is:*

*(a) derived from any part of Mitragyna speciosa plant, including the seeds thereof and all derivatives, extracts, alkaloids, isomers, and compounds, whether growing or not;*

*(b) not capable of being naturally produced by a Mitragyna speciosa plant; or*

*(c) capable of being naturally produced by a Mitragyna speciosa plant and was synthesized or manufactured outside the plant.*

*(12) Public. Owned, leased, or operated by the Commonwealth of Pennsylvania, the United States, the City, or any other public or quasi-public governmental body or agency.*

*§ 9-6702. Prohibition on Sales.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(1) It shall be unlawful for any person to sell or offer for sale any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(2) It shall be unlawful for any person to sell or offer for sale any kratom product that meets any of the following criteria:*

*(a) Is mixed or packed with a nonkratom substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer;*

*(b) Contains a kratom extract with levels of residual solvents higher than the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph;*

*(c) Contains a level of 7-hydroxymitragynine in the alkaloid fraction that is greater than 2 percent of the overall alkaloid composition of the kratom product; or*

*(d) Contains a synthetic alkaloid, including a synthetic mitragynine, a synthetic 7-hydroxymitragynine or any other synthetically derived compounds of the kratom plant.*

*(3) It shall be unlawful for any person to sell or offer for sale any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved in accordance with under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355).*

*(4) It shall be unlawful for any person to sell or offer for sale any intoxicating substance to any individual under twenty-one (21) years of age.*

*§ 9-6703. Permitted Sale of Intoxicating Substances.*

*(1) Intoxicating Substance Retailer Permit Required.*

*(a) No business shall act as an Intoxicating Substance retailer without a current intoxicating substance retailer permit for each location where the business engages in intoxicating substance retailing. Acting as an intoxicating substance retailer without a permit is hereby declared a nuisance as a matter of law.*

*(b) Each intoxicating substance retailer shall prominently display the intoxicating substance retailer permit at each location where the business engages in intoxicating substance retailing.*

*(c) An intoxicating substance retailer permit shall be issued to an applicant if, in addition to any other applicable requirement, all of the following requirements are met:*

# City of Philadelphia



*(.1) It shall be unlawful for any person to sell or offer for sale any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved in accordance with under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355).*

*(.2) The applicant has provided all material information required by the application.*

*(.3) The applicant has not made any material false statement in the application.*

*(.4) The applicant currently maintains a valid permit to dispense medical marijuana from the Pennsylvania Bureau of Medical Marijuana, if required.*

*(.5) The applicant currently maintains a valid commercial activity license and any license or permit required under this Title.*

*(.6) The location for which the intoxicating substance retailer permit is sought is fixed, and not mobile.*

*(.7) The location for which the intoxicating substance retailer permit is sought is not situated within:*

*(.a) A zoning district where such use is not expressly allowed;*

*(.b) 500 ft. of any regulated use, as set forth in subsection 14-603(13) (Regulated Use);*

*(.c) 500 ft. of any school (up to and including the 12th grade) or its adjunct recreation areas/play fields;*

*(.d) 500 ft. of any public playground;*

*(.e) 500 ft. of any public swimming pool;*

*(.f) 500 ft. of any public park;*

*(.g) 500 ft. of any public recreation center;*

*(.h) 500 ft. of any public library;*

*(.i) 500 ft. of any child care; or*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.j) Any of the following designated areas:*

*(i) City Avenue from the Schuylkill Expressway to City Boundary.*

*(ii) 63rd Street from City Avenue to Lebanon Avenue.*

*(iii) Monument Road from City Avenue to Ford Road.*

*(iv) Conshohocken Avenue.*

*(v) Parkside Avenue from 52nd Street to Belmont Avenue.*

*(vi) Haverford Avenue from City Avenue to Lansdowne Avenue.*

*(vii) 54th Street from City Avenue to Overbrook Avenue.*

*(viii) 54th Street from Arlington Street to Montgomery Avenue.*

*(ix) Germantown Avenue from Erie Avenue to W. Cumberland Street.*

*(x) Fairmount Avenue, both sides, from Broad Street to Pennsylvania Avenue.*

*(xi) Ridge Avenue from Broad Street to 33rd Street.*

*(xii) Cecil B. Moore Avenue from Broad Street to 24th Street.*

*(xiii) Broad Street from Spring Garden to Lehigh Avenue.*

*(xiv) Girard Avenue, both sides, from 4th Street to Broad Street.*

*(xv) Lehigh Avenue, south side, from 33rd Street to Broad Street.*

*(xvi) Lehigh Avenue, both sides, Broad Street to 6th Street,*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xvii) Spring Garden Street from Broad Street to Pennsylvania Avenue.*

*(xviii) Spring Garden Street, north side, from Broad Street to 4th Street.*

*(xix) Krewstown Road from Grant Avenue to Bloomfield Avenue.*

*(xx) Grant Avenue from Krewstown Road to Blue Grass Road.*

*(xxi) Red Lion Road from Roosevelt Boulevard to Steven Road.*

*(xxii) Red Lion Road from Calera Road to Academy Road.*

*(xxiii) Fairdale Road from Knights Road to Whiting Road.*

*(xxiv) Bustleton Avenue from Cottman Avenue to County Line Road.*

*(xxv) Castor Avenue from Cottman Avenue to Bustleton Avenue.*

*(xxvi) Rhawn Street from Roosevelt Boulevard to Oxford Avenue.*

*(xxvii) Oxford Avenue from Cottman Avenue to City Limit.*

*(xxviii) Verree Road from Oxford Avenue to Bustleton Avenue*

*(xxix) Byberry Road from Roosevelt Boulevard to Philmont Avenue.*

*(xxx) Morrell Avenue from Frankford Avenue to Academy Road.*

*(xxxi) Academy Road from Byberry Road to Torrey Road.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xxxii) Knights Road from Fairdale Road to City Limit.*

*(xxxiii) The area bounded by Knights Road from Franklin Mills Circle in the north to Woodhaven Road in the south, Woodhaven Road from Knights Road in the west to Franklin Mills Circle in the east, and Franklin Mills Circle from Woodhaven Road in the south to Knights Road in the north.*

*(xxxiv) Aramingo Avenue Shopping Area.*

*(xxxv) Mayfair Business Improvement District.*

*(xxxvi) Cottman Avenue from Kindred Street to its terminus at the Delaware River*

*(xxxvii) Frankford Avenue from Poquesing Creek to Harbison Ave, east side*

*(xxxviii) Bustleton Avenue from Cottman Avenue to Roosevelt Boulevard, east side*

*(xxxix) Grant Avenue from Roosevelt Boulevard to Milnor St, south side*

*(xl) Aramingo Avenue from E Allegheny Avenue to Bridge Street, east side*

*(xli) Allegheny Avenue from Kensington Avenue to Delaware Avenue, east side*

*(xlii) Kensington Ave from Allegheny Avenue to Frankford Creek, east side*

*(xliii) Torresdale Avenue from Kensington Avenue to Frankford creek*

*(xliv) Torresdale Avenue from Harbison Avenue to Convent Lane*

*(xlv) Torresdale Avenue from Fitler Street to Grant Avenue*

*(xlvi) Harbison Avenue from Bridge Street to Roosevelt Boulevard, east side*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xlvii) Richmond Street from Allegheny Avenue to Brill Street*

*(xlviii) State Road from Longshore Avenue to Poquesing Creek*

*(xlix) Rhawn Street from Roosevelt Boulevard to State Road*

*(l) Welsh Road from Roosevelt Boulevard to Walker Street*

*(li) Rowland Avenue from Frankford Avenue to Solly Avenue*

*(lii) Castor Avenue from Kensington Avenue to N Delaware Avenue*

*(liii) Lancaster Avenue from 34th Street to 48th Street.*

*(liv) Spring Garden Street from 31st Street to 40th Street.*

*(lv) Haverford Avenue from 31st Street to 52nd Street.*

*(lvi) Girard Avenue from 34th Street to Belmont Avenue.*

*(lvii) 40th Street from Girard Avenue to Chestnut Street.*

*(lviii) Belmont Avenue from Parkside Avenue to Haverford Avenue, east side.*

*(lix) Market Street from 40th Street to 63rd Street, south side.*

*(lx) Chestnut Street from 42nd Street to 63rd Street.*

*(lxi) Walnut Street from 42nd Street to 63rd Street.*

*(lxii) Baltimore Avenue from 42nd Street to 61st Street.*

*(lxiii) 52nd Street from Wyalusing Avenue to Woodland Avenue.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(lxiv) 56th Street from Market Street to Baltimore Avenue.*

*(lxv) 60th Street from Market Street to Catharine Street.*

*(lxvi) 62nd Street from Market Street to Catharine Street.*

*(lxvii) 58th Street from Market Street to Woodland Avenue.*

*(lxviii) Chester Avenue from 42nd Street to 57th Street, east side.*

*(lxix) Woodland Avenue from 42nd Street to 57th Street, east side.*

*(lxx) North 5th Street from Spencer Street to Somerville Avenue.*

*(lxxi) Ogontz Avenue from Cheltenham Avenue to 67th Avenue.*

*(lxxii) Wadsworth Avenue from Cheltenham Avenue to Michener Avenue.*

*(lxxiii) 22nd Street from Lehigh Avenue to W Allegheny Avenue*

*(lxxiv) 5th Street from W. Roosevelt Boulevard to Delphine Street*

*(lxxv) Broad Street from Ruscomb Street to W. Venango Street*

*(lxxvi) Broad Street from Lehigh Avenue to W. Westmoreland Street*

*(lxxvii) Germantown Avenue from Staub Street to E. Washington Lane*

*(lxxviii) W. Chelten Ave from Wissahickon Avenue to Morton Street*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(lxxix) Chestnut Hill Business Improvement District*

*(lxxx) Mt. Airy Business Improvement District*

*(lxxxi) Washington Avenue, both sides, from Broad Street to 25th Street*

*(lxxxii) Snyder Avenue, both sides, from Broad Street to 25th Street*

*(lxxxiii) Point Breeze Avenue, both sides, from Federal Street to Moore Street*

*(lxxxiv) West Passyunk Avenue, both sides, from Broad Street to 23rd Street*

*(lxxxv) Snyder Avenue, both sides, from Broad Street to 25th Street*

*(lxxxvi) South Street, both sides, from Broad Street to 27th Street*

*(lxxxvii) South Street, south side, from Broad Street to 10 th Street*

*(lxxxviii) Oregon Avenue, both sides, from Broad Street to 23rd Street*

*(lxxxix) Elmwood Avenue, both sides, from 65th street to Island Avenue*

*(xc) Woodland Avenue, both sides, from 58th Street to 68th Street*

*(xci) Old City Special Services District*

*(xcii) South Street/Headhouse District*

*(xciii) East Passyunk Business Improvement District*

*(xciv) Northern Liberties Business Improvement District*

*(xcv) Fishtown Kensington Area Business Improvement District*

*(xcvi) Center City District*

# City of Philadelphia



*(xcvii) Allegheny Avenue from Kensington Avenue to Delaware Avenue*

*(xcviii) Delaware Avenue from Spring Garden Street to Allegheny Avenue*

*(xcix) Lehigh Avenue from Kensington Avenue to Richmond Street*

*(c) Girard Avenue from Front Street to Richmond Street*

*(ci) Aramingo Avenue from Allegheny Avenue to Delaware Avenue*

*(cii) Market Street from Front Street to Broad Street*

*(ciii) Richmond Street from Delaware Avenue to Allegheny Avenue*

*(civ) Spring Garden Street from Delaware Avenue to Broad Street*

*(cv) Frankford Avenue from Allegheny Avenue to Delaware Avenue*

*(cvi) Callowhill Street from Delaware Avenue to Broad Street*

*(cvii) Kensington Avenue from Allegheny Avenue to Front Street*

*(cviii) Front Street from Oregon Avenue to Race Street*

*(cix) York Street from Aramingo Avenue to Amber Street*

*(cx) Chestnut Street from Front Street to Broad Street*

*(cxi) Walnut Street from Front Street to Broad Street*

*(cxii) Washington Avenue from Broad Street to Delaware Avenue*

*(cxiii) South Street from Front Street to Broad Street*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(cxiv) Passyunk Avenue from Broad Street to South Street*

*(cxv) 9th Street from Oregon Avenue to Spring Garden Street*

*(cxvi) Broad Street from Oregon Avenue to Spring Garden Street*

*(cxvii) Christian Street from Columbus Boulevard to Broad Street*

*(cxviii) Columbus Boulevard from Spring Garden St to the Walt Whitman Bridge*

*(cxix) Snyder Avenue from Columbus Boulevard to Broad Street*

*(cxx) Oregon Avenue from Columbus Boulevard to Broad Street*

*(cxxi) W Lehigh Ave from N 3rd St to n Howard St*

*(cxxii) N American St from W Huntingdon St to W Somerset St*

*(cxxiii) W Allegheny Ave from N Randolph St to N 2nd St*

*(cxxiv) 5th Street from W. Huntingdon to W. Clearfield*

*(cxxv) W Lehigh Ave from N Marshall St to N 5th St*

*(cxxvi) West Luzerne Street to N 5th St*

*(cxxvii) W Wyoming Avenue to N 5th St*

*(cxxviii) W. Erie Ave from N. Franklin St. To N 5th St.*

*(cxxix) Rising Sun Ave from N. 8th St. To W. Pike St.*

*(cxxx) W. Butler St. From N. Marshall St. To N. Lawrence St.*

*(cxxxi) N. 6th St. From W. Pike St. To W. Erie Ave.*

*(cxxxii) N 6th St from W Berks St to W Susquehanna*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(cxxxiii) Bustleton & Harbison Bustleton Ave from Unruh Ave to Princeton Ave*

*(cxxxiv) Bustleton Ave to Bradford St*

*(cxxxv) Bustleton Ave to Leonard St*

*(cxxxvi) Bustleton Ave to Knorr Street*

*(cxxxvii) Bustleton Ave from Unruh Ave to Akron Street*

*(cxxxviii) E Alleghany Avenue to B Street*

*(cxxxix) E Alleghany Avenue to D Street*

*(cxl) Castor Ave from Comly St to Benner St*

*(cxli) Castor Ave from Robbins St to Glenview St*

*(cxlii) Castor Ave to Large St*

*(cxliii) E Wingohocking St from Castor to Adams Ave*

*(cxliv) Castor Ave from E Wingohocking St to Orthodox St*

*(cxlv) E Wyoming Ave from Rosehill St to Tampa St*

*(cxlvi) E Wyoming Ave to E Mentor St*

*(cxlvii) E Wyoming to E Thelma St*

*(cxlviii) E Erie Ave from I St to Adams Ave*

*(cxlix) Frankford Ave from E Hunting Park Ave to Adams Ave*

*(cl) Torresdale Ave from Frankford Ave to Paul St*

*(cli) Kensington Ave from E Pacific St to E Luzerne St*

*(clii) Frankford Ave from E Berk St. To E. Sergeant St.*

*(cliii) Frankford Ave from Benner St to Tyson Ave*

*(cliv) Frankford Ave to Erdrick St*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



(clv) *Frankford Ave to Charles St*

(clvi) *Frankford Ave to Hawthorne St*

(clvii) *Frankford Ave to Mulberry St*

(clviii) *Frankford Ave / Bridge-Pratt Frankford Ave from Allengrove St to Brill St*

(clix) *Pratt St from Griscom St to Duffield St*

(clx) *Frankford Ave from Adams Ave to Unity St*

(clxi) *Kensington Ave from Adams Ave to Unity St*

(clxii) *Frankford Ave / Margaret-Orthodox Frankford Ave from Unity St to Allengrove St*

(clxiii) *Oxford Ave from Margaret St to Leiper St*

(clxiv) *N Front St from Clearfield to E Ontario St*

(clxv) *N Front St to N Lee St*

(clxvi) *N Front St to Mascher St*

(clxvii) *W Allegheny Ave from Mascher St to Ella St*

(clxviii) *N Front St from Diamond St to E Cumberland St*

(clxix) *Kensington Ave from E York St to E Lehigh Ave*

(clxx) *Harbison Ave from Ditman St. To Aramingo Ave*

(clxxi) *Torresdale Ave from Bridge St. To Fraley St.*

(clxxii) *East Tioga Street to Rand Street and East Tioga Street to Malta Street*

(clxxiii) *I street to Train Intersection (No Street Name)*

(clxxiv) *E Hunting Park Ave from Whitaker Ave to L St*

(clxxv) *E Hunting Park Ave to E Lycoming St*

(clxxvi) *Kensington Ave from E Indiana to E Estaugh St*

# City of Philadelphia



*(clxxvii) E Allegheny Ave from Kensington Ave to Emerald St*

*(clxxviii) E Allegheny Ave from Kensington Ave to Reach St*

*(clxxix) Kensington Ave from E. Tusculum St. To E. Orleans St.*

*(clxxx) E Vanango Street to East Glenwood Ave*

*(clxxxi) E Ontario Street to East Vanango Street*

*(clxxxii) Oxford Ave from Pratt st to E Roosevelt St*

*(clxxxiii) Oxford Ave from Sanger St to E Roosevelt St*

*(clxxxiv) Oxford Ave from E Roosevelt St to Van Kirk St*

*(.9) Any other requirement adopted by the Department by regulation pursuant to this Section.*

*(d) An intoxicating substance retailer permit is valid for one business at one location and may not be transferred from one business to another or from one location to another. A new intoxicating substance retailer permit is required whenever an intoxicating substance retailer changes location or transfers ownership.*

*(2) Permit Expiration, Renewal, and Revocation.*

*(a) Term. An intoxicating substance retailer permit shall be effective through the thirty-first day of December of the calendar year for which it is issued.*

*(b) Renewal. Any person lawfully issued an intoxicating substance retailer permit pursuant to the provisions of this Section shall be entitled to renew such permit, provided that all the requirements of this Section, and any other applicable requirements, are met.*

*(.1) An intoxicating substance retailer shall apply for renewal and submit the applicable renewal fee no later than sixty (60) days prior to expiration of the license permit term. Renewal applications submitted less than sixty (60) days prior to the expiration of the license permit term shall be subject to both the new application fee, and the renewal fee, and the late renewal fee.*

*(.2) Applicants for renewal shall meet the requirements for an intoxicating substance retailer license permit set forth under subsection (1).*

# City of Philadelphia



*(c) Revocation of Permit.*

*(.1) An intoxicating substance retailer permit may be revoked for any of the following reasons:*

*(.a) Failure to provide all information required as a condition of issuing an intoxicating substance retailer permit;*

*(.b) Making a material false statement in an application for an intoxicating substance retailer permit or in a renewal application for an intoxicating substance retailer permit;*

*(.c) Failure to maintain a valid medical marijuana permit from the Pennsylvania Bureau of Medical Marijuana, if required;*

*(.d) Failure to maintain a valid commercial activity license or any other license or permit required under this Title;*

*(.e) The person issued an intoxicating substance retailer permit is delinquent in the payment of any City or School District of Philadelphia taxes, charges, fees, rents or claims, or any penalties or fines relating to the person's business for which the person is responsible, unless the person has entered into an agreement to pay any such delinquency and is abiding by the terms of such agreement.*

*(.f) The person issued an intoxicating substance retailer permit engages in intoxicating substance retailing at any other location in the City in violation of any provision of this Section, or any City requirement with respect to intoxicating substance retailing.*

*(3) Permit Fees. The application and renewal fee*s *shall be three-hundred ($300), and the late renewal fee shall be fifty dollars ($50), except that the Department may alter these fee amounts by regulation, based on the total cost of the administration and enforcement of this Section. The application fee shall be paid at the time the application is submitted. The renewal fee shall be paid at the time the renewal application is submitted.*

*(4) Testing and Certification Required. Any intoxicating substance sold by a permitted intoxicating substance retailer shall be tested by a Drug Enforcement Agency (DEA) registered and licensed laboratory in Pennsylvania authorized to test such substances*

*(a) Intoxicating Hemp products shall be certified by such laboratory as:*

*(.1) Having a total tetrahydrocannabinols concentration (including tetrahydrocannabinolic acid) of not more than 0.3 percent on a dry weight basis; and*



Case ID: 261101288
Control No.: 26112521

*(.2) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(.3) Being free from any poisonous or otherwise deleterious ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.4) Being free from any substance that affects the quality or strength of the intoxicating hemp product to such a degree as to render the product injurious to a consumer.*

*(b) Kratom products shall be certified by such laboratory as:*

*(.1) Being free from any substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer.*

*(.2) Being free from any poisonous or otherwise deleterious nonkratom ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.3) Containing a kratom extract with levels of residual solvents below the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.4) Containing a level of 7-hydroxymitragynine in the alkaloid fraction of not more than 2 percent of the overall alkaloid composition of the kratom product.*

*(.5) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(5) Labeling Required. Any intoxicating substance sold by a permitted intoxicating substance retailer shall be labeled, in accordance with regulations adopted by the Department, in a manner that identifies to consumers that the product meets the criteria established in this Section, and otherwise complies with all applicable hemp and kratom and consumer protection laws and regulations:*

*(a) Intoxicating Hemp products shall be labeled as:*

*(.1) Having a total tetrahydrocannabinols concentration (including tetrahydrocannabinolic acid) of not more than 0.3 percent on a dry weight basis; and*

*(.2) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(.3) Being free from any poisonous or otherwise deleterious ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.4) Being free from any substance that affects the quality or strength of the intoxicating hemp product to such a degree as to render the product injurious to a consumer.*

*(b) Kratom products shall be labeled as:*

*(.1) Being free from any substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.2) Being free from any poisonous or otherwise deleterious nonkratom ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.3) Containing a kratom extract with levels of residual solvents below the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph.*

*(.4) Containing a level of 7-hydroxymitragynine in the alkaloid fraction of not more than 2 percent of the overall alkaloid composition of the kratom product.*

*(.5) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*§ 9-6704. Penalties and Enforcement.*

*A violation of any provision of this Chapter shall be classified as a Class III offense subject to the maximum fine set forth in subsection 1-109(3) of the Code, in addition to the penalties authorized pursuant to Section A-505.1 of the Philadelphia Administrative Code. Each day a violation continues shall constitute a separate offense.*

*§ 9-6705. Severability.*

*If a court of competent jurisdiction declares any part of this Chapter 9-6700 to be invalid, such judgment shall not affect the validity of this Section as a whole or any remaining part thereof. It is the intention of City Council that the remaining provisions of this Section would have been adopted as if such part found to be invalid had not been enacted.*

* * *

SECTION 2. This Ordinance shall be effective November 12, 2026, except that Section 9-6703 ("Permitted Sale of Intoxicating Substances") shall take effect upon the issuance of regulations by the Department.



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.



Case ID: 261101288
Control No.: 26112521

Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on June 4, 2026. The Bill was Signed by the Mayor on September 15, 2026.

Elizabeth McCollum
Chief Clerk of the City Council



Case ID: 261101288
Control No.: 26112521

# EXHIBIT "C"

Philadelphia, Pennsylvania

Electronic version of The Philadelphia Code and Home Rule Charter is current through October 26, 2026.

Subcode "PM" was repealed and replaced by Bill No. 120647, approved January 20, 2014 and effective July 1, 2015. Subcode "PM" was further amended, and its substantive provisions replaced in their entirety, by Bill No. 140856, approved December 19, 2014 and effective July 1, 2015.

To view the former version of Subcode "PM", click here.

Title 14: Zoning and Planning was repealed and replaced by the provisions of Bill No. 110845, approved December 22, 2011 and effective August 22, 2012.

To view the former version of Title 14, click here.

These new provisions have been incorporated into The Official Philadelphia Code

Order Code GET HELP

Website
https://www.phila.gov/

Address
City Hall
1400 John F Kennedy Blvd
Office 215
Philadelphia, Pennsylvania 19107

**Disclaimer:** This Code of Ordinances and/or any other documents that appear on this site may not reflect the most current legislation adopted by the Municipality. American Legal Publishing provides these documents for informational purposes only. These documents should not be relied upon as the definitive authority for local legislation. Additionally, the formatting and pagination of the posted documents varies from the formatting and pagination of the official copy. The official printed copy of a Code of Ordinances should be consulted prior to any action being taken.

For further information regarding the official version of any of this Code of Ordinances or other documents posted on this site, please contact the Municipality directly or contact American Legal Publishing toll-free at 800-445-5588.

**Hosted by:** American Legal Publishing

# EXHIBIT B

Filed and Attested by the
Office of Judicial Records
10 NOV 2026 01:18 pm
A. MALONIS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION**

| | |
|---|---|
| PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,<br>Plaintiffs,<br>v.<br>CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,<br>Defendants. | ________ TERM, 2026<br>No. ______________<br>CIVIL ACTION — EQUITY<br>Assigned to: ______________ |

**ORDER GRANTING SPECIAL INJUNCTION**

AND NOW, this ____ day of November, 2026, upon consideration of the Emergency Petition for a Special Injunction and Preliminary Injunction Pursuant to Pa. R. Civ. P. 1531 (the "Petition") filed by Plaintiffs Pennsylvania Healthy Alternatives Association ("PAHAA") and MNG 2005, Inc. d/b/a CBD Kratom ("MNG") (together, "Plaintiffs"), the Verified Complaint, the Affidavit of Craig Katz and its exhibits, and the Memorandum of Law in support, and [after notice to Defendants and argument] [without a hearing], the Court FINDS as follows:

1. The Ordinance takes effect on November 12, 2026. On that date, its prohibitions and daily penalties become operative, while Section 9-6703, which contains the only permit pathway, does not take effect until the Department of Licenses and Inspections issues regulations, which have not been issued.



Case ID: 261101288
Control No.: 26112521

2. Plaintiffs have shown, on the averments of the Petition and the Affidavit of Craig Katz, that immediate and irreparable injury will be sustained before a full hearing on a preliminary injunction can be held. Pa. R. Civ. P. 1531(a). Absent relief, MNG must close its three Philadelphia stores at 212 S. 17th Street, 524 South Street, and 4040 City Avenue, Suite 2B, on November 12, 2026, with resulting loss of customers, goodwill, trained employees, leaseholds, and investments that cannot be measured by an accurate pecuniary standard.

3. Plaintiffs have made a prima facie showing of a clear right to relief on their claims under Article I, Sections 1 and 26 of the Pennsylvania Constitution and on their claims that the Ordinance is void for vagueness and constitutes de facto zoning enacted outside the City's zoning procedures.

4. Greater injury would result from refusing this special injunction than from granting it, because the relief is conditioned on Plaintiffs' and PAHAA's members' compliance with age, product-content, testing, and labeling requirements that address the Ordinance's stated objectives.

5. This special injunction restores and preserves the status quo, being the parties' status immediately before the Ordinance's effective date; is reasonably suited to abate the offending activity; and will not adversely affect the public interest.

Accordingly, it is hereby ORDERED and DECREED that the Petition is GRANTED IN PART, and a special injunction is entered, as follows:

1. Defendants City of Philadelphia, Mayor Cherelle Parker, Co-Commissioner Ralph DiPietro, and Co-Commissioner Bridget Collins-Greenwald, together with their officers,

agents, employees, and all persons acting in concert or participation with them who receive actual notice of this Order (collectively, the "Enjoined Parties"), are ENJOINED from implementing or enforcing Bill No. 260163, which creates Chapter 9-6700 of The Philadelphia Code, "Intoxicating Substances" (the "Ordinance"), against Plaintiffs and the members of PAHAA, and from issuing any citation, notice of violation, cease-operations order, nuisance declaration, or fine under the Ordinance against Plaintiffs or PAHAA's members, including under Sections 9-6702(1) and (3), the permit requirement and nuisance declaration of Section 9-6703(1)(a), the permit criteria of Section 9-6703(1)(c)(.1), (.4), (.7), and (.9), and Section 9-6704 (the "Special Injunction").

2. The Special Injunction is conditioned on Plaintiffs' and PAHAA's members' compliance, while it remains in effect, with the conditions set forth in Paragraphs 3(a) through 3(e).

3. Plaintiffs and PAHAA's members shall comply with the following conditions:

(a) Minimum age. They shall not sell any intoxicating hemp-derived or kratom product to any person under twenty-one (21) years of age, and shall require identification from any customer who appears to be under thirty (30) years of age.

(b) Kratom products. They shall sell only natural-leaf kratom products, and shall not sell any kratom product containing concentrated or synthetic 7-hydroxymitragynine or any other synthetic or synthetically derived kratom alkaloid.

(c) Hemp products. They shall sell only hemp products that meet the definition of hemp in the Agriculture Improvement Act of 2018, 7 U.S.C. § 1639o(1), as amended from time to time, including a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry-weight basis.



Case ID: 261101288
Control No.: 26112521

(d) Testing. They shall continue to have every product they sell tested by an accredited, independent third-party laboratory for cannabinoid content (hemp products) or alkaloid content (kratom products).

(e) Labeling. They shall continue to label every product with its ingredients, dosage information, and warnings, and to provide QR-code or equivalent access to the product's Certificate of Analysis.

1. This Order shall become effective upon Plaintiffs' filing with the Prothonotary of a bond in the amount of $___________, with security approved by the Court, or the deposit of legal tender of the United States in that amount, pursuant to Pa. R. Civ. P. 1531(b).

2. A hearing on Plaintiffs' request for a preliminary injunction shall be held on November ____, 2026, at _______ __.m., in Courtroom ______, City Hall, Philadelphia, Pennsylvania. Defendants may file a response to the Petition on or before November ____, 2026.

3. This Special Injunction shall remain in effect until the Court rules on Plaintiffs' request for a preliminary injunction following the hearing scheduled in Paragraph 5, or until further Order of this Court. [If entered without notice and a hearing: Pursuant to Pa. R. Civ. P. 1531(d), this Special Injunction shall be deemed dissolved unless a hearing on the continuation of the injunction is held within five (5) days after it is granted, or within such other time as the parties may agree or as the Court, upon cause shown, shall direct.]

4. Plaintiffs shall serve a copy of this Order on Defendants, through the City of Philadelphia Law Department, by email and hand delivery immediately upon its entry.



Case ID: 261101288
Control No.: 26112521

BY THE COURT:

________________________________, J.



Case ID: 261101288
Control No.: 26112521

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
By: Patrick C. Campbell, Jr., Esquire
Attorney I.D. No. 53350
565 E. Swedesford Road, Suite 303
Wayne, PA 19087
Tel. 215.977.4100
Fax 215. 977.4101
Patrick.Campbell@lewisbrisbois.com

*Attorneys for Plaintiffs*

OFFICE OF JUDICIAL RECORDS FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
Filed and Attested by the Office of Judicial Records 10 NOV 2026 01:18 pm A. MALONIS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

| | |
|---|---|
| PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,<br><br>Defendants. | ________ TERM, 2026<br><br>No. ______________<br><br>CIVIL ACTION — EQUITY<br><br>Assigned to: ______________ |

**PLAINTIFFS' EMERGENCY PETITION FOR A SPECIAL INJUNCTION AND PRELIMINARY INJUNCTION PURSUANT TO PA. R. CIV. P. 1531**

MNG 2005, Inc., doing business as CBD Kratom ("MNG"), and Pennsylvania Healthy Alternatives Association ("PAHAA") (together, "Plaintiffs"), by their undersigned counsel, petition this Court under Pa. R. Civ. P. 1531 for a special injunction and, after hearing, a preliminary injunction staying enforcement of Bill No. 260163 (the "Ordinance"), which creates Chapter 9-6700 of The Philadelphia Code, "Intoxicating Substances," against Plaintiffs and PAHAA's members pending final resolution of this action. The Ordinance takes effect on November 12, 2026. In support, Plaintiffs rely on their Verified Complaint (Exhibit A), the

Ordinance (Exhibit B), the Affidavit of Craig Katz with exhibits (Exhibit C), and the Memorandum of Law filed with this Petition, each incorporated by reference, and aver as follows:

## I. NATURE OF THE PETITION

1. This Petition seeks to preserve the status quo before an Ordinance that purports to regulate "Intoxicating Substances" closes every lawful hemp and kratom retailer in Philadelphia, including the three Philadelphia stores operated by MNG, on November 12, 2026.

2. The Ordinance operates as two independent *de facto* bans. First, Section 9-6702(3) makes it unlawful to sell any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive, or the subject of an application approved under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355). No kratom or consumer hemp product has, or has a practical path to, any of those federal designations, and the only potentially applicable pathway, the food additive petition process, takes approximately two years.

3. Second, even for a retailer that could clear the FDA condition, the Ordinance's 500-foot setbacks and 184 designated-area exclusions, Section 9-6703(1)(c)(.7), leave virtually no commercially viable retail location in the City, including the locations where Plaintiffs operate today.

4. Compounding both bans, Section 2 of the Ordinance makes the prohibitions and daily penalties effective November 12, 2026, but provides that Section 9-6703, the only permit pathway, "shall take effect upon the issuance of regulations by the Department." No regulations have been issued, and the Ordinance sets no deadline for them.



Case ID: 261101288
Control No.: 26112521

5. The Ordinance's own regulatory provisions (a twenty-one-and-over age limit, a 2% cap on 7-hydroxymitragynine ("7-OH") in the alkaloid fraction, a ban on synthetic alkaloids, laboratory testing, and labeling) address each harm the sponsor identified. Plaintiffs do not ask the Court to suspend those protections. To the contrary, Plaintiffs and PAHAA's members will comply with the Ordinance's core regulatory requirements, as set out in Part VIII below, as a condition of the injunction.

## II. THE PARTIES

6. Plaintiff PAHAA is a Pennsylvania nonprofit corporation with an address at 443 E. Baltimore Pike, Media, Pennsylvania 19063. Its members are retailers, manufacturers, and wholesalers of hemp-derived products, including at least six retail establishments in Philadelphia that sell products affected by the Ordinance.

7. Plaintiff MNG is a Missouri corporation with its principal place of business at 12400 Olive Blvd., Suite 100, St. Louis, Missouri 63141. MNG is a member of PAHAA. (Katz Aff. ¶ 3.)

8. MNG operates three retail stores in Philadelphia (the "Stores") at 212 S. 17th Street, 524 South Street, and 4040 City Avenue, Suite 2B. (Katz Aff. ¶ 21.)

9. Defendant City of Philadelphia (the "City") is a municipal corporation organized under Pennsylvania law. The Ordinance represents official City policy and, when effective, will be implemented and enforced by the City and its departments, agencies, officers, and employees. (*See* Ex. A, Compl. ¶ 16.)

10. Defendant Cherelle Parker is the Mayor of Philadelphia and is sued solely in her official capacity. The Mayor supervises the executive branch of City government and is responsible for the administration and enforcement of The Philadelphia Code. (*Id.* ¶ 17.)



Case ID: 261101288
Control No.: 26112521

11. Defendants Ralph DiPietro and Bridget Collins-Greenwald are the Co-Commissioners of the Philadelphia Department of Licenses and Inspections (the "Department"), which the Ordinance charges with issuing implementing regulations and administering the permit, testing, labeling, fee, renewal, and enforcement regime. Each is sued solely in his or her official capacity. (*Id.* ¶ 19-21.)

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction under 42 Pa.C.S. § 931 and the Declaratory Judgments Act, 42 Pa.C.S. § 7531 et seq., and authority to grant interim injunctive relief under Pa. R. Civ. P. 1531.

13. Venue is proper in Philadelphia County because the cause of action arose here, Defendants are located here, and the Stores and other affected properties are located here. (*Id.* ¶ 22.)

## IV. THE ORDINANCE

14. Section 9-6701(9) defines "Intoxicating Substance" as "[a]ny Intoxicating Hemp Product or Kratom Product." Alcohol is not included. (*See* Ex. B § 9-6701(9).)

15. Section 9-6702 makes it unlawful to sell: (a) any substance within the federal "Exclusions" from the definition of hemp, § 9-6702(1); (b) kratom products that are adulterated, contain excess residual solvents, exceed 2% 7-OH in the alkaloid fraction, or contain synthetic alkaloids, § 9-6702(2); (c) "any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved" under the cited sections of the Federal Food, Drug, and Cosmetic Act, § 9-6702(3); and (d) any intoxicating substance to anyone under twenty-one, § 9-6702(4). (*Id.* § 9-6702.)



Case ID: 261101288
Control No.: 26112521

16. Section 9-6703 requires a permit for each retail location and declares unpermitted retailing "a nuisance as a matter of law." § 9-6703(1)(a). It repeats the FDA condition as a permit criterion, § 9-6703(1)(c)(.1); requires a medical marijuana permit "if required," § 9-6703(1)(c)(.4); and adds "[a]ny other requirement adopted by the Department by regulation," § 9-6703(1)(c)(.9). (*Id.* § 9-6703.)

17. Section 9-6703(1)(c)(.7) bars permits within 500 feet of schools, playgrounds, public pools, parks, recreation centers, libraries, child-care uses, and regulated uses under Section 14-603(13) of the Zoning Code, and in 184 enumerated corridors and districts, including the Center City District, South Street, and portions of City Avenue. (*Id.*)

18. Products sold by a permitted retailer must be tested by a DEA-registered laboratory located in Pennsylvania, § 9-6703(4), and "labeled, in accordance with regulations adopted by the Department," § 9-6703(5). (*Id.*)

19. Each violation is a Class III offense, and "[e]ach day a violation continues shall constitute a separate offense." § 9-6704. (*Id.* § 9-6704.)

20. Section 2 provides: "This Ordinance shall be effective November 12, 2026, except that Section 9-6703 ('Permitted Sale of Intoxicating Substances') shall take effect upon the issuance of regulations by the Department." (*Id.* § 2.) Upon information and belief, no regulations have been issued, and the Ordinance sets no deadline for them. (Katz Aff. ¶ 25.)

21. The Ordinance contains no grandfathering provision, transition period, variance or waiver procedure, or nonconforming-use protection for existing lawful retailers. (*See generally* Ex. B.)



Case ID: 261101288
Control No.: 26112521

22. Section 9-6705 is a severability provision, confirming that Council intended the Ordinance's remaining provisions to operate if any part is held invalid. (*Id.* § 9-6705.)

23. The legislative record shows that Council was told before it voted that the FDA condition could never be met and would operate as a de facto ban; that the Department of Public Health answered "Not currently" when asked whether it had the resources to implement the Bill; and that Council nonetheless passed the Bill 16–0 without removing the FDA condition. (Ex. A, Compl. ¶¶ 133-53)

### A. There Is No FDA Pathway to Lawful Sale

24. Section 9-6702(3) permits the sale of an Intoxicating Substance only if it is (1) "considered appropriate for use as a dietary supplement," (2) considered appropriate for use as "a safe food additive," or (3) "the subject of an application that has been approved" under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 321, 331, 342, 348, or 355. Section 9-6703(1)(c)(.1) repeats the same condition as a prerequisite to any permit. (Ex. B § 9-6702). Every kratom product, including smokable kratom, and every hemp product sold to consumers, such as drinks and gummies, is an "Intoxicating Substance." (*Id.* § 9-6701). None of the three routes is available to them. (*Id.* § 9-6702); (Katz Aff. ¶ 25.)

25. Specifically, regarding the first two routes relating to being considered appropriate for use as a dietary supplement or safe food additive, the FDA has not recognized any hemp or kratom product as a lawful dietary supplement or as a safe food additive. (Katz Aff. ¶ 25.) Thus, neither designation exists for these products today. (*Id.*)

26. Regarding the third route relating to an approved application smokable hemp and natural-leaf kratom sold without medical claims are not foods, dietary supplements, food additives,



Case ID: 261101288
Control No.: 26112521

or drugs within the FDCA provisions the Ordinance cites. (*See generally* Ex. B.) No FDCA application process applies to them, so there is no application that could ever be "approved." (Katz Aff. ¶ 25.)

27. Of the cited provisions, the only one that governs applications for food ingredients is Section 409, 21 U.S.C. § 348, the food additive petition process. (Ex. B § 9-6702(3).) The FDA has never approved hemp or kratom as a food additive, and the FDA itself estimates that the petition process takes approximately two years. *See Questions and Answers About Food Additive or Color Additive Petition Process*, U.S. Food & Drug Admin., https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-questions-and-answers-about-food-additive-or-color-additive-petition-process (last visited Nov. 9, 2026). No retailer could obtain approval before November 12, 2026, or for years afterward.

28. Section 505, 21 U.S.C. § 355, is the new-drug approval pathway. It applies to products marketed as drugs, not to botanical products sold to adults without drug claims. As the Global Kratom Coalition told Council's Committee, Section 505 is a drug-approval pathway that "no botanical product could meet," and the provision "risks functioning as a de facto ban on all natural kratom products" and "nullifies" the Bill's tailored safety provisions. (*Hearing on Bill 260163 Before the Comm. on Com. & Econ. Dev. of the Phila. City Council* at 147:5–151:19 (May 21, 2026) (Statement of Allison Smith on behalf of Global Kratom Coalition) (hereinafter "Comm. Hr'g Tr.").)

29. Council was told in plain terms before it voted that the FDA approval condition could never be met by these products because that pathway was only for drugs marketed as drugs, and that the condition made the Bill a de facto ban. (*Id.* 207:17–20, 208:9–12) (Statement of Adam Suib).) At the June 4, 2026 Stated Meeting, after public comment urging Council to "remove the



Case ID: 261101288
Control No.: 26112521

unregulated FDA requirements," Council passed the Bill 16–0 without doing so. (*Council of the City of Philadelphia, Stated Meeting* at 192:18–24, 235:15–238:15 (June 4, 2026) (hereinafter "Stated Mtg. Tr.").)

30. Section 9-6702(3) therefore operates as a categorical ban on the sale of kratom and hemp products in Philadelphia, not as a regulatory standard any retailer can satisfy.

**B. What the Sponsor Said She Was Trying to Achieve**

31. The Bill's sponsor, Councilmember Katherine Gilmore Richardson, introduced Bill No. 260163 on March 5, 2026. She described its targets as "nuisance businesses," particularly "illegal smoke shops" that operate without community or zoning approval, "fuel" neighborhood crime, and "expose our young people to dangerous products," such as concentrated and synthetic 7-OH products. (Comm. Hr'g Tr. 21:10–18.)

32. She further described the Bill as aimed at businesses that "continue to exploit loopholes, disregard community concerns and operate in ways that put our neighborhoods and the well-being of our communities at stake," adding that "[t]hey are putting profits over our safety." (*Id.* at 23:1–12.)

33. She described the land-use problem as shops that "operate without community zoning approval" and that "apply to be a grocery or a convenience store" before selling these products, which she called "a cat-and-mouse game." (Id. at 21:19-24, 104:3-105:8.)

34. She stated that only intoxicating products approved by the FDA should be sold in the City, while admitting that she had no concern with the actual health and wellness benefits of the products. (*Id.* at 24:23–26:4.) She also conceded that "it would be nearly impossible for the City of Philadelphia to test every single product." (*Id.* at 214:11–14.)



Case ID: 261101288
Control No.: 26112521

35. None of those stated objectives describes Plaintiffs. (Katz Aff. ¶¶ 13-20.) MNG's Stores are licensed, fixed-location retailers, in good standing, that have never been cited for a nuisance, criminal activity, or a sale to a minor, and that sell only tested, labeled, natural-leaf kratom and Farm Bill-compliant hemp products to age-verified adults. (*Id.* ¶¶ 10, 12–24.) Each of the sponsor's concerns, including youth access, concentrated and synthetic 7-OH, unknown contents, and unlicensed shops, is already addressed by the Ordinance's own age limit, 7-OH cap, synthetic-alkaloid ban, testing, labeling, and license requirements, with which Plaintiffs will comply. (Ex. B §§ 9-6702(2), (4); 9-6703(1)(c)(.5)–(.6), (4), (5).)

## V. PLAINTIFFS' BUSINESSES AND SAFETY PRACTICES

36. MNG and its affiliates have been in business for more than ten years and operate more than fifty "CBD Kratom" stores across the United States. In that time, MNG has never been found liable for selling an unsafe product or for any injury caused by a product it sold. (Katz Aff. ¶¶ 6, 8.)

37. MNG has operated in Philadelphia for five years, since opening its first Store in 2021. It holds every license and permit required to operate each Store, each of which is current and in good standing, and, to the affiant's knowledge, no Store has been cited for a nuisance, criminal activity, or a sale to a minor. (*Id.* ¶¶ 22–24.)

38. Every hemp-derived product MNG sells contains a delta-9 THC concentration of not more than 0.3 percent on a dry-weight basis, consistent with the federal definition of hemp in the 2018 Farm Bill 7 U.S.C. § 1639o(1). (*Id.* ¶ 10.)

39. MNG sells only natural-leaf kratom. It does not sell any product containing concentrated or synthetic 7-OH, synthetic mitragynine, or any other synthetic kratom alkaloid, and it does not sell kratom products adulterated with other drugs or substances. (*Id.* ¶ 12.) Any 7-OH



Case ID: 261101288
Control No.: 26112521

in MNG's natural-leaf kratom is the trace amount that occurs naturally in the leaf, within the Ordinance's own 2% limit.

40. Accredited third-party laboratories test every hemp-derived product MNG sells for cannabinoid content, including CBD and delta-9 THC, and test its natural-leaf kratom products for alkaloid content. (*Id.* ¶¶ 13–16.) Certificates of Analysis are publicly available and linked by QR code from most product labels. (*Id.* ¶¶ 13–16 & Exs. A–C.)

41. MNG does not sell hemp or kratom products to anyone under eighteen, or under twenty-one where legally required (such as smokable products), and its sales consultants must request identification from any customer who does not appear to be at least thirty (30) years old. (*Id.* ¶¶ 17–18.)

42. MNG trains its sales consultants for several weeks before they work independently, with continuing education afterward, and keeps most products in locked glass cases accessible only with a consultant's assistance. (*Id.* ¶¶ 19–20.)

## VI. IMMEDIATE AND IRREPARABLE HARM

43. Every one of MNG's three Stores, and, upon information and belief, every PAHAA member store in Philadelphia, is located within a 500-foot setback, a designated exclusion area, or both under Section 9-6703(1)(c)(.7). Even if the Department issued regulations and permits became available, none of those stores could obtain a permit at its current location, and every one of them would be forced to close. (*Id.* ¶ 26.) Maps showing each MNG Store in relation to the applicable setbacks and exclusion areas follow. In each map, the green dot marks the Store, the shaded circles mark 500-foot buffers around protected uses, and the solid red lines and shapes mark designated exclusion areas.



Case ID: 261101288
Control No.: 26112521

44. The 17th Street Store (212 S. 17th Street, Philadelphia, PA 19103). The Store lies within the 500-foot buffer around Rittenhouse Square, a public park. (Ex. B § 9-6703(1)(c)(.7)(.f).) No permit could issue at this location. (*Id.*)




*Figure 1. 212 S. 17th Street, within the 500-foot buffer around Rittenhouse Square.*

45. The South Street Store (524 South Street, Philadelphia, PA 19147). The Store lies within the 500-foot buffers around Delancey Park and Bainbridge Green, both public parks. It is also within the designated exclusion area for South Street, south side, from Broad Street to Front Street. (*Id.* § 9-6703(1)(c)(.7)(.c)-(.d), (.f), (.j)((cxiii).) The Store is therefore barred twice over. (*Id.*)



Case ID: 261101288
Control No.: 26112521




*Figure 2. 524 South Street, within the St. Peter's School and Bainbridge Green buffers and the South Street exclusion area.*

46. The City Avenue Store (4040 City Avenue, Suite 2B, Philadelphia, PA 19131). The Store lies within the designated exclusion areas for City Avenue from the Schuylkill Expressway to the city boundary and for Monument Road from City Avenue to Ford Road. (*Id.* § 9-6703(1)(c)(.7)(i), (iii).) No permit could issue at this location. (*Id.*)




*Figure 3. 4040 City Avenue, Suite 2B, within the City Avenue and Monument Road exclusion areas.*

47. Because the setbacks and exclusion areas overlap across nearly every commercial corridor in the City, MNG has nowhere in Philadelphia to relocate, and the same is true of PAHAA's other Philadelphia members. (Katz Aff. ¶ 29.) The Ordinance offers no grandfathering, variance, amortization, or nonconforming-use protection. (*See generally* Ex. B.) Its geographic provisions alone will close every one of Plaintiffs' Philadelphia stores. (*Id.*)

48. Intoxicating hemp-derived and natural-leaf kratom products make up approximately 90% of the Stores' sales, which totaled several million dollars in 2025. (Katz Aff. ¶ 27.) The Stores cannot operate profitably selling only products the Ordinance does not cover. (*Id.* ¶¶ 27–28.)

49. If the Ordinance takes effect on November 12, 2026, MNG will be forced to close all three Stores: it cannot continue selling its core products without risking daily fines and nuisance enforcement, it has no permit pathway, and it has nowhere to relocate in the City. Closing the Stores threatens the existence of MNG's Philadelphia business. (*Id.* ¶¶ 29–30.)

50. MNG employs approximately 20 people at the Stores, 15 full-time and 5 part-time, all of whom completed MNG's multi-week training program. Closure would jeopardize the employment of 19 of them, permanently dissipate MNG's investment in that workforce, and leave MNG facing severe, likely insurmountable obstacles in reassembling a trained team if relief were granted later. (*Id.* ¶ 31.)

51. The Stores' leases run for several more years, with remaining obligations exceeding $1,500,000. If the Stores close, MNG will be unable to perform, and the leases will go into default, exposing MNG to acceleration, damages claims, and loss of its leasehold interests and improvements. (*Id.* ¶ 32.)



Case ID: 261101288
Control No.: 26112521

52. MNG has invested hundreds of thousands of dollars in location-specific buildouts, fixtures, secure display cases, signage, and equipment that cannot be recovered if the Stores close, and the Ordinance would strand approximately $100,000 of inventory purchased through interstate channels for lawful retail sale. (*Id.* ¶¶ 33–34.)

53. The Stores have built relationships with thousands of regular adult customers. If the Stores close, those customers will turn to other sources, including unregulated online and out-of-City sellers, and MNG's Philadelphia goodwill will be lost in a way that cannot be measured in dollars or restored by a later award of money. (*Id.* ¶ 35.)

54. These harms will occur on November 12, 2026, before a full hearing on a preliminary injunction can reasonably be held on regular notice. Each day of continued operation after that date exposes MNG and every other PAHAA member to a separate Class III offense and nuisance enforcement. (Ex. B § 9-6704; § 9-6703(1)(a)).

## VII. PLAINTIFFS SATISFY EACH PREREQUISITE FOR INJUNCTIVE RELIEF

55. A party seeking a preliminary or special injunction must show that: (1) the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; (2) greater injury would result from refusing the injunction than from granting it; (3) the injunction will restore the parties to their status immediately before the alleged wrongful conduct; (4) the activity sought to be restrained is actionable, the right to relief is clear, and the wrong is manifest, i.e., the party is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the injunction will not adversely affect the public interest. *Warehime v. Warehime*, 860 A.2d 41, 46–47 (Pa. 2004); *Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1001 (Pa. 2003). Plaintiffs need only



Case ID: 261101288
Control No.: 26112521

establish a prima facie right to relief. *Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 249 (Pa. Super. 2013).

56. Likelihood of success: substantive due process. Under Article I, Section 1 of the Pennsylvania Constitution, an exercise of the police power "must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained." *Gambone v. Commonwealth*, 101 A.2d 634, 637 (Pa. 1954); *Haveman v. Bureau of Prof'l & Occupational Affairs*, 238 A.3d 567, 573–74 (Pa. Cmwlth. 2020). The Ordinance bans a lawful occupation outright, through the FDA condition, the no-permit gap, and the geographic exclusions, even though its own age, product-content, testing, and labeling provisions address every harm the sponsor identified.

57. Likelihood of success: equal protection. The Ordinance regulates "Intoxicating Substances" but defines that term to exclude alcohol, a lawful, age-restricted intoxicant that raises the same asserted concerns and may be sold throughout the City, including in the 184 zones from which Plaintiffs are barred. That disparate treatment of similarly situated sellers lacks a reasonable basis and violates Article I, Sections 1 and 26. *Hopewell Twp. Bd. of Supervisors v. Golla*, 452 A.2d 1337, 1343–44 (Pa. 1982); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

58. Likelihood of success: vagueness. The Ordinance's prohibitions and daily penalties take effect November 12, 2026, while the permit pathway, labeling standards, and additional permit criteria depend on Department regulations that do not exist, and Section 9-6702(3) prohibits substances "not considered appropriate" without saying who does the considering or by what standard. The Ordinance therefore fails to provide fair notice or minimal guidelines for

enforcement. *Commonwealth v. Stein*, 546 A.2d 36, 40 (Pa. 1988); *Commonwealth v. Parker White Metal Co.*, 515 A.2d 1358, 1367 (Pa. 1986).

59. Likelihood of success: de facto zoning. The 500-foot setbacks and 184 designated-area exclusions dictate on which parcels a retail use may operate and cross-reference the Zoning Code's own use classifications, yet the Ordinance was enacted in Title 9 rather than Title 14 and, upon information and belief, was not referred to the Philadelphia City Planning Commission as zoning legislation. An ordinance regulating a zoning principle without following zoning procedures is invalid. *Dean v. City of Harrisburg*, 563 A.2d 965, 968–69 (Pa. Cmwlth. 1989); *Bd. of Supervisors of Franklin Twp. v. Meals*, 426 A.2d 1200, 1202 (Pa. Cmwlth. 1981).

60. Immediate and irreparable harm. As set out in Part VI, the Ordinance will end Plaintiffs' Philadelphia operations on November 12, 2026, causing loss of customers, goodwill, trained employees, leaseholds, and investments that cannot be measured by an accurate pecuniary standard. A threatened loss so great that it threatens the existence of the business warrants injunctive relief. *Three County Servs., Inc. v. Phila. Inquirer*, 486 A.2d 997, 1001 (Pa. Super. 1985). The averred violation of the Pennsylvania Constitution independently supports a finding of irreparable harm. *Stilp v. Commonwealth*, 910 A.2d 775, 787 (Pa. Cmwlth. 2006), aff'd, 974 A.2d 491 (Pa. 2009).

61. Greater injury from refusal. Refusing relief would close lawful, long-established businesses. Granting it costs the City nothing cognizable: the City has not issued the regulations its own permit scheme requires, its Department of Public Health conceded it lacks current resources to implement the Ordinance, and the injunction is conditioned on Plaintiffs' compliance with the Ordinance's core protections. (Comm. Hr'g Tr. 32:15-17; 37:1-7.)



Case ID: 261101288
Control No.: 26112521

62. Status quo. The status quo is the last peaceable, non-contested status preceding the controversy: Plaintiffs' lawful retail operation before the Ordinance's effective date. The requested relief preserves that status quo pending a decision on the merits.

63. Reasonably suited to abate the offending activity. The relief is tailored. It stays enforcement only as to Plaintiffs and PAHAA's members, and only on the condition that they comply with the age, product-content, alkaloid and cannabinoid testing, and labeling terms in Part VIII.

64. Public interest. The public interest is served by keeping tested, labeled products available to age-verified adults through licensed, fixed-location retailers, rather than pushing that demand toward unregulated online and out-of-City sellers. The public has no interest in enforcement of an unconstitutional ordinance. *See Dillon v. City of Erie*, 83 A.3d 467, 474 (Pa. Cmwlth. 2014); *see SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 509 (Pa. 2014).

65. The legal grounds for each prerequisite are set out fully in the accompanying Memorandum of Law, which Plaintiffs incorporate by reference.

## VIII. CONDITIONS PLAINTIFFS WILL ACCEPT DURING THE PENDENCY OF THIS ACTION

66. As a condition of the injunction, Plaintiffs and PAHAA's members will, during the pendency of this action:

(a) Minimum age (§ 9-6702(4)). Raise their minimum age to twenty-one for all intoxicating hemp-derived and kratom products, sell no covered product to anyone under twenty-one, and continue requiring identification from any customer who appears to be under thirty. (Katz Aff. ¶ 36(1).)

(b) Kratom product standards (§ 9-6702(2)). Sell no kratom product that contains more than two percent 7-OH in the alkaloid fraction, or that



Case ID: 261101288
Control No.: 26112521

contains a synthetic alkaloid or other synthetically derived kratom compound. (*Id.* ¶ 36(2).)

(c) Hemp product standards. Sell no hemp product that contains more than 0.3 percent delta-9 THC on a dry-weight basis, and at all times comply with the definition of hemp in the 2018 Farm Bill 7 U.S.C. § 1639o(1), as amended from time to time. (*Id.* ¶ 36(3).)

(d) Testing (§ 9-6703(4)). Continue testing every product they sell through accredited, independent third-party laboratories that test for cannabinoid and alkaloid content. (*Id.* ¶ 36(4).)

(e) Labeling (§ 9-6703(5)). Continue labeling every product with its ingredients, dosage information, and warnings; provide QR-code access to Certificates of Analysis; and meet any reasonable additional labeling requirements in Department regulations once issued. (*Id.* ¶ 36(5).)

## IX. NEED FOR A SPECIAL INJUNCTION AND REQUEST FOR HEARING

67. Rule 1531(a) authorizes the Court to issue a special injunction without a hearing or without notice where "immediate and irreparable injury will be sustained before notice can be given or a hearing held," and permits the Court to act on the averments of the pleadings or petition and on affidavits. Pa. R. Civ. P. 1531(a).

68. Absent a special injunction, Plaintiffs will suffer the harms described above beginning November 12, 2026, before a full preliminary injunction hearing can be held on ordinary notice.

69. On November 10, 2026, Plaintiffs' counsel provided notice of this Petition, together with copies of the Complaint, the Affidavit, and the Memorandum of Law, to the City of



Case ID: 261101288
Control No.: 26112521

Philadelphia Law Department's Legislation and Legal Counsel Unit by email to Lewis Rosman (Lewis.Rosman@Phila.gov), Zoey Chenitz (zoey.chenitz@phila.gov), and Reynelle Staley (reynelle.staley@phila.gov). Plaintiffs respectfully request an emergency hearing on the special injunction on or before November 11, 2026, at the Court's earliest convenience.

70. Should the Court grant a special injunction without a hearing, Plaintiffs request that the Court schedule a hearing on the preliminary injunction within five days, as Rule 1531(d) contemplates.

## X. BOND

71. Under Pa. R. Civ. P. 1531(b), Plaintiffs request that the Court set bond in a nominal amount, given the constitutional nature of the claims, the absence of cognizable harm to the City from a conditioned stay, and the public interest in the relief sought.

**WHEREFORE,** Plaintiffs respectfully request that the Court:

1. Enter a special injunction, and after hearing a preliminary injunction, enjoining Defendants and their officers, agents, employees, and all persons acting in concert with them who receive actual notice of the order, from implementing or enforcing Bill No. 260163 (Chapter 9-6700 of The Philadelphia Code) against Plaintiffs and PAHAA's members, including Sections 9-6702(1) and (3), the permit requirement and nuisance declaration of Section 9-6703(1)(a), the permit criteria of Section 9-6703(1)(c)(.1), (.4), (.7), and (.9), and the penalties of Section 9-6704 as applied to any enjoined provision, pending final resolution of this action;

2. Condition that relief on compliance by Plaintiffs and PAHAA's members with the terms set out in Part VIII;

3. Schedule an emergency hearing on the special injunction and, if necessary, a hearing on the preliminary injunction within five days under Pa. R. Civ. P. 1531(d);



Case ID: 261101288
Control No.: 26112521

4. Set bond in a nominal amount under Pa. R. Civ. P. 1531(b); and

5. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: */s/ Patrick C. Campbell, Jr.*

Patrick C. Campbell, Jr., Esquire
PA Attorney I.D. No. 53350
565 E. Swedesford Road, Suite 303
Wayne, Pennsylvania 19087
Tel. 215.977.4100 | Fax 215.977.4101
Patrick.Campbell@lewisbrisbois.com
*Attorneys for Plaintiffs*

Dated: November 10, 2026



Case ID: 261101288
Control No.: 26112521

# CERTIFICATE OF SERVICE

I, Patrick C. Campbell, Jr., Esq., certify that on November 10, 2026, I caused a true and correct copy of the foregoing Petition, the Memorandum of Law, the Affidavit of Craig Katz, the Complaint, and the proposed Orders to be served by [email and hand delivery] on the following:

City of Philadelphia Law Department,
Lewis Rosman, Chief Deputy City Solicitor
1515 Arch Street, 17th Floor,
Philadelphia, PA 19102
Lewis.Rosman@Phila.gov, Counsel for Defendants.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: */s/ Patrick C. Campbell, Jr.*

Patrick C. Campbell, Jr., Esquire
PA Attorney I.D. No. 53350
565 E. Swedesford Road, Suite 303
Wayne, Pennsylvania 19087
Tel. 215.977.4100 | Fax 215.977.4101
Patrick.Campbell@lewisbrisbois.com
*Attorneys for Plaintiffs*

Dated: November 10, 2026



Case ID: 261101288
Control No.: 26112521

**VERIFICATION**

I, Craig Katz, hereby state I am employed by Plaintiff MNG 2005, Inc. as its Government Relations and Compliance Manager and authorized to make this verification on its behalf. While the forgoing document was prepared by counsel, and thus the language contained therein is that of counsel, the facts set forth in the document are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the provisions of 18 Pa.C.S.A. §4904 relating to unsworn falsifications to authorities.

Craig Katz

**Dated:** 11/6/2026

2

# Exhibit A

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
Patrick C. Campbell, Esquire
Attorney ID No.: 53350
565 E. Swedesford Road, Suite 303
Wayne, PA 19087
Tel.: (215) 977-4100
Fax: (215) 977-4107
Patrick.Campbell@lewisbrisbois.com

Counsel for Plaintiffs

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,

*Plaintiffs*,

v.

CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,

*Defendants*.

________ TERM, 2026

No. ______________

CIVIL ACTION

Assigned to: ______________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**AND OTHER RELIEF**

Plaintiffs Pennsylvania Healthy Alternatives Association ("PAHAA") and MNG 2005, Inc. ("MNG") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against the City of Philadelphia (the "City") and the above-named officials in their official capacities (collectively, "Defendants"), and allege as follows:



Case ID: 261101288
Control No.: 26112521

## INTRODUCTION

1. This action challenges a Philadelphia ordinance that throws out the baby with the bath water. The City Council (the "Council") said it was targeting illegal smoke shops that "fuel crime" and "expose our young people to dangerous products," such as concentrated and synthetic 7-OH[1] products. Instead of regulating those actors and products, the Council adopted Bill No. 260163 (the "Ordinance"), which effectively bans every hemp and kratom product in the City, including the tested, labeled, natural-leaf products that PAHAA's members, including MNG, sell only to age-verified adults.

2. The Ordinance's own safety measures (a 2% cap on 7-OH, a ban on synthetic alkaloids, laboratory testing, labeling, and a 21-and-over age limit) show the City knew how to regulate to achieve its intended objectives but ***and imposed a ban instead***.

3. The ban is because the Ordinance:

- Conditions the right to sell on FDA recognition, which is a legal and regulatory impossibility because it does not exist and no botanical product has a practical path to obtain it.
- Has an effective date of November 12, 2026, while the only permit pathway waits indefinitely on regulations the City has not and has no deadline to issue.
- Bars permits by imposing a setback within 500 feet of a long list of uses and in 184 designated areas, leaving virtually no viable retail location in Philadelphia.

[1] 7-OH, also known as 7-hydroxymitragynine, is an alkaloid compound.



Case ID: 261101288
Control No.: 26112521

4. Also, the Ordinance purports to be directed at "Intoxicating Substances"; however, alcohol, an intoxicating substance with far greater documented harms including underage use and abuse than the lawful products sold by PAHAA's members, is exempted.

5. The Council was warned that the FDA condition alone would operate as a *de facto* ban because it was unattainable, and the Council passed the bill unchanged. The result is a ban dressed up as regulation, in violation of the Pennsylvania Constitution and Pennsylvania law.

6. The Ordinance also adopts a chapter number, Chapter 9-6700, that the Philadelphia Code has already assigned to an unrepealed restaurant ordinance, leaving the public without fair notice of which law governs.

7. Starting November 12, 2026, lawful retailers shall face daily penalties with no permit process, no available permit, and no lawful way to comply, for an indefinite period.

8. Even if permits become available, 500-foot setbacks from schools, playgrounds, parks, recreation centers, libraries, and child-care uses, combined with 184 excluded zones and districts, eliminate virtually every commercially viable retail location, including but not limited to, those on which some of PAHAA's members currently operate, and is a *de facto* citywide ban.

9. The City may not extinguish a ***<u>lawful</u>*** business through an indefinite no-permit gap, a functionally prohibitory geographic scheme, and standardless restrictions that provide neither fair notice nor a meaningful avenue for relief.

10. Plaintiffs seek declaratory and injunctive relief before the Ordinance forces the closure of their Philadelphia stores, kills jobs, strands lawful inventory, destroys leasehold and compliance investments, and exposes them to mounting penalties for conduct the Ordinance's own permit provisions contemplate may lawfully occur.

**PARTIES**

11. Plaintiff PAHAA is a Pennsylvania nonprofit corporation with an address at 443 E. Baltimore Pike, Media, Pa. 19063, whose application for Section 501(c)(6) status is pending. Its members are retailers, manufacturers, and wholesalers in the hemp-derived products industry in Pennsylvania, including at least six retail establishments in Philadelphia that sell lawful products affected by the Ordinance. PAHAA's members sell pure leaf kratom and PAHAA prohibits its members from selling 7-OH.

12. Plaintiff MNG 2005, Inc. d/b/a CBD Kratom ("MNG") is a Missouri corporation with its principal place of business at 12400 Olive Blvd., St Louis, Mo. 63141. Through subsidiaries, MNG operates three retail stores in Philadelphia (212 S 17th Street, 524 South Street, and 4040 City Avenue Suite 2B (the "Stores")), where it lawfully sells hemp products (drinkables, edibles, creams, tinctures, and smokables) and natural-leaf kratom products to adults. MNG is a member of PAHAA.

13. PAHAA's members have invested substantial resources in their Philadelphia operations, including leases, buildouts, inventory, employee training, vendor relationships, product-testing protocols, labeling systems, and consumer-compliance infrastructure.

14. PAHAA's members do not sell hemp or kratom products to anyone under eighteen, or under twenty-one for smokables, and they require identification from any customer who appears younger than thirty, a practice just as rigorous as Pennsylvania's age-verification requirements for alcohol and tobacco.

15. PAHAA's members have their products independently tested by accredited labs, many certified by the DEA, for impurities, provide QR codes on labels linking to the laboratory results, and label ingredients, dosage information, and warnings where appropriate.



Case ID: 261101288
Control No.: 26112521

16. Defendant City of Philadelphia is a municipal corporation organized under Pennsylvania law. Bill No. 260163 represents official municipal policy and, when effective, will be implemented and enforced by the City and its departments, agencies, officers, and employees.

17. Defendant Cherelle Parker is the Mayor of Philadelphia and is sued solely in her official capacity. The Mayor is responsible for supervising the executive branch of City government and for ensuring the administration and enforcement of the Philadelphia Code.

18. The Ordinance assigns the "Department" authority to issue implementing regulations and to administer material aspects of the permit, testing, labeling, fee, renewal, and enforcement regime. The Department is defined in Sec. 9-101 as the Department of Licenses and Inspections unless otherwise specified. The Ordinance does not otherwise specify a definition for Department.

19. Defendant Ralph DiPietro is the Co-Commissioner of the Philadelphia Department of Licenses and Inspections and is sued solely in his official capacity. The Co-Commissioner is responsible for the inspections, safety, and compliance functions implicated by the Ordinance, including enforcement against unpermitted business activity.

20. Defendant Bridget Collins-Greenwald is the Co-Commissioner of the Philadelphia Department of Licenses and Inspections and is sued solely in her official capacity. The Co-Commissioner is responsible for the Quality of Life functions implicated by the Ordinance, including enforcement against unpermitted business activity.

21. The official-capacity Defendants are proper parties for prospective declaratory and injunctive relief because each has, or upon the Ordinance's effective date will have, a direct connection to its implementation or enforcement.



Case ID: 261101288
Control No.: 26112521

## VENUE

22. Venue is proper in this Court because the cause of action arose in this county and the properties at issue are located in this county.

## FACTUAL ALLEGATIONS

### What are PAHAA members and "CBD Kratom" Retail Stores Are and How They Operate

23. MNG and its affiliates own and operate over 50 "CBD Kratom" retail stores across the United States and employ over 400 individuals.

24. The "CBD Kratom" concept was founded in 2016 after MNG's founders identified a need in the marketplace while searching for natural, non-pharmaceutical ways to deal with a relative's chronic pain.

25. PAHAA's members' retail stores focus on their customers' wellness through various products including, but not limited to, hemp-derived cannabinoid-based products, such as CBD (cannabidiol), in both topical/cosmetic and consumable forms, and natural leaf kratom, an herbal product derived from or comprising the leaf of a tree native to Southeast Asia.

26. PAHAA members' retail stores provide customers with safe products that offer effective alternative remedies to improve individualized wellness so that, as MNG's motto goes, they can "sleep well, wake well, and live well."

27. As part of that mission, PAHAA's members educate customers about how hemp and natural-leaf kratom products can support their well-being.

28. By way of example, MNG trains its employees for at least five weeks, with continuous education thereafter, in, among other things, how to consult with a customer about what product is best for that particular customer's needs.



Case ID: 261101288
Control No.: 26112521

29. MNG's CBD Kratom stores are newly renovated, well lit, clean, and secure, and products are kept out of the reach of customers, most behind locked cases, requiring the assistance of a sales consultant to gain access.

30. The CBD Kratom stores are mostly in desirable commercial locations such as Rittenhouse Square in Philadelphia, Media in Delaware County, the Financial District in New York City, and River North in Chicago.

31. Sales consultants are trained and instructed to require identification from any customer who does not appear to be at least 30 years of age and are trained to spot fake identification.

32. By way of comparison, the FDA's Tobacco Compliance and Enforcement Program for the sale of another legal product, tobacco, only requires persons to be asked for identification if they appear to be under the age of 30, with no identification training other than instructions to match the purchaser's face with the picture.

33. "Cannabis" in the context of PAHAA's members refers only to hemp, a botanical class of the plant cannabis sativa.

34. MNG has been in business for approximately ten years and has served hundreds of thousands of customers.

**<u>Hemp-Derived Products, Generally</u>**

35. The term "cannabis sativa" refers to a plant species that can be separated into two different types of flowering plants: hemp and marijuana.

36. By way of background, in December 2018, the Agriculture Improvement Act of 2018 (the "Farm Bill") was signed into law. It removed hemp from Schedule I of the Controlled Substances Act, legalized the cultivation, processing, distribution, possession, and sale of hemp

and hemp extracts, and directed the U.S. Department of Agriculture to promulgate regulations governing hemp.

37. The Farm Bill defined "hemp" as "the plant cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9-tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o.

38. The Farm Bill further amended the federal Controlled Substances Act to exclude "tetrahydrocannabinols in hemp" from the definition of "tetrahydrocannabinol," a Schedule I substance, and to exclude "hemp" from the definition of "marihuana." 21 U.S.C. §§ 802(16)(B), 812(c).

39. This statute was amended by Public Law 119-37, enacted November 12, 2025, and amendments to the definition of "hemp" are currently scheduled to become effective December 11, 2026.

40. The amendments add exclusions to the definition of hemp, including cannabinoids that "are not capable of being naturally produced" and any hemp-derived cannabinoid products (whether intermediate or final) that contain cannabinoids that "are capable of being naturally produced" but were "synthesized or manufactured outside the plant." See Public Law 119-37 (2025).

41. Accordingly, sales of certain hemp-derived cannabinoids, such as CBD, will remain legal under federal law after the amendments go into effect on December 11, 2026.

42. However, hemp is a $29 billion industry in the United States. The implementation date of those amendments is, therefore, anything but certain. There is bipartisan and White House support for legislation to regulate hemp products.



Case ID: 261101288
Control No.: 26112521

43. In 2019, the Pennsylvania Department of Agriculture's Controlled Plant and Noxious Weed Committee expressly adopted the federal definition of hemp and exempted hemp and products containing hemp-derived cannabinoids from the Commonwealth's criminal laws. 49 Pa.B. 1667 (Apr. 6, 2019).

44. The United States Drug Enforcement Administration ("DEA") has advised that "cannabinoids extracted from the cannabis plant that have a delta-9-THC concentration of not more than 0.3 percent on a dry weight basis meet the definition of 'hemp' and thus are not controlled under the [Controlled Substances Act]". Letter from DEA to Alabama Board of Pharmacy (Sept. 15, 2021), a true and correct copy of which is attached as Ex. A.

45. As intended by federal and state legislators, the hemp industry, from farmers to retail shop owners, has grown rapidly across the nation and in Pennsylvania since 2018, particularly in the manufacture and sale of hemp products such as oils, flower, topical creams, and infused edible products containing CBD and other cannabinoids.

46. In a memo to all members of the Pennsylvania State Senate, dated September 25, 2026, Senator Dawn Keefer (R-31) announced that she would be proposing state legislation to address hemp sales.

47. Key components of Senator Keefer's proposed legislation will be a) Department of Agriculture registration, b) independent testing and truthful labels, c) 21-and-over sales with ID checks, d) a ban on candy-style packaging and youth-targeted marketing. It also grandfathers existing Pennsylvania operators who can document lawful pre-enactment operations. Sen. Dawn Keefer, *Protecting Pennsylvania's Responsible Hemp Businesses and Keeping Harmful Products Away from Children*, Pa. Senate Co-Sponsorship Memo (Sept. 25, 2026), https://www.palegis.us/senate/co-sponsorship/memo?memoID=49288.

**PAHAA's Members' Hemp-Derived Products**

48. All of PAHAA's members hemp-derived products comply with the Farm Bill.

49. All of PAHAA's members' hemp-derived products contain a Δ-9 THC concentration of not more than 0.3 percent on a dry weight basis.

50. PAHAA's members voluntarily comply with the regulatory concerns relating to hemp sales.

51. Every hemp-derived product sold is tested for cannabinoid content, including CBD and delta-9 THC by independent, accredited third-party laboratories.

52. Such hemp-derived products prominently display ingredient labels, and most display a QR code that a customer can scan with a smartphone to view a Certificate of Analysis containing three to five pages of product testing results.

**Kratom Products, Generally**

53. PAHAA members also sell products derived from the leaf of kratom (Mitragyna speciosa), a plant native to Southeast Asia, which medical researchers have studied for use in, among other things, mitigating the opioid epidemic, pain relief, and treatment of anxiety, depression, PTSD, and other conditions.

54. Kratom has been used in Southeast Asia in teas for hundreds if not thousands of years as a relaxant.

55. A March 2020 study by the Department of Psychiatry and Behavioral Sciences at Johns Hopkins University School of Medicine, which surveyed over 2,700 kratom users, found that kratom is "typically ingested orally for treating pain and other medical conditions," that the typical kratom consumer is over forty years old and college educated, that ninety-one percent of consumers use it for pain management, and that the likelihood of kratom use being characterized



Case ID: 261101288
Control No.: 26112521

as even mildly abusive is less than ten percent. See Garcia-Romeu et al., *Kratom (Mitragyna speciosa): User demographics, use patterns, and implications for the opioid epidemic*, 208 Drug & Alcohol Dependence 107849 (Mar. 2020).

56. Natural-leaf kratom is not a controlled substance under federal law or Pennsylvania law.

57. Concerns with kratom are easily addressed through regulation. In fact, there is model legislation adopted by 17 states to date-the Kratom Consumer Protection Act ("KCPA").

58. On October 25, 2026 the Pennsylvania House of Representatives passed House Bill 2657 by a vote of 202-0. *See* H.B. 2657, Gen. Assemb., Reg. Sess. (Pa. 2025-2026), https://www.palegis.us/legislation/bills/2025/hb2657.

59. The KCPA, the industry's approved model legislation, generally includes some combination of:

- Age limit. No sales to people under 18 or, increasingly, under 21. Selling to a minor is usually a misdemeanor.
- Adulteration ban. Products may not contain substances that make them injurious, such as other drugs or controlled substances.
- Synthetic alkaloid ban. No synthetic mitragynine, synthetic 7-OH or other synthesized kratom alkaloids.
- 7-OH cap. A limit on how much 7-OH can be present, often 2% of the alkaloid fraction in earlier laws and lower in newer ones.
- Labeling. Ingredients, the processor's name and address, directions, and often the amount of mitragynine and 7-OH per serving, plus warnings.
- Registration. Processors or products must register with a state agency, sometimes with a lab certificate.
- Penalties. Fines, civil penalties or suspension of the right to sell, and in some states a private right for consumers to sue.



Case ID: 261101288
Control No.: 26112521

60. Pennsylvania's proposed legislation includes many provisions commonly found in KCPA. It a) restricts sales to adults 21+, b) requires product labeling and consumer warnings, c) prohibits synthetic or adulterated kratom products, d) limits high concentrations of 7-hydroxymitragynine (7-OH), and e) establishes state oversight through the Department of Health. *Id.*

61. In an FDA sponsored natural kratom leaf-controlled dosing study, the first of its kind, no deaths or "serious adverse events" were reported and drug-like effects, such as feeling high or sedated, did not occur until very high doses-12g or more. *See* C. Reissig et al, *A Pilot, Dose-Finding, Pharmacodynamic and Pharmacokinetic Study of Orally Administered Botanical Kratom*, J. Clin. Psychopharmacology (2026), https://doi.org/10.1097/jcp.0000000000002158.

**PAHAA's Members' Kratom Products**

62. Importantly, PAHAA's members, including MNG, sell only natural-leaf kratom products, tested by independent, accredited, third-party laboratories for alkaloids and labeled with all ingredients and provided with appropriate warnings.

63. PAHAA members sell only natural-leaf kratom products having an amount of 7-OH which is more than 2% or less of the overall alkaloid composition of the product.

64. Accredited third-party laboratories test the natural-leaf kratom products sold for kratom alkaloid content.

65. They do not sell 7-OH products.

66. PAHAA's members self-regulate—meaning they essentially comply with the provisions of the KCPA such as testing, labeling, age limits, adulteration and 7-OH bans.



Case ID: 261101288
Control No.: 26112521

**The Ordinance**

67. On March 5, 2026, Councilmember Gilmore Richardson introduced Bill No. 260163 in Philadelphia City Council. The Bill was referred to the Committee on Commerce and Economic Development. *See* Phila., Pa., Bill No. 260163 § 9-6703(4) (introduced Mar. 5, 2025) (signed Sept. 15, 2026).

68. Councilwoman Richardson described the Bill as aimed at what she described as "nuisance businesses", particularly "illegal smoke shops" that operate without community or zoning approval and "fuel" neighborhood crime. Hearing on Bills 260162, 260163 & 260465 Before the Phila. City Council Comm. on Commerce & Econ. Dev., 2026 Sess. 21:10-18. (May 21, 2026) (hereinafter "Committee Hearing Transcript").

69. The official legislative record of the City's proceedings concerning the Ordinance is located at Transcript Room - Committee Hearings (052126/Commerce) and Transcript Room - Council Sessions (060426), incorporated by reference and judicial notice thereof is requested.

70. The Councilwoman further described the object of the Bill to take aim at those businesses that "continue to exploit loopholes, disregard community concerns and operate in ways that put our neighborhoods and the well-being of our communities at stake" and that "[t]hey are putting profits over our safety." *Id.* at 23:1-12.

71. The Councilwoman said that only intoxicating products approved by the FDA should be sold in the City. She admitted that she had no concern with the actual health and wellness benefits of any of the products. *Id.* at 24:23-25:4.

72. On May 21, 2026, the Bill was amended in committee. As amended, it creates Chapter 9-6700 of The Philadelphia Code, titled "Intoxicating Substances." *See* Phila., Pa., Bill No. 260163, Proposed Amendments in Committee (May 21, 2026).



Case ID: 261101288
Control No.: 26112521

73. Confusingly, Chapter 9-6700 of The Philadelphia Code relating to restaurants already exists and has never been repealed, and is titled "Third-Party Restaurant Reservation Services." This section of the Code became effective April 7, 2026. *See generally* Phila., Pa., Code § 9-6700 (2026).[2] .

74. Section 9-6701(4) of the Ordinance defines "Intoxicating Hemp Product" as "[a]ny substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o)." *See* Phila., Pa., Bill No. 260163 § 9-6701(4) (June 4, 2026) (signed Sept. 15, 2026).

75. Section 9-6701(11) of the Ordinance broadly defines "Kratom Product" as an intermediate or final product intended for human or animal use, through any means of application or administration, that contains mitragynine or 7-hydroxymitragynine in any form and is derived from Mitragyna speciosa, is not capable of being naturally produced by the plant, or is capable of natural production but was synthesized or manufactured outside the plant. *Id.*

76. Section 9-6701(10) separately defines "Kratom Extract" as a food product containing any part of a kratom leaf that has been extracted and concentrated to provide more standardized dosing. *Id.*

[2] Bill 260163, as passed, provided that its provisions would be set forth at sections 9-6701 to 9-6705 of the Philadelphia Code. *See* Phila., Pa., Bill No. 260163 (June 4, 2026) (signed Sept. 15, 2026). A copy of the Ordinance as passed is attached as Ex. B. However, the provisions of Bill 260163 are placed in the electronic version of the Philadelphia Code at sections 9-6901 to 9-6905. Even more confusing, the electronic version of the Philadelphia Code provides a disclaimer that "These documents **should not** be relied upon as the definitive authority for local legislation. Additionally, the formatting and pagination of the posted documents varies from the formatting and pagination of the official copy." *See* Philadelphia Code Disclaimer, attached hereto as Ex. C. (emphasis added). Thus, for the purposes of this Complaint, Plaintiffs refer to the Ordinance as signed on September 15, 2025-section 9-6700, *et seq*.



Case ID: 261101288
Control No.: 26112521

77. Section 9-6702(1) of the Ordinance makes it unlawful to sell or offer for sale any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o). *Id.*

78. Section 9-6702(2) of the Ordinance makes it unlawful to sell or offer for sale a kratom product that: is mixed or packed in a manner that renders it injurious; contains residual solvents above the standards in the edition of United States Pharmacopeia/National Formulary 467 current on the paragraph's effective date; contains more than two percent 7-hydroxymitragynine in the alkaloid fraction; or contains a synthetic alkaloid or other synthetically derived kratom compound. *Id.*

79. Section 9-6702(3) of the Ordinance operates through the federal Food and Drug Administration ("FDA"). This section of the Ordinance makes it unlawful to sell or offer for sale an intoxicating substance that is "not considered appropriate for use as a dietary supplement or a safe food additive" or is not the subject of an application approved under specified provisions of the Federal Food, Drug, and Cosmetic Act ( the "FDCA"), 21 U.S.C. §§ 321, 331, 342, 348, or 355. *Id.*

80. Thus Section 9-6702(3) provides only three paths to the permittable sale of defined intoxicating substances in Philadelphia: being deemed appropriate for use as a dietary supplement under the FDCA, being deemed appropriate for use as a safe food additive under the FDCA, and being the subject of an application approved under the FDCA. These paths are all dead ends as they ban PAHAA members' otherwise legal products.

81. The FDCA does not regulate smokable kratom or hemp so long as there are no medical claims made for the products. Also, the FDA under the FDCA also has not approved either hemp or kratom as an ingredient of edible or drinkable products.



Case ID: 261101288
Control No.: 26112521

82. PAHAA members' pure leaf kratom and hemp, as smokable products which do not make medical claims, are not dietary supplements or food additives, so they are not regulated under the FDCA. Also, there is no possible application for approval under the FDCA because the FDCA does not apply to these products – they are not food. Thus, there is no path to permitted sales, and the Ordinance bans these products.

83. Also, any edible or drinkable hemp product which otherwise is currently permitted is effectively banned by the Ordinance. The FDA has not recognized any hemp product or kratom product as a lawful dietary supplement or safe food additive. Furthermore, the FDA and has not approved any kratom product or hemp product as a food additive under an application under 21 U.S.C. §342.

84. If PAHAA members file an application as required by the Ordinance, the FDA itself estimates it would take over 2 years to get approval. *See* Food & Drug Admin., Guidance for Industry: Questions and Answers About the Food Additive or Color Additive Petition Process (Apr. 2011), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-questions-and-answers-about-food-additive-or-color-additive-petition-process.

85. Since the Ordinance goes into effect on November 12, the PAHAA members' would never be able to get a timely approval from the FDA for its edible and drinkable products. Thus their sales of edible and drinkable products will be effectively banned.

86. The Ordinance therefore conditions every sale of otherwise permitted hemp and kratom on an approval of a federal application that either does not exist or can only be obtained through a multi-year administrative process.



Case ID: 261101288
Control No.: 26112521

87. Thus, the Ordinance, specifically Section 9-6702(3), functions as a categorical ban on all Intoxicating Substances, including tested and properly labeled natural-leaf kratom. *Id.*

88. The Ordinance repeats that same prohibition as a condition of permit eligibility in Section 9-6703(1)(c)(.1), so that no applicant could ever satisfy it. *Id.*

89. While the FDA has recommended a scheduling action on 7-OH, "it is not focused on natural kratom leaf products." *See* Hiding in Plain Sight: 7-OH Products, U.S. Food & Drug Admin., https://www.fda.gov/news-events/public-health-focus/hiding-plain-sight-7-oh-products; *see also* U.S. Food & Drug Administration, *FDA Takes Steps to Restrict 7-OH Opioid Products Threatening American Consumers* (Sept. 16, 2026), https://www.fda.gov/news-events/press-announcements/fda-takes-steps-restrict-7-oh-opioid-products-threatening-american-consumers.

90. In addition, Section 9-6702(1) of the Ordinance outright bans the sale of every "Intoxicating Hemp Product". Confusingly, Section 9-6703(4)(a) and (5)(a) prescribe testing and labeling standards for "Intoxicating Hemp products" sold by permitted retailers. *See* Phila., Pa., Bill No. 260163 § 9-6701(4) (June 4, 2026) (signed Sept. 15, 2026).

91. Those hemp testing and labeling provisions established by the Ordinance can never be applied to permitted retailers, because the products they govern are banned in all circumstances. *See id.*

92. Section 9-6703 of the Ordinance establishes an "Intoxicating Substance" retailer permit and requires a separate current permit for every retail location. It declares unpermitted retailing a nuisance as a matter of law. *See id.*

93. As demonstrated above, under Section 9-6703 of the Ordinance, current retailers simply cannot obtain a permit to sell hemp and kratom products. The Ordinance thereby bans retail sales of these products in Philadelphia.



Case ID: 261101288
Control No.: 26112521

94. Among other prerequisites, Section 9-6703(1)(c)(.5) of the Ordinance requires a valid commercial activity license, any otherwise required license or permit, a fixed location, and compliance with zoning. It also states that an applicant must maintain a valid permit to dispense medical marijuana from the Pennsylvania Bureau of Medical Marijuana "if required," without stating in the Ordinance under what circumstances a permit to dispense medical marijuana is required. *See id.*

95. Section 9-6703(1)(c)(.7)(.b) of the Ordinance bars a permit for a location within 500 feet of a regulated use under Section 14-603(13), a school through grade twelve or its recreation areas or playfields, a public playground, public swimming pool, public park, public recreation center, public library, or child-care use. *See id.*

96. Section 9-6703(1)(c)(.7) of the Ordinance separately identifies 184 street corridors, segments, business districts, and other designated areas in which a permit may not issue. The enumerated areas include major commercial locations such as portions of City Avenue, Germantown Avenue, Broad Street, Market Street, Chestnut Street, Walnut Street, South Street, Frankford Avenue, Kensington Avenue, Aramingo Avenue, Bustleton Avenue, and Castor Avenue, as well as Old City, Northern Liberties, Fishtown, the Center City District, and East Passyunk. *See id.*

97. A permit is location- and owner-specific, is not transferable, and remains valid only through December 31 of the calendar year for which it is issued. *Id.* at (1)(d). The Ordinance also provides for renewal and revocation. *Id.* at (2)

98. Section 9-6703 of the Bill requires products sold by a permitted retailer to be tested by a Drug Enforcement Administration-registered laboratory located in Pennsylvania and labeled in accordance with Department regulations.



Case ID: 261101288
Control No.: 26112521

99. This provision of the Ordinance also bans otherwise permitted retail sale of hemp and kratom because no Department labeling regulations have been adopted. *Id.* at (4).

100. Section 9-6704 of the Bill classifies each violation of Chapter 9-6700 as a Class III offense subject to the maximum fine in Section 1-109(3) of the Philadelphia Code, in addition to penalties under Section A-505.1 of the Philadelphia Administrative Code. Each day of a continuing violation is a separate offense. *Id.*

**<u>The No-Permit Gap</u>**

101. Section 2 of Ordinance No. 260163 provides: "This Ordinance shall be effective November 12, 2026, except that Section 9-6703 ('Permitted Sale of Intoxicating Substances') shall take effect upon the issuance of regulations by the Department." *Id.*

102. Those aforementioned regulations do not exist.

103. The Ordinance sets no date by which the Department must propose, adopt, or issue those regulations. *Id.* It supplies no default procedure through which a retailer may apply if regulations have not issued by November 12, 2026. *Id.*

104. As a result, on November 12, 2026, Section 9-6702's prohibitions and Section 9-6704's daily penalties become operative even if Section 9-6703 remains inoperative and no permit can be applied for, processed, or granted. That gap is another indefinite total ban.

105. The Ordinance contains no grandfathering, preexisting use provisions for an existing lawful retailer, no transition period for existing inventory or leases, no variance or waiver procedure, and no mechanism for recognition of a lawful previously approved nonconforming retail use.



Case ID: 261101288
Control No.: 26112521

**The Setbacks and Geographic Zone Exclusions**

106. Even after regulations issue, the overlapping 500-foot setbacks and 184 designated-zone exclusions, when mapped across Philadelphia, leave virtually no commercially viable retail locations. Upon information and belief, applying those exclusions to PAHAA's members' current stores makes PAHAA's members ineligible for permits at those locations and effectively requires Plaintiffs to cease their Philadelphia operations.

107. The setbacks and geographic use restrictions are not tied to individualized evidence concerning PAHAA's members' stores, products, operating practices, or history. *See id.* The Ordinance provides no process through which Plaintiffs can show that a particular location poses no material risk or that tailored operating conditions would address any identified concern. *See id.*

108. PAHAA's members, including MNG, have operated as lawful retailers and have developed substantial, reasonable investment-backed expectations in the continued use of their stores, inventory, leases, goodwill, and compliance systems, subject to lawful health and safety regulation.

109. PAHAA's members purchase and receive hemp and kratom products and related products through interstate channels of trade.

110. The Ordinance will prevent or materially burden those interstate transactions and will strand inventory lawfully acquired for retail sale.

111. To prepare for the November 12, 2026 effective date, PAHAA's members must make immediate and costly decisions about inventory, purchasing, staffing, lease obligations, relocation, and store closure. Injuries from these decisions are concrete and imminent and are directly traceable to Defendants' implementation and threatened enforcement of the Ordinance.



Case ID: 261101288
Control No.: 26112521

112. Without judicial relief, PAHAA's members face the closure of stores, loss of trained employees, customers and goodwill, impairment of contractual relationships, stranded inventory, unrecoverable compliance and buildout costs, and exposure to daily fines and other enforcement measures.

113. Each of PAHAA's members' Philadelphia stores, including MNG's three Stores, falls within one or more of the 500-foot setbacks or 184 designated-area exclusions, so the Ordinance bars their continued lawful retail use and will force them to close.

114. The Ordinance was not enacted as an amendment to the Philadelphia Zoning Code (Title 14 of The Philadelphia Code) and, upon information and belief, was not subjected to the review and procedures that apply to zoning legislation, including review and recommendation by the Philadelphia City Planning Commission. *See* Sec. 14-301(3) (c)(.2).

**The Ordinance Exempts Alcohol**

115. Section 9-6701(9) of the Bill defines "Intoxicating Substance" to mean "[a]ny Intoxicating Hemp Product or Kratom Product." *See* Phila., Pa., Bill No. 260163 § 9-6701(4) (June 4, 2026) (signed Sept. 15, 2026). Alcohol is not included as an "Intoxicating Substance" in the Ordinance.

116. Alcohol, however, is clearly an "intoxicating substance". It affects the central nervous system and can impair judgment, coordination, reaction time, perception, and decision-making

117. Products containing alcohol, an inherently intoxicating substance, are not required to carry QR codes linking consumers to batch-specific laboratory analyses.



Case ID: 261101288
Control No.: 26112521

118. By contrast, many hemp and kratom products, such as Plaintiffs' members products, already provide consumers with direct access to third-party test results through QR-code-enabled Certificates of Analysis.

119. According to the Center for Disease Control ("CDC"), alcohol use can lead to well documented health issues such as:

- Injuries—motor vehicle crashes, falls, drownings, and burns.
- Violence—homicide, suicide, sexual violence, and intimate partner violence.
- Alcohol poisoning—high blood alcohol levels that affect body functions like breathing and heart rate.
- Overdose—from alcohol use with other drugs, like opioids.
- Sexually transmitted infections or unplanned pregnancy—alcohol use can lead to sex without protection, which can cause these conditions.
- Miscarriage, stillbirth, or fetal alcohol spectrum disorder (FASD)—from alcohol use during pregnancy;
- Cancer;
- High blood pressure.
- Heart disease.
- Liver disease.
- Stroke.
- Alcohol use disorder—this affects both physical and mental health.
- Digestive problems.
- Weaker immune system—increasing your chances of getting sick.
- Mental health conditions, including depression and anxiety.
- Learning problems, and issues at school or work.
- Memory problems, including dementia.
- Relationship problems with family and friends

*See* Ctrs. for Disease Control & Prevention, *About Alcohol Use*, https://www.cdc.gov/alcohol/about-alcohol-use/index.html (last visited Nov. 6, 2026).

120. Again, according to the CDC:

- Young people (ages 12-20) in the United States use alcohol **more than other drugs**.
  - o Drinking can have serious effects on their health and well-being.
  - o Underage drinking can also put their safety—and the safety of those around them—at risk.



Case ID: 261101288
Control No.: 26112521

- People who are younger than 21 should not drink any alcohol.

*See* Ctrs. for Disease Control & Prevention, *Community Strategies to Prevent Underage Drinking*, https://www.cdc.gov/alcohol/underage-drinking/community-strategies.html (last visited Nov. 6, 2026) (emphasis added).

121. And, according to CDC data (*emphasis added*):

> Excessive alcohol use causes about **4,000** deaths among young people (under 21) each year. These deaths are from several alcohol-related causes, such as:

- Motor vehicle crashes.
- Violence and other injuries.
- Suicide.
- Drug overdoses.
- Health issues from being exposed to alcohol during pregnancy.

*Id*.

122. CDC recommended solutions include a) reducing the number of outlets that sell alcohol b) increasing the distances between them, making alcohol more expensive through taxes and d) enforce laws currently on the books. *Id.*

123. And, while alcohol comes with warnings, it does not come with ingredient labels, COA analysis or dosing.

124. A high-profile example of the consumer health concerns because of the lack of transparency in alcohol are the tequila class actions against brands such as Casamigos and Don Julio where it is alleged that despite labels representing the products are made from 100% pure blue weber agave, independent laboratory testing found that they actually contain cane alcohol and cheaper alcohol substitutes.

125. In another example of the lack of transparency in the alcohol industry, a recent peer reviewed study found unacceptable amounts of PFAs (forever chemicals) in a number of different



Case ID: 261101288
Control No.: 26112521

beers. *See* Jennifer Hoponick Redmon *et al.*, *Hold My Beer: The Linkage Between Municipal Water and Brewing Location on PFAS in Popular Beverages*, 59 **Env't Sci. & Tech.** 8368 (2025).

126. Pennsylvania law does not bar municipalities from prohibiting the retail sale of alcohol. To the contrary, the Liquor Code's local-option provision authorizes the electors of any municipality to prohibit the granting of liquor licenses, malt and brewed beverage licenses, and the operation of State liquor stores within the municipality. 47 P.S. § 4-472(a). The Liquor Code also expressly preserves municipalities' authority to regulate zoning and to enforce local ordinances dealing with health and welfare issues. 47 P.S. § 4-493.1(a).

127. Pennsylvania municipalities have made extensive use of that authority. Upon information and belief, approximately 675 Pennsylvania municipalities are "dry" or partially "dry," prohibiting some or all retail alcohol sales within their borders, according to the Pennsylvania Liquor Control Board's list of dry municipalities See Pennsylvania Liquor Control Board website at https://www.pa.gov/agencies/lcb/licensing/resources-for-licensees/quota-system/wet-and-dry-municipalities.

128. The City has the ability to but has not sought to prohibit, or to impose comparable bans, exclusions or regulations on, the retail sale of alcohol. Alcohol may be sold throughout the City, including within the 184 corridors and districts in which the Ordinance forbids Plaintiffs to operate.

129. Scientific and public-health data show that hemp and kratom products, sold as PAHAA's members sell them, disclose ingredients, provide testing results so consumers can see impurity testing results, and present, at most, no greater risk of abuse or harm to individuals or the community, than the risk presented by alcohol.



Case ID: 261101288
Control No.: 26112521

130. MNG, PAHAA, and its members will continue to comply with their self-regulations. They will not sell products containing 7-OH (other than that occur naturally in natural leaf kratom in trace amounts) and their hemp products will comply with the definition of hemp in the 2018 Farm Bill, 7 USC 1639o(1) as amended from time to time.

131. Specifically, in addition to continuing to require identification from any customer who appears to be under thirty (30), using continue accredited independent third-party laboratory testing of every product it sells, and labeling every product, MNG is prepared to raise its minimum age to twenty-one (21) for all intoxicating hemp-derived and kratom products and will not sell any covered product to anyone under 21.

132. Moreover, Plaintiffs will continue to test for alkaloids and cannabinoids and provide ingredient labels and certificates of analysis.

## **The Legislative Record**

133. The legislative record shows that PAHAA's members' businesses and products were not the issue.

134. Councilwoman Richardson's comments, detailed above, evidence a disregard for the legitimate business and services of PAHAA members.

135. The concerns from physicians who testified had to do with unregulated sales and sales tactics-such as selling intoxicating hemp products disguised as kids treats to unsuspecting minors. Committee Hearing Transcript at 54:19-62:23.

136. Supporting community activists, physicians, and industry experts called for regulation—not a ban-especially a ban that affects the rights of adult consumers. *Id.* at 64:2-16, 79:1-85:3, 124:10-131:21, 147:5-151:19, 205:11-211:10.



Case ID: 261101288
Control No.: 26112521

137. Pennsylvania Cannabis Coalition (i.e. Big Cannabis), a trade group representing Marijuana sellers, competitors with Plaintiffs, came out to trash hemp products-their competition. Id. at 141:2-146:19. Ignoring the fact the Bill was an obvious ban, this representative applauded the Bill because she characterized it as regulatory so consumers know what they put in their bodies and have confidence that the products are not being marketed to children. *Id.*

138. A supporting physician attributed the rise in kratom-related poison-center calls to "concentrated" 7-hydroxymitragynine ("7-OH") products-not natural leaf kratom. *Id.* at 51:21-52:8.

139. Another emergency room physician also argued for regulation of kratom-pointing out that he had no experience with minor's inadvertently overdosing on kratom and the incidence of adult overdose was low. *Id.* at 124:10-129:8. He pointed to the beneficial uses of kratom-especially for those wishing to stop using opioids-when used properly. *Id.* 130:13-131:21.

140. Council was told in clear and unmistakable terms that its FDA approval condition could never be met by any of these products because that approval pathway was only for drugs marketed as drugs-not for supplements. *Id.* at 207:17-20. Council was told that the proposed regulatory condition in the Bill made it a *de facto* ban. *Id.* at 208:9-12.

141. The City chose prohibition over regulation it could not enforce. Asked whether it had the resources to implement the Bill, the Department of Public Health answered, "Not currently." *Id.* at 35:21-36:6. The Bill sponsor conceded that "it would be nearly impossible for the City of Philadelphia to test every single product." *Id.* at 214:11-14.

142. PAHAA's members' products and practices essentially already address each stated harm. Independent testing addresses potency by testing for cannabinoids and alkaloids, ingredients, dosage, and warning labels and QR-codes provide consumer access to accredited



Case ID: 261101288
Control No.: 26112521

third-party lab results[3]; age gates and verification addresses youth access; members do not sell concentrated or synthetic 7-OH; and members operate licensed, fixed-location stores that are not sources of crime.

143. The Ordinance itself contains measures tailored to those harms: a two-percent cap on 7-OH, a ban on synthetic alkaloids, testing and labeling requirements, and a twenty-one-and-over age limit. But Section 9-6702(3), together with the no-permit gap and geographic exclusions, makes those measures meaningless by banning tested, labeled, age-restricted products along with the unregulated products that prompted the legislation.

144. Other lawmakers addressing the same concerns have distinguished between concentrated or synthetic 7-OH products and natural-leaf kratom. For example, legislation pending in Pennsylvania and New Jersey would prohibit 7-OH products without prohibiting natural-leaf kratom, and federal legislation introduced in September 2026 would specifically schedule synthetic 7-OH products above a specified threshold rather than kratom generally. See H.R. 10272, 119th Cong. (2026).

145. The Bill's own supporters distinguished PAHAA's members' products from those that prompted it. A Penn Medicine addiction physician testified that today's "highly concentrated extracts" are "far removed from the traditional leaf product." Committee Hearing Transcript at 50:23-51:3. And the Department of Public Health acknowledged that it "does not currently regulate kratom products." *Id.* at 35:21-24.

146. Opponents of the enactment of the Ordinance were many and vocal.

---

[3] By way of example, a certificate of analysis for every one of MNG's products can be found at it web site test results page :https://shopcbdkratom.com/pages/test-results?srsltid=AYCX9vLntxWL06uzFlitxqOisGVkM7vfhsSLYDJne8Qx5uWXvqfHhXng.



Case ID: 261101288
Control No.: 26112521

147. They pointed out to the Council during the June 4, 2026 meeting where it was presented for a vote that:

a. The Council was ignoring the science;

b. That kratom is only a partial agonist, meaning that while it affects the mu opioid receptor in the brain, it does not cause respiratory depression like opioids-much like chocolate and cheese;

c. It has many health and life saving benefits such as pain relief and help with addiction recovery;

d. That the Council was engaged in a smear campaign by linking legitimate adult kratom use for wellness benefits to crime and addiction; and

e. That one would not even recognize kratom users as they pass them on the street because they are fully functioning, productive members of society.

*See* Philadelphia City Council, Stated Meeting Tr. 235-38 (June 4, 2026) at 157:3-201:20.

148. One opponent said that as a person in recovery from substance use disorder, natural leaf kratom had saved his life and the life of countless others. *Id.* at 170:9-19.

149. The Council was in fact invited to visit one of the several CBD Kratom shops in the city to see that they are not the source of crimes or misdemeanors. *Id.* at 195:18-22.

150. The Council enacted the Bill knowing that Section 9-6702(3) would ban natural leaf kratom. The Global Kratom Coalition testified that the provision "risks functioning as a *de facto* ban on all natural kratom products," because Section 505 of the Federal Food Drug and Cosmetics Act is a drug-approval pathway that "no botanical product could meet," and that "this single regulation nullifies" the Bill's tailored safety provisions. Committee Hearing Transcript at 147:5-151:19.



Case ID: 261101288
Control No.: 26112521

151. The sponsor responded that her circulated amendments "will be all the amendments that we are considering at this time." *Id.* at 171:15-18. The Committee then approved the amendments and reported the Bill favorably without opposition. *Id.* at 235:19-238:14. At the June 4, 2026 Stated Meeting, after public comment urging Council to "remove the unregulated FDA requirements," Council passed the Bill 16 to 0 without doing so. *Id.* at 192:18-24, 235:15-238:15.

152. Council was provided a draft of legislation to regulate hemp and made aware of the KCPA, both of which address the concerns stated by the Ordinance's sponsor while at the same time permitting lawful businesses like Plaintiffs to remain open. They were ignored.

153. The amendments essentially proposed keeping the regulatory provisions of the Ordinance but removing the bans, the setbacks and the exclusionary zones.

**COUNT I— SUBSTANTIVE DUE PROCESS (Pa. Const. art. I, § 1)**

154. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

155. Article I, Section 1 of the Pennsylvania Constitution guarantees the inherent and indefeasible rights of acquiring, possessing, and protecting property and of pursuing one's own happiness, which include the right to engage in a lawful business or occupation.

156. A substantive due process challenge under the Pennsylvania Constitution is subject to means-end review, in which the court weighs the rights infringed by the law against the interest sought to be achieved and scrutinizes the relationship between the means and that end.

157. Under Pennsylvania's rational basis test a law that purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained, and the government may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.



Case ID: 261101288
Control No.: 26112521

158. The Ordinance fails that test. It is unduly oppressive and patently beyond the necessities of the case because it forces the closure of the PAHAA members' established Stores and effectively bans a lawful business citywide, when the Ordinance's own permit, testing, labeling, and age-restriction provisions demonstrate that the City's asserted concerns can be addressed by regulation short of a de facto ban.

159. The Ordinance's means lack a real and substantial relation to its stated objective of addressing intoxicating substances because it exempts alcohol, an intoxicating product of comparable or greater harm, and because its indefinite no-permit gap and near-total geographic exclusions bear no relationship to the safety of any particular product, store, or retailer.

160. The Ordinance is also patently beyond the necessities of the case because it prohibits products that already meet the City's stated safety objectives: PAHAA's members' products essentially meet the Ordinance's stated regulations-they are independently tested, fully labeled, digitally linked to accessible laboratory results, and sold only to age-verified adults.

161. To the extent that MNG or any other PAHAA member does not comply with the Ordinance's safeguards, MNG will comply with objectives of the Ordinance: MNG will raise its minimum age to twenty-one (21) for all intoxicating hemp-derived and kratom products, will not sell any covered product to anyone under 21, and will keep requiring identification from any customer who appears to be under thirty (30).

162. Moreover, MNG will not sell any kratom product containing 7-OH (other than that occurring naturally in natural-leaf kratom in trace amounts) and their hemp products will comply with the definition of hemp in the 2018 Farm Bill, 7 USC 1639o(1) as amended from time to time.



Case ID: 261101288
Control No.: 26112521

163. Prohibiting compliant products along with noncompliant ones imposes an unusual and unnecessary restriction on a lawful occupation and discards the lawful market to reach its unlawful fringe.

164. The Ordinance therefore violates Article I, Section 1 of the Pennsylvania Constitution on its face and as applied to Plaintiffs, and Plaintiffs are entitled to declaratory and injunctive relief.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that Bill No. 260163 is void or in the alternative grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees and costs;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT II — STATE-LAW PREEMPTION (Pennsylvania Law)**

165. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

166. Pennsylvania has established a comprehensive statewide framework governing industrial hemp through Act 92 of 2016, as amended, and related statewide statutes, regulations, licensing, testing, cultivation, processing, and enforcement requirements.



Case ID: 261101288
Control No.: 26112521

167. That framework reflects the Commonwealth's decision to regulate hemp on a uniform statewide basis and occupies the field or alternatively establishes state policies with which a municipality may not conflict.

168. The Ordinance conflicts with that statewide framework by redefining and prohibiting categories of hemp products by reference to evolving federal exclusions, imposing local testing and labeling conditions, and functionally excluding lawful hemp commerce from Philadelphia.

169. The First Class City Home Rule Act and the Philadelphia Home Rule Charter do not authorize the City to exercise powers contrary to, or preempted by, laws of statewide application. See 53 P.S. § 13133.

170. The Ordinance frustrates the General Assembly's objective of a uniform Commonwealth hemp regime and subjects state-authorized market participants and products to inconsistent local prohibitions.

171. Consumable products containing hemp or kratom are also governed by the Commonwealth's food-safety statutes on adulterated and misbranded food, including 3 Pa.C.S. § 5723 *et seq.*

172. The General Assembly has occupied this field. Alternatively, the Ordinance irreconcilably conflicts with state law and stands as an obstacle to the full purposes and objectives of the General Assembly.

173. Bill No. 260163 and Chapter 9-6700 are therefore preempted and invalid under Pennsylvania law, at least insofar as they regulate hemp products within the field occupied by, or in conflict with, the Commonwealth's hemp framework.



Case ID: 261101288
Control No.: 26112521

174. Plaintiffs are entitled to a declaration that the preempted provisions are invalid and to preliminary and permanent injunctive relief against their implementation and enforcement.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees and costs;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT III— EQUAL PROTECTION (Pa. Const. art. I, §§ 1 and 26)**

175. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

176. Article I, Sections 1 and 26 of the Pennsylvania Constitution guarantee equal protection of the laws and prohibit the Commonwealth and its political subdivisions from denying any person the enjoyment of a civil right or discriminating against any person in the exercise of a civil right.

177. The Ordinance classifies retailers of adult-use intoxicating products by product type. It singles out retailers of hemp and kratom products for a functional prohibition while leaving retailers of alcohol, an intoxicating adult-use product that presents comparable or greater risks, free to operate throughout the City, including in every area from which Plaintiffs are excluded.

178. The distinction cannot be justified on the ground that the City lacks authority over alcohol. Pennsylvania law authorizes municipalities to prohibit retail alcohol sales and preserves local health and welfare ordinances, and numerous Pennsylvania municipalities restrict or prohibit such sales. 47 P.S. §§ 4-472(a), 4-493.1(a).

179. Plaintiffs and alcohol retailers are similarly situated with respect to the Ordinance's stated purpose of regulating intoxicating products sold to adults. The classification lacks a reasonable ground of difference with a fair and substantial relationship to that purpose and is arbitrary under Pennsylvania's less deferential standard.

180. The Ordinance therefore denies Plaintiffs equal protection under the Pennsylvania Constitution on its face and as applied, and Plaintiffs are entitled to declaratory and injunctive relief.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

## COUNT IV— INVALID *DE FACTO* ZONING AND DEPRIVATION OF PROPERTY RIGHTS (Pa. Const. art. I, § 1; Pennsylvania Law)

181. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

182. Although styled as a licensing ordinance, the Ordinance's 500-foot setbacks and 184 designated-area exclusions dictate which uses may occur on which parcels of land within the City. The Ordinance therefore regulates the use of real property and operate as zoning in substance.

183. The sponsor confirmed the Ordinance's land-use purpose, describing its targets as shops that "operate without community zoning approval" and that "apply to be a grocery or a convenience store" before selling these products—"a cat-and-mouse game." Comm. Tr. at 21, 103–04.

184. Because zoning restricts and deprives a property owner of constitutionally protected property rights, it "can be sustained only if it is clearly necessary to protect the health or safety or morals or general welfare of the people." *Hopewell Twp. Bd. of Supervisors v. Golla*, 452 A.2d 1337, 1342 (Pa. 1982).

185. The Ordinance's location-based exclusions are not clearly necessary to protect the public. They eliminate virtually every commercially viable location in the City, are not tied to any evidence concerning Plaintiffs' Stores, and are not imposed on alcohol retailers whose products present comparable or greater risks.

186. Each of PAHAA's members' Philadelphia stores, including MNG's three Stores, is an existing, lawful use. Under Pennsylvania law, the right to continue a lawful use that predates a restrictive land-use regulation is constitutionally protected, and a municipality may not extinguish it without compensation, including through forced amortization. *See PA Northwestern Distributors, Inc. v. Zoning Hearing Bd.*, 584 A.2d 1372 (Pa. 1991).



Case ID: 261101288
Control No.: 26112521

187. The Ordinance contains no grandfathering, nonconforming-use, variance, or transition provision, and would immediately terminate the lawful use by MNG and the other members of PAHAA. In addition, by imposing land-use restrictions outside the Philadelphia Zoning Code and Charter, and their required procedures, the City has evaded the procedural protections that govern zoning legislation.

188. The Ordinance's exclusions are therefore invalid and unconstitutional under Article I, Section 1 of the Pennsylvania Constitution, on their face and as applied to Plaintiffs' stores. Plaintiffs are entitled to declaratory and injunctive relief, including a declaration that their stores may continue as lawful existing uses.

189. The Ordinance also, while clearly a zoning ordinance with setbacks and exclusionary zones that dictate uses of property, was not passed according the procedural requirements and safeguards for a zoning ordinance including, but not limited to, submission to the planning commission, public hearings and variances for pre-existing uses.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages;

(d) Award Plaintiffs their reasonable attorneys' fees and costs;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT V INVALID *DE FACTO* ZONING AND DEPRIVATION OF PROPERTY RIGHTS BASED UPON IMPROPER NOTICE**
**(Pa. Const. art. I, § 1; Pennsylvania Law)**

190. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

191. As alleged , the Ordinance's setbacks and designated-area exclusions regulate the use of land and operate as zoning in substance.

192. The Ordinance is designated Chapter 9-6700 of The Philadelphia Code, a chapter already occupied by the restaurant ordinance enacted by Bill No. 250888-A, approved January 7, 2026, and effective April 7, 2026.

193. The restaurant ordinance was in force during the debate and passage of Bill No. 260163 and remains in force. The duplicate numbering makes it impossible for the public or Plaintiffs to accurately research or address the terms of the Ordinance.

194. Based upon the failure of the Ordinance to provide proper notice to the public, the Ordinance is void *ab initio*. *Kelly v. City of Philadelphia*, 382 Pa. 459 (1955).

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under;



Case ID: 261101288
Control No.: 26112521

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT VI — EQUAL PROTECTION**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**

195. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

196. The Ordinance expressly classifies businesses based on whether they sell "Intoxicating Substances".

197. It then defines that term to include Plaintiffs' product but to exclude alcohol.

198. Alcohol is a comparator product that presents at least comparable but more likely greater risks relating to intoxication, misuse, dependency, contamination, or youth access, yet their retailers remain eligible to operate under materially less prohibitory retail and location regimes.

199. Plaintiffs are similarly situated to those retailers in relevant respects, including retail sales to adult consumers, product-safety obligations, age-verification concerns, and the City's ability to address risks through licensing, testing, labeling, inspections, and enforcement.

200. The Ordinance's disparate treatment is not rationally related to its stated ends because less restrictive and more tailored rules are available and because the Ordinance's own permit provisions recognize that regulated sale can be lawful.

201. The classification sweeps together tested, labeled, age-restricted products and the unregulated, contaminated, or synthetic products that prompted the Ordinance, and treats them identically, even though only the latter present the harms the City identified.

202. There is no rational basis for imposing a functionally citywide exclusion and an indefinite no-permit period uniquely on hemp and kratom retailers while permitting comparator businesses to operate through ordinary licensing and compliance mechanisms.



Case ID: 261101288
Control No.: 26112521

203. The classification here is also based on mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable which fails rational basis review. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); and *W. Easton Two, LP v. Borough Council of W. Easton*, 489 F. Supp. 3d 333, 370 (E.D. Pa. 2020).

204. PAHAA's members are similarly situated to the City's alcohol retailers in every material respects relevant to the Ordinance's stated purpose of regulating "intoxicating substances" sold to adults:

- Both sell age-restricted, intoxicating products to adults.
- Both raise the same asserted concerns about youth access and misuse, and the City can address both through licensing, testing, labeling and enforcement.
- Alcohol's documented harms (intoxication, abuse, impaired driving, injury, and death) are comparable to, or greater than, those of PAHAA's members' tested, labeled products.

Yet alcohol may be sold throughout the City, including most if not all of the 184 corridors and districts from which PAHAA's members are barred, and Pennsylvania law subjects new alcohol licenses near schools only to a discretionary 300-foot review.

205. The Ordinance was also passed in a state of unsubstantiated and hysterical fears and animus.

206. By way of example, the sponsor referred to sellers as "illegal smoke shops" that "fuel crime" and "operate without community zoning approval".



Case ID: 261101288
Control No.: 26112521

207. None of those concerns describes PAHAA's members, including MNG, which are licensed, fixed-location retailers selling only tested, labeled, natural-leaf products to age-verified adults.

208. By banning Plaintiffs' products because of fears about other sellers and other products, the City has extended to lawful, compliant businesses the "vague, undifferentiated fears" that *Cleburne, and its progeny* holds cannot justify unequal treatment.

209. The Ordinance also undercuts its own rationale: its 7-OH cap, synthetic-alkaloid ban, testing, labeling, and age provisions show that regulated sale serves the City's goals, yet its FDA condition, no-permit gap, and geographic exclusions ban the very products those provisions regulate.

210. Council was warned of this result and enacted the Ordinance anyway. A classification that treats tested, labeled, age-restricted products the same as the unregulated, synthetic products that prompted the legislation, while exempting the more harmful product, alcohol, is not rationally related to any legitimate governmental interest and denies Plaintiffs equal protection of the laws.

211. Plaintiffs are thus entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT VII — SUBSTANTIVE DUE PROCESS**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**

212. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

213. The Fourteenth Amendment prohibits a municipality, acting under color of state law, from arbitrarily depriving a person of liberty or property.

214. Plaintiffs possess protected liberty and property interests in pursuing their lawful occupations and in the lawful use of their stores, leases, inventory, business assets, and established operations, subject to lawful regulation.

215. The Ordinance's timing structure is arbitrary and irrational because it activates prohibitions and daily penalties on a fixed date while postponing the only permit pathway until an event for which the City imposed no deadline.

216. The Ordinance's own permit, testing, and labeling provisions presuppose that compliant sales can occur consistently with public health and safety. Yet the regulatory gap makes such sales categorically impossible for an indefinite period regardless of a retailer's practices or a product's safety.



Case ID: 261101288
Control No.: 26112521

217. The Ordinance's prohibitions also reach products, like PAHAA's members' products that are independently tested, fully labeled, and sold only to adults, and therefore do not present the dosing, youth-access, or synthetic-concentrate harms on which the City relied. Prohibiting such products does not advance the City's stated objectives at all.

218. The cumulative geographic exclusions likewise bear no substantial, rational or any relationship to the asserted regulatory purpose insofar as they eliminate virtually every commercially viable site and operate as a *de facto* ban rather than a location-based safety regulation.

219. The undefined medical-marijuana-permit condition and absence of any variance or transition mechanism further disconnect the Ordinance's means from its asserted ends.

220. The challenged structure is not rationally related to a legitimate governmental interest, is arbitrary and oppressive, and violates substantive due process on its face and as applied to Plaintiffs.

221. Defendants will act under color of state law in implementing and enforcing the Ordinance, which is an official policy of the City. Plaintiffs are entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

222. The Ordinance's deprivation of Plaintiffs' interests is so arbitrary and egregious that it shocks the conscience.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;



Case ID: 261101288
Control No.: 26112521

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT VIII — PROCEDURAL DUE PROCESS**
**(42 U.S.C. § 1983; U.S. Const. amend. XIV)**

223. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

224. Plaintiffs have cognizable property interests in their existing lawful business operations, leases, inventory, commercial licenses, established locations, and associated goodwill, as well as in avoiding the imposition of daily civil penalties without constitutionally adequate procedures.

225. The Ordinance deprives PAHAA's members of those interests by rendering their current locations ineligible, foreclosing covered sales during an indefinite no-permit period, and threatening penalties and nuisance enforcement.

226. The Ordinance affords PAHAA's members no individualized notice or hearing before that deprivation, no operative application process during the regulatory gap, and no opportunity to demonstrate compliance through existing safety measures.



Case ID: 261101288
Control No.: 26112521

227. The Ordinance provides no grandfathered status, variance, waiver, transition procedure, or meaningful opportunity to challenge the application of the geographic exclusions to PAHAA's members' existing locations before closure or penalties.

228. The risk of erroneous or arbitrary deprivation is substantial because eligibility depends on extensive geographic rules, an undefined "if required" medical-marijuana condition, and regulations not yet issued, while additional or alternative procedures would impose minimal administrative burdens.

229. Post-enforcement review cannot adequately remedy the loss of an ongoing business, customer goodwill, leasehold value, and market position caused by forced closure.

230. Defendants' threatened deprivation of Plaintiffs' protected interests without constitutionally sufficient notice and opportunity to be heard violates procedural due process. Plaintiffs are entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;



Case ID: 261101288
Control No.: 26112521

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT IX — DORMANT COMMERCE CLAUSE (U.S. Const. art. I, § 8, cl. 3)**

231. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

232. The Commerce Clause protects the national market against local laws that impose burdens on interstate commerce clearly excessive in relation to their putative local benefits.

233. Hemp and kratom products move through interstate markets. MNG and other PAHAA members purchase covered products from outside Pennsylvania and receive them in Philadelphia for lawful retail sale.

234. By creating an indefinite period in which no retailer can obtain the permit contemplated by the Ordinance and by eliminating virtually all commercially viable retail sites, the Ordinance forecloses or materially reduces the Philadelphia market for interstate hemp and kratom products.

235. The resulting burdens include lost interstate sales, stranded inventory, disrupted supplier relationships, increased distribution and relocation costs, and exclusion of lawful out-of-state products from a major local market.

236. Those burdens are clearly excessive in relation to any putative local benefit because the City can advance consumer safety through materially less burdensome alternatives, including a timely permit process, product testing, accurate labeling, age verification, inspections, tailored location rules, and enforcement against adulterated or mislabeled products.

237. The Ordinance's permit provisions themselves identify workable regulatory alternatives and confirm that an indefinite and geographically comprehensive prohibition is unnecessary.



Case ID: 261101288
Control No.: 26112521

238. The Ordinance therefore violates the dormant Commerce Clause, on its face and as applied to Plaintiffs. Plaintiffs are entitled to declaratory and injunctive relief.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT X — VOID FOR VAGUENESS**
**(U.S. Const. amend. XIV)**

239. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

240. Due process requires a law carrying civil penalties and business-closing consequences to provide fair notice of the conduct it prohibits and objective standards sufficient to prevent arbitrary or discriminatory enforcement.

241. Section 9-6702(3) prohibits sale of an intoxicating substance "not considered appropriate for use as a dietary supplement or a safe food additive" but does not identify who must



Case ID: 261101288
Control No.: 26112521

do the considering, what evidence controls, when that judgment occurs, or how a retailer can determine whether a particular product satisfies the standard.

242. The cited provisions of the Federal Food, Drug, and Cosmetic Act do not convert the phrase "considered appropriate" into a clear, administrable rule for retailers or enforcement officers.

243. The Ordinance also incorporates by reference federal hemp definitions and "Exclusions" that may change over time, without stating which version governs, how changes will be communicated, or what transition period applies.

244. The phrase "if required" in the medical-marijuana-permit prerequisite similarly fails to identify the circumstances under which an otherwise lawful hemp or kratom retailer must hold a medical marijuana dispensary permit.

245. This phrase is ambiguous and in one reasonable interpretation makes the subject permits conditional upon regulations that do not exist yet.

246. These ambiguities leave Plaintiffs unable to determine in advance which inventory may lawfully be sold and invite inconsistent, subjective, and arbitrary enforcement backed by daily penalties.

247. Sections 9-6701(4), 9-6702(1), 9-6702(3), and the related permit criteria are unconstitutionally vague on their face and as applied to Plaintiffs. Plaintiffs are entitled to declaratory and injunctive relief and nominal damages under 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;



Case ID: 261101288
Control No.: 26112521

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**COUNT XIII — REGULATORY TAKING**
**(U.S. Const. amends. V and XIV; 42 U.S.C. § 1983)**

248. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

249. The Takings Clause, applicable to the City through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation.

250. PAHAA's members, including MNG, hold cognizable property interests in their leaseholds, inventory, fixtures, buildouts, equipment, and other assets committed to their Philadelphia retail locations.

251. Plaintiffs made substantial investments in reasonable reliance on the lawful status of their businesses and products, including long-term leases, store improvements, inventory, testing, labeling, training, and compliance systems.

252. The Ordinance's indefinite no-permit gap and geographic exclusions deprive those property interests of economically viable use for their intended retail purpose, strand inventory, and destroy or severely impair the value of location-specific improvements and leaseholds.



Case ID: 261101288
Control No.: 26112521

253. The economic impact on Plaintiffs is severe; the Ordinance interferes with distinct and reasonable investment-backed expectations; and the character of the governmental action is functionally equivalent to appropriating the value of Plaintiffs' established retail use for a public regulatory purpose while singling out a narrow class of businesses.

254. The Ordinance provides no amortization period, grandfathering, transferable development right, alternative site, compensation procedure, or other mechanism to mitigate that burden.

255. Plaintiffs' property rights include their ownership and leasehold interests in their locations and businesses, the right to use and enjoy those locations for the retail purposes for which they were acquired, and their investment-backed expectations.

256. As applied to Plaintiffs, the Ordinance effects a regulatory taking without just compensation in violation of the Fifth and Fourteenth Amendments. Plaintiffs are entitled to all relief available under 42 U.S.C. § 1983, including a declaration of unconstitutionality, appropriate injunctive relief, and nominal damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and grant the following relief:

(a) Declare that the Ordinance is void or in the alternative, grandfather the affected PAHAA members' retail establishments and the Stores;

(b) Preliminarily and permanently enjoin Defendants, and their officers, agents, employees, and all persons acting in concert with them who receive actual notice, from implementing or enforcing the Ordinance against Plaintiffs;

(c) Award Plaintiffs damages under 42 U.S.C. § 1983;



Case ID: 261101288
Control No.: 26112521

(d) Award Plaintiffs their reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and other applicable law;

(e) Retain jurisdiction as necessary to effectuate the Court's judgment; and

Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

*/s/ Patrick C. Campbell, Jr.*
Patrick C. Campbell, Jr.
PA State Bar No. 53350
565 E. Swedesford Road, Suite 303
Wayne, Pennsylvania 19087
215.977.4100

*Attorneys for Plaintiffs*

Dated: November 10, 2026

**VERIFICATION**

I, Craig Katz, hereby state I am employed by Plaintiff MNG 2005, Inc. as its Government Relations and Compliance Manager and authorized to make this verification on its behalf. While the forgoing document was prepared by counsel, and thus the language contained therein is that of counsel, the facts set forth in the document are true and correct to the best of my knowledge, information and belief. I understand that this statement is made subject to the provisions of 18 Pa.C.S.A. §4904 relating to unsworn falsifications to authorities.

Craig Katz

**Dated:** 11/6/2026

2

Case ID: 261101288
Control No.: 26112521

# EXHIBIT "A"

**U.S. Department of Justice**
Drug Enforcement Administration
8701 Morrissette Drive
Springfield, Virginia 22152

*www.dea.gov*

September 15, 2021

Donna C. Yeatman, R.Ph.
Executive Secretary
Alabama Board of Pharmacy
111 Village Street
Birmingham, Alabama 35242

Dear Dr. Yeatman:

This is in response to your letter dated August 19, 2021, in which you request the control status of delta-8-tetrahydrocannabinol ($\Delta^8$-THC) under the Controlled Substances Act (CSA). The Drug Enforcement Administration (DEA) reviewed the CSA and its implementing regulations with regard to the control status of this substance.

$\Delta^8$-THC is a tetrahydrocannabinol substance contained in the plant *Cannabis sativa L.* and also can be produced synthetically from non-cannabis materials. The CSA classifies tetrahydrocannabinols as controlled in schedule I. 21 U.S.C. 812, Schedule I(c)(17); 21 CFR § 1308.11(d)(31). Subject to limited exceptions, for the purposes of the CSA, the term "tetrahydrocannabinols" means those "naturally contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the substances contained in the cannabis plant and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant." 21 CFR § 1308.11(d)(31). Thus, $\Delta^8$-THC synthetically produced from non-cannabis materials is controlled under the CSA as a "tetrahydrocannabinol."

The CSA, however, excludes from control "tetrahydrocannabinols in hemp (as defined under section 1639*o* of Title 7)." Hemp, in turn, is defined as "the plant *Cannabis sativa L.* and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol [($\Delta^9$-THC)] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. 1639*o*(1).

Accordingly, cannabinoids extracted from the cannabis plant that have a $\Delta^9$-THC concentration of not more than 0.3 percent on a dry weight basis meet the definition of "hemp" and thus are not controlled under the CSA. Conversely, naturally derived cannabinoids having a $\Delta^9$-THC concentration more than 0.3 percent on a dry weight basis is controlled in schedule I under the CSA as tetrahydrocannabinols.[1]

[1] The Agricultural Improvement Act of 2018 (AIA), Pub. L. 115-334, § 12619, amended the CSA to remove "tetrahydrocannabinols in hemp" from control. See 21 U.S.C. § 812, Schedule I(c)(17). As noted, however, "hemp" is defined to "mean the *plant* Cannabis sativa L. and *any part of that plant*, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9-tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. 1639o (emphasis added). Thus, only tetrahydrocannabinol in or derived from the cannabis plant—not synthetic tetrahydrocannabinol—is subject to being excluded from control as a "tetrahydrocannabinol[] in hemp."

Case ID: 261101288
Control No.: 26112521

If you have any further questions, please contact the Drug and Chemical Evaluation Section at DPE@usdoj.gov or (571) 362-3249.

Sincerely,

Terrence L. Boos, Ph.D., Chief
Drug & Chemical Evaluation Section
Diversion Control Division

cc: Birmingham Office

# EXHIBIT "B"

# City of Philadelphia

(Bill No. 260163)

AN ORDINANCE

Amending Title 9 of The Philadelphia Code, entitled "Regulation of Businesses, Trades and Professions," to establish restrictions and regulations related to the sale of certain intoxicating substances and provide for associated penalties and enforcement, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Title 9 of The Philadelphia Code is amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

* * *

CHAPTER 9-100. GENERAL PROVISIONS

* * *

§ 9-105. Penalties.

(1) Except as otherwise provided in Chapters 9-600, 9-702, 9-800, 9-900, 9-1000, 9-1100, 9-1200, 9-1600, 9-4000, 9-4200, [and] 9-4400, *and 9-6700,* Sections 9-604, 9-622 and 9-623 of this Title, and subsection 11-707(1) of Title 11, any person who violates any provision of this Title or any regulation adopted hereunder shall, in addition to any other penalty indicated in this Title, pay a fine of no less than one hundred fifty dollars ($150) nor more than three hundred dollars ($300).

* * *

*CHAPTER 9-6700. INTOXICATING SUBSTANCES*

* * *

*§ 9-6701. Definitions.*

*(1) Container. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(2) Hemp. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(3) Hemp-Derived Cannabinoid Product. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(4) Intoxicating Hemp Product. Any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(5) Intoxicating Substance Retailer. A person who, in the usual course of business, purchases or receives Intoxicating Substances for the purpose of sale to a consumer.*

*(6) Intoxicating Substance Retailing. The sale or offer for sale of any Intoxicating Substance to a consumer.*

*(7) Industrial Hemp. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(8) Intermediate Hemp-Derived Cannabinoid Product. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(9) Intoxicating Substance. Any Intoxicating Hemp Product or Kratom Product.*

*(10) "Kratom Extract." A food product that contains any part of a leaf from mitragyna speciosa, commonly known as kratom, which has been extracted and concentrated to provide more standardized dosing.*

*(11) Kratom Product. Any intermediate or final product that is intended for human or animal use through any means of application or administration, such as inhalation or ingestion, and contains in any form mitragynine or 7 hydroxymitragynine that is:*

*(a) derived from any part of Mitragyna speciosa plant, including the seeds thereof and all derivatives, extracts, alkaloids, isomers, and compounds, whether growing or not;*

*(b) not capable of being naturally produced by a Mitragyna speciosa plant; or*

*(c) capable of being naturally produced by a Mitragyna speciosa plant and was synthesized or manufactured outside the plant.*

*(12) Public. Owned, leased, or operated by the Commonwealth of Pennsylvania, the United States, the City, or any other public or quasi-public governmental body or agency.*

*§ 9-6702. Prohibition on Sales.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(1) It shall be unlawful for any person to sell or offer for sale any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(2) It shall be unlawful for any person to sell or offer for sale any kratom product that meets any of the following criteria:*

*(a) Is mixed or packed with a nonkratom substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer;*

*(b) Contains a kratom extract with levels of residual solvents higher than the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph;*

*(c) Contains a level of 7-hydroxymitragynine in the alkaloid fraction that is greater than 2 percent of the overall alkaloid composition of the kratom product; or*

*(d) Contains a synthetic alkaloid, including a synthetic mitragynine, a synthetic 7-hydroxymitragynine or any other synthetically derived compounds of the kratom plant.*

*(3) It shall be unlawful for any person to sell or offer for sale any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved in accordance with under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355).*

*(4) It shall be unlawful for any person to sell or offer for sale any intoxicating substance to any individual under twenty-one (21) years of age.*

*§ 9-6703. Permitted Sale of Intoxicating Substances.*

*(1) Intoxicating Substance Retailer Permit Required.*

*(a) No business shall act as an Intoxicating Substance retailer without a current intoxicating substance retailer permit for each location where the business engages in intoxicating substance retailing. Acting as an intoxicating substance retailer without a permit is hereby declared a nuisance as a matter of law.*

*(b) Each intoxicating substance retailer shall prominently display the intoxicating substance retailer permit at each location where the business engages in intoxicating substance retailing.*

*(c) An intoxicating substance retailer permit shall be issued to an applicant if, in addition to any other applicable requirement, all of the following requirements are met:*

# City of Philadelphia



*(.1) It shall be unlawful for any person to sell or offer for sale any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved in accordance with under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355).*

*(.2) The applicant has provided all material information required by the application.*

*(.3) The applicant has not made any material false statement in the application.*

*(.4) The applicant currently maintains a valid permit to dispense medical marijuana from the Pennsylvania Bureau of Medical Marijuana, if required.*

*(.5) The applicant currently maintains a valid commercial activity license and any license or permit required under this Title.*

*(.6) The location for which the intoxicating substance retailer permit is sought is fixed, and not mobile.*

*(.7) The location for which the intoxicating substance retailer permit is sought is not situated within:*

*(.a) A zoning district where such use is not expressly allowed;*

*(.b) 500 ft. of any regulated use, as set forth in subsection 14-603(13) (Regulated Use);*

*(.c) 500 ft. of any school (up to and including the 12th grade) or its adjunct recreation areas/play fields;*

*(.d) 500 ft. of any public playground;*

*(.e) 500 ft. of any public swimming pool;*

*(.f) 500 ft. of any public park;*

*(.g) 500 ft. of any public recreation center;*

*(.h) 500 ft. of any public library;*

*(.i) 500 ft. of any child care; or*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.j) Any of the following designated areas:*

*(i) City Avenue from the Schuylkill Expressway to City Boundary.*

*(ii) 63rd Street from City Avenue to Lebanon Avenue.*

*(iii) Monument Road from City Avenue to Ford Road.*

*(iv) Conshohocken Avenue.*

*(v) Parkside Avenue from 52nd Street to Belmont Avenue.*

*(vi) Haverford Avenue from City Avenue to Lansdowne Avenue.*

*(vii) 54th Street from City Avenue to Overbrook Avenue.*

*(viii) 54th Street from Arlington Street to Montgomery Avenue.*

*(ix) Germantown Avenue from Erie Avenue to W. Cumberland Street.*

*(x) Fairmount Avenue, both sides, from Broad Street to Pennsylvania Avenue.*

*(xi) Ridge Avenue from Broad Street to 33rd Street.*

*(xii) Cecil B. Moore Avenue from Broad Street to 24th Street.*

*(xiii) Broad Street from Spring Garden to Lehigh Avenue.*

*(xiv) Girard Avenue, both sides, from 4th Street to Broad Street.*

*(xv) Lehigh Avenue, south side, from 33rd Street to Broad Street.*

*(xvi) Lehigh Avenue, both sides, Broad Street to 6th Street,*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xvii) Spring Garden Street from Broad Street to Pennsylvania Avenue.*

*(xviii) Spring Garden Street, north side, from Broad Street to 4th Street.*

*(xix) Krewstown Road from Grant Avenue to Bloomfield Avenue.*

*(xx) Grant Avenue from Krewstown Road to Blue Grass Road.*

*(xxi) Red Lion Road from Roosevelt Boulevard to Steven Road.*

*(xxii) Red Lion Road from Calera Road to Academy Road.*

*(xxiii) Fairdale Road from Knights Road to Whiting Road.*

*(xxiv) Bustleton Avenue from Cottman Avenue to County Line Road.*

*(xxv) Castor Avenue from Cottman Avenue to Bustleton Avenue.*

*(xxvi) Rhawn Street from Roosevelt Boulevard to Oxford Avenue.*

*(xxvii) Oxford Avenue from Cottman Avenue to City Limit.*

*(xxviii) Verree Road from Oxford Avenue to Bustleton Avenue*

*(xxix) Byberry Road from Roosevelt Boulevard to Philmont Avenue.*

*(xxx) Morrell Avenue from Frankford Avenue to Academy Road.*

*(xxxi) Academy Road from Byberry Road to Torrey Road.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xxxii) Knights Road from Fairdale Road to City Limit.*

*(xxxiii) The area bounded by Knights Road from Franklin Mills Circle in the north to Woodhaven Road in the south, Woodhaven Road from Knights Road in the west to Franklin Mills Circle in the east, and Franklin Mills Circle from Woodhaven Road in the south to Knights Road in the north.*

*(xxxiv) Aramingo Avenue Shopping Area.*

*(xxxv) Mayfair Business Improvement District.*

*(xxxvi) Cottman Avenue from Kindred Street to its terminus at the Delaware River*

*(xxxvii) Frankford Avenue from Poquesing Creek to Harbison Ave, east side*

*(xxxviii) Bustleton Avenue from Cottman Avenue to Roosevelt Boulevard, east side*

*(xxxix) Grant Avenue from Roosevelt Boulevard to Milnor St, south side*

*(xl) Aramingo Avenue from E Allegheny Avenue to Bridge Street, east side*

*(xli) Allegheny Avenue from Kensington Avenue to Delaware Avenue, east side*

*(xlii) Kensington Ave from Allegheny Avenue to Frankford Creek, east side*

*(xliii) Torresdale Avenue from Kensington Avenue to Frankford creek*

*(xliv) Torresdale Avenue from Harbison Avenue to Convent Lane*

*(xlv) Torresdale Avenue from Fitler Street to Grant Avenue*

*(xlvi) Harbison Avenue from Bridge Street to Roosevelt Boulevard, east side*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xlvii) Richmond Street from Allegheny Avenue to Brill Street*

*(xlviii) State Road from Longshore Avenue to Poquesing Creek*

*(xlix) Rhawn Street from Roosevelt Boulevard to State Road*

*(l) Welsh Road from Roosevelt Boulevard to Walker Street*

*(li) Rowland Avenue from Frankford Avenue to Solly Avenue*

*(lii) Castor Avenue from Kensington Avenue to N Delaware Avenue*

*(liii) Lancaster Avenue from 34th Street to 48th Street.*

*(liv) Spring Garden Street from 31st Street to 40th Street.*

*(lv) Haverford Avenue from 31st Street to 52nd Street.*

*(lvi) Girard Avenue from 34th Street to Belmont Avenue.*

*(lvii) 40th Street from Girard Avenue to Chestnut Street.*

*(lviii) Belmont Avenue from Parkside Avenue to Haverford Avenue, east side.*

*(lix) Market Street from 40th Street to 63rd Street, south side.*

*(lx) Chestnut Street from 42nd Street to 63rd Street.*

*(lxi) Walnut Street from 42nd Street to 63rd Street.*

*(lxii) Baltimore Avenue from 42nd Street to 61st Street.*

*(lxiii) 52nd Street from Wyalusing Avenue to Woodland Avenue.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(lxiv) 56th Street from Market Street to Baltimore Avenue.*

*(lxv) 60th Street from Market Street to Catharine Street.*

*(lxvi) 62nd Street from Market Street to Catharine Street.*

*(lxvii) 58th Street from Market Street to Woodland Avenue.*

*(lxviii) Chester Avenue from 42nd Street to 57th Street, east side.*

*(lxix) Woodland Avenue from 42nd Street to 57th Street, east side.*

*(lxx) North 5th Street from Spencer Street to Somerville Avenue.*

*(lxxi) Ogontz Avenue from Cheltenham Avenue to 67th Avenue.*

*(lxxii) Wadsworth Avenue from Cheltenham Avenue to Michener Avenue.*

*(lxxiii) 22nd Street from Lehigh Avenue to W Allegheny Avenue*

*(lxxiv) 5th Street from W. Roosevelt Boulevard to Delphine Street*

*(lxxv) Broad Street from Ruscomb Street to W. Venango Street*

*(lxxvi) Broad Street from Lehigh Avenue to W. Westmoreland Street*

*(lxxvii) Germantown Avenue from Staub Street to E. Washington Lane*

*(lxxviii) W. Chelten Ave from Wissahickon Avenue to Morton Street*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



(lxxix) *Chestnut Hill Business Improvement District*

(lxxx) *Mt. Airy Business Improvement District*

(lxxxi) *Washington Avenue, both sides, from Broad Street to 25th Street*

(lxxxii) *Snyder Avenue, both sides, from Broad Street to 25th Street*

(lxxxiii) *Point Breeze Avenue, both sides, from Federal Street to Moore Street*

(lxxxiv) *West Passyunk Avenue, both sides, from Broad Street to 23rd Street*

(lxxxv) *Snyder Avenue, both sides, from Broad Street to 25th Street*

(lxxxvi) *South Street, both sides, from Broad Street to 27th Street*

(lxxxvii) *South Street, south side, from Broad Street to 10 th Street*

(lxxxviii) *Oregon Avenue, both sides, from Broad Street to 23rd Street*

(lxxxix) *Elmwood Avenue, both sides, from 65th street to Island Avenue*

(xc) *Woodland Avenue, both sides, from 58th Street to 68th Street*

(xci) *Old City Special Services District*

(xcii) *South Street/Headhouse District*

(xciii) *East Passyunk Business Improvement District*

(xciv) *Northern Liberties Business Improvement District*

(xcv) *Fishtown Kensington Area Business Improvement District*

(xcvi) *Center City District*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xcvii) Allegheny Avenue from Kensington Avenue to Delaware Avenue*

*(xcviii) Delaware Avenue from Spring Garden Street to Allegheny Avenue*

*(xcix) Lehigh Avenue from Kensington Avenue to Richmond Street*

*(c) Girard Avenue from Front Street to Richmond Street*

*(ci) Aramingo Avenue from Allegheny Avenue to Delaware Avenue*

*(cii) Market Street from Front Street to Broad Street*

*(ciii) Richmond Street from Delaware Avenue to Allegheny Avenue*

*(civ) Spring Garden Street from Delaware Avenue to Broad Street*

*(cv) Frankford Avenue from Allegheny Avenue to Delaware Avenue*

*(cvi) Callowhill Street from Delaware Avenue to Broad Street*

*(cvii) Kensington Avenue from Allegheny Avenue to Front Street*

*(cviii) Front Street from Oregon Avenue to Race Street*

*(cix) York Street from Aramingo Avenue to Amber Street*

*(cx) Chestnut Street from Front Street to Broad Street*

*(cxi) Walnut Street from Front Street to Broad Street*

*(cxii) Washington Avenue from Broad Street to Delaware Avenue*

*(cxiii) South Street from Front Street to Broad Street*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(cxiv) Passyunk Avenue from Broad Street to South Street*

*(cxv) 9th Street from Oregon Avenue to Spring Garden Street*

*(cxvi) Broad Street from Oregon Avenue to Spring Garden Street*

*(cxvii) Christian Street from Columbus Boulevard to Broad Street*

*(cxviii) Columbus Boulevard from Spring Garden St to the Walt Whitman Bridge*

*(cxix) Snyder Avenue from Columbus Boulevard to Broad Street*

*(cxx) Oregon Avenue from Columbus Boulevard to Broad Street*

*(cxxi) W Lehigh Ave from N 3rd St to n Howard St*

*(cxxii) N American St from W Huntingdon St to W Somerset St*

*(cxxiii) W Allegheny Ave from N Randolph St to N 2nd St*

*(cxxiv) 5th Street from W. Huntingdon to W. Clearfield*

*(cxxv) W Lehigh Ave from N Marshall St to N 5th St*

*(cxxvi) West Luzerne Street to N 5th St*

*(cxxvii) W Wyoming Avenue to N 5th St*

*(cxxviii) W. Erie Ave from N. Franklin St. To N 5th St.*

*(cxxix) Rising Sun Ave from N. 8th St. To W. Pike St.*

*(cxxx) W. Butler St. From N. Marshall St. To N. Lawrence St.*

*(cxxxi) N. 6th St. From W. Pike St. To W. Erie Ave.*

*(cxxxii) N 6th St from W Berks St to W Susquehanna*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(cxxxiii) Bustleton & Harbison Bustleton Ave from Unruh Ave to Princeton Ave*

*(cxxxiv) Bustleton Ave to Bradford St*

*(cxxxv) Bustleton Ave to Leonard St*

*(cxxxvi) Bustleton Ave to Knorr Street*

*(cxxxvii) Bustleton Ave from Unruh Ave to Akron Street*

*(cxxxviii) E Alleghany Avenue to B Street*

*(cxxxix) E Alleghany Avenue to D Street*

*(cxl) Castor Ave from Comly St to Benner St*

*(cxli) Castor Ave from Robbins St to Glenview St*

*(cxlii) Castor Ave to Large St*

*(cxliii) E Wingohocking St from Castor to Adams Ave*

*(cxliv) Castor Ave from E Wingohocking St to Orthodox St*

*(cxlv) E Wyoming Ave from Rosehill St to Tampa St*

*(cxlvi) E Wyoming Ave to E Mentor St*

*(cxlvii) E Wyoming to E Thelma St*

*(cxlviii) E Erie Ave from I St to Adams Ave*

*(cxlix) Frankford Ave from E Hunting Park Ave to Adams Ave*

*(cl) Torresdale Ave from Frankford Ave to Paul St*

*(cli) Kensington Ave from E Pacific St to E Luzerne St*

*(clii) Frankford Ave from E Berk St. To E. Sergeant St.*

*(cliii) Frankford Ave from Benner St to Tyson Ave*

*(cliv) Frankford Ave to Erdrick St*

# City of Philadelphia



(clv) *Frankford Ave to Charles St*

(clvi) *Frankford Ave to Hawthorne St*

(clvii) *Frankford Ave to Mulberry St*

(clviii) *Frankford Ave / Bridge-Pratt Frankford Ave from Allengrove St to Brill St*

(clix) *Pratt St from Griscom St to Duffield St*

(clx) *Frankford Ave from Adams Ave to Unity St*

(clxi) *Kensington Ave from Adams Ave to Unity St*

(clxii) *Frankford Ave / Margaret-Orthodox Frankford Ave from Unity St to Allengrove St*

(clxiii) *Oxford Ave from Margaret St to Leiper St*

(clxiv) *N Front St from Clearfield to E Ontario St*

(clxv) *N Front St to N Lee St*

(clxvi) *N Front St to Mascher St*

(clxvii) *W Allegheny Ave from Mascher St to Ella St*

(clxviii) *N Front St from Diamond St to E Cumberland St*

(clxix) *Kensington Ave from E York St to E Lehigh Ave*

(clxx) *Harbison Ave from Ditman St. To Aramingo Ave*

(clxxi) *Torresdale Ave from Bridge St. To Fraley St.*

(clxxii) *East Tioga Street to Rand Street and East Tioga Street to Malta Street*

(clxxiii) *I street to Train Intersection (No Street Name)*

(clxxiv) *E Hunting Park Ave from Whitaker Ave to L St*

(clxxv) *E Hunting Park Ave to E Lycoming St*

(clxxvi) *Kensington Ave from E Indiana to E Estaugh St*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(clxxvii) E Allegheny Ave from Kensington Ave to Emerald St*

*(clxxviii) E Allegheny Ave from Kensington Ave to Reach St*

*(clxxix) Kensington Ave from E. Tusculum St. To E. Orleans St.*

*(clxxx) E Vanango Street to East Glenwood Ave*

*(clxxxi) E Ontario Street to East Vanango Street*

*(clxxxii) Oxford Ave from Pratt st to E Roosevelt St*

*(clxxxiii) Oxford Ave from Sanger St to E Roosevelt St*

*(clxxxiv) Oxford Ave from E Roosevelt St to Van Kirk St*

*(.9) Any other requirement adopted by the Department by regulation pursuant to this Section.*

*(d) An intoxicating substance retailer permit is valid for one business at one location and may not be transferred from one business to another or from one location to another. A new intoxicating substance retailer permit is required whenever an intoxicating substance retailer changes location or transfers ownership.*

*(2) Permit Expiration, Renewal, and Revocation.*

*(a) Term. An intoxicating substance retailer permit shall be effective through the thirty-first day of December of the calendar year for which it is issued.*

*(b) Renewal. Any person lawfully issued an intoxicating substance retailer permit pursuant to the provisions of this Section shall be entitled to renew such permit, provided that all the requirements of this Section, and any other applicable requirements, are met.*

*(.1) An intoxicating substance retailer shall apply for renewal and submit the applicable renewal fee no later than sixty (60) days prior to expiration of the license permit term. Renewal applications submitted less than sixty (60) days prior to the expiration of the license permit term shall be subject to both the new application fee, and the renewal fee, and the late renewal fee.*

*(.2) Applicants for renewal shall meet the requirements for an intoxicating substance retailer license permit set forth under subsection (1).*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(c) Revocation of Permit.*

*(.1) An intoxicating substance retailer permit may be revoked for any of the following reasons:*

*(.a) Failure to provide all information required as a condition of issuing an intoxicating substance retailer permit;*

*(.b) Making a material false statement in an application for an intoxicating substance retailer permit or in a renewal application for an intoxicating substance retailer permit;*

*(.c) Failure to maintain a valid medical marijuana permit from the Pennsylvania Bureau of Medical Marijuana, if required;*

*(.d) Failure to maintain a valid commercial activity license or any other license or permit required under this Title;*

*(.e) The person issued an intoxicating substance retailer permit is delinquent in the payment of any City or School District of Philadelphia taxes, charges, fees, rents or claims, or any penalties or fines relating to the person's business for which the person is responsible, unless the person has entered into an agreement to pay any such delinquency and is abiding by the terms of such agreement.*

*(.f) The person issued an intoxicating substance retailer permit engages in intoxicating substance retailing at any other location in the City in violation of any provision of this Section, or any City requirement with respect to intoxicating substance retailing.*

*(3) Permit Fees. The application and renewal fee*s *shall be three-hundred ($300), and the late renewal fee shall be fifty dollars ($50), except that the Department may alter these fee amounts by regulation, based on the total cost of the administration and enforcement of this Section. The application fee shall be paid at the time the application is submitted. The renewal fee shall be paid at the time the renewal application is submitted.*

*(4) Testing and Certification Required. Any intoxicating substance sold by a permitted intoxicating substance retailer shall be tested by a Drug Enforcement Agency (DEA) registered and licensed laboratory in Pennsylvania authorized to test such substances*

*(a) Intoxicating Hemp products shall be certified by such laboratory as:*

*(.1) Having a total tetrahydrocannabinols concentration (including tetrahydrocannabinolic acid) of not more than 0.3 percent on a dry weight basis; and*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.2) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(.3) Being free from any poisonous or otherwise deleterious ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.4) Being free from any substance that affects the quality or strength of the intoxicating hemp product to such a degree as to render the product injurious to a consumer.*

*(b) Kratom products shall be certified by such laboratory as:*

*(.1) Being free from any substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer.*

*(.2) Being free from any poisonous or otherwise deleterious nonkratom ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.3) Containing a kratom extract with levels of residual solvents below the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.4) Containing a level of 7-hydroxymitragynine in the alkaloid fraction of not more than 2 percent of the overall alkaloid composition of the kratom product.*

*(.5) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(5) Labeling Required. Any intoxicating substance sold by a permitted intoxicating substance retailer shall be labeled, in accordance with regulations adopted by the Department, in a manner that identifies to consumers that the product meets the criteria established in this Section, and otherwise complies with all applicable hemp and kratom and consumer protection laws and regulations:*

*(a) Intoxicating Hemp products shall be labeled as:*

*(.1) Having a total tetrahydrocannabinols concentration (including tetrahydrocannabinolic acid) of not more than 0.3 percent on a dry weight basis; and*

*(.2) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(.3) Being free from any poisonous or otherwise deleterious ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.4) Being free from any substance that affects the quality or strength of the intoxicating hemp product to such a degree as to render the product injurious to a consumer.*

*(b) Kratom products shall be labeled as:*

*(.1) Being free from any substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.2) Being free from any poisonous or otherwise deleterious nonkratom ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.3) Containing a kratom extract with levels of residual solvents below the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph.*

*(.4) Containing a level of 7-hydroxymitragynine in the alkaloid fraction of not more than 2 percent of the overall alkaloid composition of the kratom product.*

*(.5) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*§ 9-6704. Penalties and Enforcement.*

*A violation of any provision of this Chapter shall be classified as a Class III offense subject to the maximum fine set forth in subsection 1-109(3) of the Code, in addition to the penalties authorized pursuant to Section A-505.1 of the Philadelphia Administrative Code. Each day a violation continues shall constitute a separate offense.*

*§ 9-6705. Severability.*

*If a court of competent jurisdiction declares any part of this Chapter 9-6700 to be invalid, such judgment shall not affect the validity of this Section as a whole or any remaining part thereof. It is the intention of City Council that the remaining provisions of this Section would have been adopted as if such part found to be invalid had not been enacted.*

* * *

SECTION 2. This Ordinance shall be effective November 12, 2026, except that Section 9-6703 ("Permitted Sale of Intoxicating Substances") shall take effect upon the issuance of regulations by the Department.



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



---

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.



Case ID: 261101288
Control No.: 26112521

Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on June 4, 2026. The Bill was Signed by the Mayor on September 15, 2026.

Elizabeth McCollum
Chief Clerk of the City Council



Case ID: 261101288
Control No.: 26112521

# EXHIBIT "C"

Philadelphia, Pennsylvania

Electronic version of The Philadelphia Code and Home Rule Charter is current through October 26, 2026.

Subcode "PM" was repealed and replaced by Bill No. 120647, approved January 20, 2014 and effective July 1, 2015. Subcode "PM" was further amended, and its substantive provisions replaced in their entirety, by Bill No. 140856, approved December 19, 2014 and effective July 1, 2015.

To view the former version of Subcode "PM", click here.

Title 14: Zoning and Planning was repealed and replaced by the provisions of Bill No. 110845, approved December 22, 2011 and effective August 22, 2012.

To view the former version of Title 14, click here.

These new provisions have been incorporated into The Official Philadelphia Code

Order Code GET HELP

Website
https://www.phila.gov/

Address
City Hall
1400 John F Kennedy Blvd
Office 215
Philadelphia, Pennsylvania 19107

**Disclaimer:** This Code of Ordinances and/or any other documents that appear on this site may not reflect the most current legislation adopted by the Municipality. American Legal Publishing provides these documents for informational purposes only. These documents should not be relied upon as the definitive authority for local legislation. Additionally, the formatting and pagination of the posted documents varies from the formatting and pagination of the official copy. The official printed copy of a Code of Ordinances should be consulted prior to any action being taken.

For further information regarding the official version of any of this Code of Ordinances or other documents posted on this site, please contact the Municipality directly or contact American Legal Publishing toll-free at 800-445-5588.

**Hosted by:** American Legal Publishing

# Exhibit B

# City of Philadelphia

(Bill No. 260163)

AN ORDINANCE

Amending Title 9 of The Philadelphia Code, entitled "Regulation of Businesses, Trades and Professions," to establish restrictions and regulations related to the sale of certain intoxicating substances and provide for associated penalties and enforcement, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Title 9 of The Philadelphia Code is amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

* * *

CHAPTER 9-100. GENERAL PROVISIONS

* * *

§ 9-105. Penalties.

(1) Except as otherwise provided in Chapters 9-600, 9-702, 9-800, 9-900, 9-1000, 9-1100, 9-1200, 9-1600, 9-4000, 9-4200, [and] 9-4400, *and 9-6700,* Sections 9-604, 9-622 and 9-623 of this Title, and subsection 11-707(1) of Title 11, any person who violates any provision of this Title or any regulation adopted hereunder shall, in addition to any other penalty indicated in this Title, pay a fine of no less than one hundred fifty dollars ($150) nor more than three hundred dollars ($300).

* * *

*CHAPTER 9-6700. INTOXICATING SUBSTANCES*

* * *

*§ 9-6701. Definitions.*

*(1) Container. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(2) Hemp. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(3) Hemp-Derived Cannabinoid Product. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(4) Intoxicating Hemp Product. Any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(5) Intoxicating Substance Retailer. A person who, in the usual course of business, purchases or receives Intoxicating Substances for the purpose of sale to a consumer.*

*(6) Intoxicating Substance Retailing. The sale or offer for sale of any Intoxicating Substance to a consumer.*

*(7) Industrial Hemp. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(8) Intermediate Hemp-Derived Cannabinoid Product. As defined by the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(9) Intoxicating Substance. Any Intoxicating Hemp Product or Kratom Product.*

*(10) "Kratom Extract." A food product that contains any part of a leaf from mitragyna speciosa, commonly known as kratom, which has been extracted and concentrated to provide more standardized dosing.*

*(11) Kratom Product. Any intermediate or final product that is intended for human or animal use through any means of application or administration, such as inhalation or ingestion, and contains in any form mitragynine or 7 hydroxymitragynine that is:*

*(a) derived from any part of Mitragyna speciosa plant, including the seeds thereof and all derivatives, extracts, alkaloids, isomers, and compounds, whether growing or not;*

*(b) not capable of being naturally produced by a Mitragyna speciosa plant; or*

*(c) capable of being naturally produced by a Mitragyna speciosa plant and was synthesized or manufactured outside the plant.*

*(12) Public. Owned, leased, or operated by the Commonwealth of Pennsylvania, the United States, the City, or any other public or quasi-public governmental body or agency.*

*§ 9-6702. Prohibition on Sales.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(1) It shall be unlawful for any person to sell or offer for sale any substance set forth in the Exclusions from the definition of Hemp under the Agricultural Marketing Act of 1946 (7 U.S.C. § 1639o).*

*(2) It shall be unlawful for any person to sell or offer for sale any kratom product that meets any of the following criteria:*

*(a) Is mixed or packed with a nonkratom substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer;*

*(b) Contains a kratom extract with levels of residual solvents higher than the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph;*

*(c) Contains a level of 7-hydroxymitragynine in the alkaloid fraction that is greater than 2 percent of the overall alkaloid composition of the kratom product; or*

*(d) Contains a synthetic alkaloid, including a synthetic mitragynine, a synthetic 7-hydroxymitragynine or any other synthetically derived compounds of the kratom plant.*

*(3) It shall be unlawful for any person to sell or offer for sale any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved in accordance with under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355).*

*(4) It shall be unlawful for any person to sell or offer for sale any intoxicating substance to any individual under twenty-one (21) years of age.*

*§ 9-6703. Permitted Sale of Intoxicating Substances.*

*(1) Intoxicating Substance Retailer Permit Required.*

*(a) No business shall act as an Intoxicating Substance retailer without a current intoxicating substance retailer permit for each location where the business engages in intoxicating substance retailing. Acting as an intoxicating substance retailer without a permit is hereby declared a nuisance as a matter of law.*

*(b) Each intoxicating substance retailer shall prominently display the intoxicating substance retailer permit at each location where the business engages in intoxicating substance retailing.*

*(c) An intoxicating substance retailer permit shall be issued to an applicant if, in addition to any other applicable requirement, all of the following requirements are met:*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.1) It shall be unlawful for any person to sell or offer for sale any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved in accordance with under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355).*

*(.2) The applicant has provided all material information required by the application.*

*(.3) The applicant has not made any material false statement in the application.*

*(.4) The applicant currently maintains a valid permit to dispense medical marijuana from the Pennsylvania Bureau of Medical Marijuana, if required.*

*(.5) The applicant currently maintains a valid commercial activity license and any license or permit required under this Title.*

*(.6) The location for which the intoxicating substance retailer permit is sought is fixed, and not mobile.*

*(.7) The location for which the intoxicating substance retailer permit is sought is not situated within:*

*(.a) A zoning district where such use is not expressly allowed;*

*(.b) 500 ft. of any regulated use, as set forth in subsection 14-603(13) (Regulated Use);*

*(.c) 500 ft. of any school (up to and including the 12th grade) or its adjunct recreation areas/play fields;*

*(.d) 500 ft. of any public playground;*

*(.e) 500 ft. of any public swimming pool;*

*(.f) 500 ft. of any public park;*

*(.g) 500 ft. of any public recreation center;*

*(.h) 500 ft. of any public library;*

*(.i) 500 ft. of any child care; or*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.j) Any of the following designated areas:*

*(i) City Avenue from the Schuylkill Expressway to City Boundary.*

*(ii) 63rd Street from City Avenue to Lebanon Avenue.*

*(iii) Monument Road from City Avenue to Ford Road.*

*(iv) Conshohocken Avenue.*

*(v) Parkside Avenue from 52nd Street to Belmont Avenue.*

*(vi) Haverford Avenue from City Avenue to Lansdowne Avenue.*

*(vii) 54th Street from City Avenue to Overbrook Avenue.*

*(viii) 54th Street from Arlington Street to Montgomery Avenue.*

*(ix) Germantown Avenue from Erie Avenue to W. Cumberland Street.*

*(x) Fairmount Avenue, both sides, from Broad Street to Pennsylvania Avenue.*

*(xi) Ridge Avenue from Broad Street to 33rd Street.*

*(xii) Cecil B. Moore Avenue from Broad Street to 24th Street.*

*(xiii) Broad Street from Spring Garden to Lehigh Avenue.*

*(xiv) Girard Avenue, both sides, from 4th Street to Broad Street.*

*(xv) Lehigh Avenue, south side, from 33rd Street to Broad Street.*

*(xvi) Lehigh Avenue, both sides, Broad Street to 6th Street,*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xvii) Spring Garden Street from Broad Street to Pennsylvania Avenue.*

*(xviii) Spring Garden Street, north side, from Broad Street to 4th Street.*

*(xix) Krewstown Road from Grant Avenue to Bloomfield Avenue.*

*(xx) Grant Avenue from Krewstown Road to Blue Grass Road.*

*(xxi) Red Lion Road from Roosevelt Boulevard to Steven Road.*

*(xxii) Red Lion Road from Calera Road to Academy Road.*

*(xxiii) Fairdale Road from Knights Road to Whiting Road.*

*(xxiv) Bustleton Avenue from Cottman Avenue to County Line Road.*

*(xxv) Castor Avenue from Cottman Avenue to Bustleton Avenue.*

*(xxvi) Rhawn Street from Roosevelt Boulevard to Oxford Avenue.*

*(xxvii) Oxford Avenue from Cottman Avenue to City Limit.*

*(xxviii) Verree Road from Oxford Avenue to Bustleton Avenue*

*(xxix) Byberry Road from Roosevelt Boulevard to Philmont Avenue.*

*(xxx) Morrell Avenue from Frankford Avenue to Academy Road.*

*(xxxi) Academy Road from Byberry Road to Torrey Road.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xxxii) Knights Road from Fairdale Road to City Limit.*

*(xxxiii) The area bounded by Knights Road from Franklin Mills Circle in the north to Woodhaven Road in the south, Woodhaven Road from Knights Road in the west to Franklin Mills Circle in the east, and Franklin Mills Circle from Woodhaven Road in the south to Knights Road in the north.*

*(xxxiv) Aramingo Avenue Shopping Area.*

*(xxxv) Mayfair Business Improvement District.*

*(xxxvi) Cottman Avenue from Kindred Street to its terminus at the Delaware River*

*(xxxvii) Frankford Avenue from Poquesing Creek to Harbison Ave, east side*

*(xxxviii) Bustleton Avenue from Cottman Avenue to Roosevelt Boulevard, east side*

*(xxxix) Grant Avenue from Roosevelt Boulevard to Milnor St, south side*

*(xl) Aramingo Avenue from E Allegheny Avenue to Bridge Street, east side*

*(xli) Allegheny Avenue from Kensington Avenue to Delaware Avenue, east side*

*(xlii) Kensington Ave from Allegheny Avenue to Frankford Creek, east side*

*(xliii) Torresdale Avenue from Kensington Avenue to Frankford creek*

*(xliv) Torresdale Avenue from Harbison Avenue to Convent Lane*

*(xlv) Torresdale Avenue from Fitler Street to Grant Avenue*

*(xlvi) Harbison Avenue from Bridge Street to Roosevelt Boulevard, east side*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xlvii) Richmond Street from Allegheny Avenue to Brill Street*

*(xlviii) State Road from Longshore Avenue to Poquesing Creek*

*(xlix) Rhawn Street from Roosevelt Boulevard to State Road*

*(l) Welsh Road from Roosevelt Boulevard to Walker Street*

*(li) Rowland Avenue from Frankford Avenue to Solly Avenue*

*(lii) Castor Avenue from Kensington Avenue to N Delaware Avenue*

*(liii) Lancaster Avenue from 34th Street to 48th Street.*

*(liv) Spring Garden Street from 31st Street to 40th Street.*

*(lv) Haverford Avenue from 31st Street to 52nd Street.*

*(lvi) Girard Avenue from 34th Street to Belmont Avenue.*

*(lvii) 40th Street from Girard Avenue to Chestnut Street.*

*(lviii) Belmont Avenue from Parkside Avenue to Haverford Avenue, east side.*

*(lix) Market Street from 40th Street to 63rd Street, south side.*

*(lx) Chestnut Street from 42nd Street to 63rd Street.*

*(lxi) Walnut Street from 42nd Street to 63rd Street.*

*(lxii) Baltimore Avenue from 42nd Street to 61st Street.*

*(lxiii) 52nd Street from Wyalusing Avenue to Woodland Avenue.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



(lxiv) *56th Street from Market Street to Baltimore Avenue.*

(lxv) *60th Street from Market Street to Catharine Street.*

(lxvi) *62nd Street from Market Street to Catharine Street.*

(lxvii) *58th Street from Market Street to Woodland Avenue.*

(lxviii) *Chester Avenue from 42nd Street to 57th Street, east side.*

(lxix) *Woodland Avenue from 42nd Street to 57th Street, east side.*

(lxx) *North 5th Street from Spencer Street to Somerville Avenue.*

(lxxi) *Ogontz Avenue from Cheltenham Avenue to 67th Avenue.*

(lxxii) *Wadsworth Avenue from Cheltenham Avenue to Michener Avenue.*

(lxxiii) *22nd Street from Lehigh Avenue to W Allegheny Avenue*

(lxxiv) *5th Street from W. Roosevelt Boulevard to Delphine Street*

(lxxv) *Broad Street from Ruscomb Street to W. Venango Street*

(lxxvi) *Broad Street from Lehigh Avenue to W. Westmoreland Street*

(lxxvii) *Germantown Avenue from Staub Street to E. Washington Lane*

(lxxviii) *W. Chelten Ave from Wissahickon Avenue to Morton Street*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



(lxxix) *Chestnut Hill Business Improvement District*

(lxxx) *Mt. Airy Business Improvement District*

(lxxxi) *Washington Avenue, both sides, from Broad Street to 25th Street*

(lxxxii) *Snyder Avenue, both sides, from Broad Street to 25th Street*

(lxxxiii) *Point Breeze Avenue, both sides, from Federal Street to Moore Street*

(lxxxiv) *West Passyunk Avenue, both sides, from Broad Street to 23rd Street*

(lxxxv) *Snyder Avenue, both sides, from Broad Street to 25th Street*

(lxxxvi) *South Street, both sides, from Broad Street to 27th Street*

(lxxxvii) *South Street, south side, from Broad Street to 10 th Street*

(lxxxviii) *Oregon Avenue, both sides, from Broad Street to 23rd Street*

(lxxxix) *Elmwood Avenue, both sides, from 65th street to Island Avenue*

(xc) *Woodland Avenue, both sides, from 58th Street to 68th Street*

(xci) *Old City Special Services District*

(xcii) *South Street/Headhouse District*

(xciii) *East Passyunk Business Improvement District*

(xciv) *Northern Liberties Business Improvement District*

(xcv) *Fishtown Kensington Area Business Improvement District*

(xcvi) *Center City District*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(xcvii) Allegheny Avenue from Kensington Avenue to Delaware Avenue*

*(xcviii) Delaware Avenue from Spring Garden Street to Allegheny Avenue*

*(xcix) Lehigh Avenue from Kensington Avenue to Richmond Street*

*(c) Girard Avenue from Front Street to Richmond Street*

*(ci) Aramingo Avenue from Allegheny Avenue to Delaware Avenue*

*(cii) Market Street from Front Street to Broad Street*

*(ciii) Richmond Street from Delaware Avenue to Allegheny Avenue*

*(civ) Spring Garden Street from Delaware Avenue to Broad Street*

*(cv) Frankford Avenue from Allegheny Avenue to Delaware Avenue*

*(cvi) Callowhill Street from Delaware Avenue to Broad Street*

*(cvii) Kensington Avenue from Allegheny Avenue to Front Street*

*(cviii) Front Street from Oregon Avenue to Race Street*

*(cix) York Street from Aramingo Avenue to Amber Street*

*(cx) Chestnut Street from Front Street to Broad Street*

*(cxi) Walnut Street from Front Street to Broad Street*

*(cxii) Washington Avenue from Broad Street to Delaware Avenue*

*(cxiii) South Street from Front Street to Broad Street*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(cxiv) Passyunk Avenue from Broad Street to South Street*

*(cxv) 9th Street from Oregon Avenue to Spring Garden Street*

*(cxvi) Broad Street from Oregon Avenue to Spring Garden Street*

*(cxvii) Christian Street from Columbus Boulevard to Broad Street*

*(cxviii) Columbus Boulevard from Spring Garden St to the Walt Whitman Bridge*

*(cxix) Snyder Avenue from Columbus Boulevard to Broad Street*

*(cxx) Oregon Avenue from Columbus Boulevard to Broad Street*

*(cxxi) W Lehigh Ave from N 3rd St to n Howard St*

*(cxxii) N American St from W Huntingdon St to W Somerset St*

*(cxxiii) W Allegheny Ave from N Randolph St to N 2nd St*

*(cxxiv) 5th Street from W. Huntingdon to W. Clearfield*

*(cxxv) W Lehigh Ave from N Marshall St to N 5th St*

*(cxxvi) West Luzerne Street to N 5th St*

*(cxxvii) W Wyoming Avenue to N 5th St*

*(cxxviii) W. Erie Ave from N. Franklin St. To N 5th St.*

*(cxxix) Rising Sun Ave from N. 8th St. To W. Pike St.*

*(cxxx) W. Butler St. From N. Marshall St. To N. Lawrence St.*

*(cxxxi) N. 6th St. From W. Pike St. To W. Erie Ave.*

*(cxxxii) N 6th St from W Berks St to W Susquehanna*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(cxxxiii) Bustleton & Harbison Bustleton Ave from Unruh Ave to Princeton Ave*

*(cxxxiv) Bustleton Ave to Bradford St*

*(cxxxv) Bustleton Ave to Leonard St*

*(cxxxvi) Bustleton Ave to Knorr Street*

*(cxxxvii) Bustleton Ave from Unruh Ave to Akron Street*

*(cxxxviii) E Alleghany Avenue to B Street*

*(cxxxix) E Alleghany Avenue to D Street*

*(cxl) Castor Ave from Comly St to Benner St*

*(cxli) Castor Ave from Robbins St to Glenview St*

*(cxlii) Castor Ave to Large St*

*(cxliii) E Wingohocking St from Castor to Adams Ave*

*(cxliv) Castor Ave from E Wingohocking St to Orthodox St*

*(cxlv) E Wyoming Ave from Rosehill St to Tampa St*

*(cxlvi) E Wyoming Ave to E Mentor St*

*(cxlvii) E Wyoming to E Thelma St*

*(cxlviii) E Erie Ave from I St to Adams Ave*

*(cxlix) Frankford Ave from E Hunting Park Ave to Adams Ave*

*(cl) Torresdale Ave from Frankford Ave to Paul St*

*(cli) Kensington Ave from E Pacific St to E Luzerne St*

*(clii) Frankford Ave from E Berk St. To E. Sergeant St.*

*(cliii) Frankford Ave from Benner St to Tyson Ave*

*(cliv) Frankford Ave to Erdrick St*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



(clv) *Frankford Ave to Charles St*

(clvi) *Frankford Ave to Hawthorne St*

(clvii) *Frankford Ave to Mulberry St*

(clviii) *Frankford Ave / Bridge-Pratt Frankford Ave from Allengrove St to Brill St*

(clix) *Pratt St from Griscom St to Duffield St*

(clx) *Frankford Ave from Adams Ave to Unity St*

(clxi) *Kensington Ave from Adams Ave to Unity St*

(clxii) *Frankford Ave / Margaret-Orthodox Frankford Ave from Unity St to Allengrove St*

(clxiii) *Oxford Ave from Margaret St to Leiper St*

(clxiv) *N Front St from Clearfield to E Ontario St*

(clxv) *N Front St to N Lee St*

(clxvi) *N Front St to Mascher St*

(clxvii) *W Allegheny Ave from Mascher St to Ella St*

(clxviii) *N Front St from Diamond St to E Cumberland St*

(clxix) *Kensington Ave from E York St to E Lehigh Ave*

(clxx) *Harbison Ave from Ditman St. To Aramingo Ave*

(clxxi) *Torresdale Ave from Bridge St. To Fraley St.*

(clxxii) *East Tioga Street to Rand Street and East Tioga Street to Malta Street*

(clxxiii) *I street to Train Intersection (No Street Name)*

(clxxiv) *E Hunting Park Ave from Whitaker Ave to L St*

(clxxv) *E Hunting Park Ave to E Lycoming St*

(clxxvi) *Kensington Ave from E Indiana to E Estaugh St*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(clxxvii) E Allegheny Ave from Kensington Ave to Emerald St*

*(clxxviii) E Allegheny Ave from Kensington Ave to Reach St*

*(clxxix) Kensington Ave from E. Tusculum St. To E. Orleans St.*

*(clxxx) E Vanango Street to East Glenwood Ave*

*(clxxxi) E Ontario Street to East Vanango Street*

*(clxxxii) Oxford Ave from Pratt st to E Roosevelt St*

*(clxxxiii) Oxford Ave from Sanger St to E Roosevelt St*

*(clxxxiv) Oxford Ave from E Roosevelt St to Van Kirk St*

*(.9) Any other requirement adopted by the Department by regulation pursuant to this Section.*

*(d) An intoxicating substance retailer permit is valid for one business at one location and may not be transferred from one business to another or from one location to another. A new intoxicating substance retailer permit is required whenever an intoxicating substance retailer changes location or transfers ownership.*

*(2) Permit Expiration, Renewal, and Revocation.*

*(a) Term. An intoxicating substance retailer permit shall be effective through the thirty-first day of December of the calendar year for which it is issued.*

*(b) Renewal. Any person lawfully issued an intoxicating substance retailer permit pursuant to the provisions of this Section shall be entitled to renew such permit, provided that all the requirements of this Section, and any other applicable requirements, are met.*

*(.1) An intoxicating substance retailer shall apply for renewal and submit the applicable renewal fee no later than sixty (60) days prior to expiration of the license permit term. Renewal applications submitted less than sixty (60) days prior to the expiration of the license permit term shall be subject to both the new application fee, and the renewal fee, and the late renewal fee.*

*(.2) Applicants for renewal shall meet the requirements for an intoxicating substance retailer license permit set forth under subsection (1).*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(c) Revocation of Permit.*

*(.1) An intoxicating substance retailer permit may be revoked for any of the following reasons:*

*(.a) Failure to provide all information required as a condition of issuing an intoxicating substance retailer permit;*

*(.b) Making a material false statement in an application for an intoxicating substance retailer permit or in a renewal application for an intoxicating substance retailer permit;*

*(.c) Failure to maintain a valid medical marijuana permit from the Pennsylvania Bureau of Medical Marijuana, if required;*

*(.d) Failure to maintain a valid commercial activity license or any other license or permit required under this Title;*

*(.e) The person issued an intoxicating substance retailer permit is delinquent in the payment of any City or School District of Philadelphia taxes, charges, fees, rents or claims, or any penalties or fines relating to the person's business for which the person is responsible, unless the person has entered into an agreement to pay any such delinquency and is abiding by the terms of such agreement.*

*(.f) The person issued an intoxicating substance retailer permit engages in intoxicating substance retailing at any other location in the City in violation of any provision of this Section, or any City requirement with respect to intoxicating substance retailing.*

*(3) Permit Fees. The application and renewal fee*s *shall be three-hundred ($300), and the late renewal fee shall be fifty dollars ($50), except that the Department may alter these fee amounts by regulation, based on the total cost of the administration and enforcement of this Section. The application fee shall be paid at the time the application is submitted. The renewal fee shall be paid at the time the renewal application is submitted.*

*(4) Testing and Certification Required. Any intoxicating substance sold by a permitted intoxicating substance retailer shall be tested by a Drug Enforcement Agency (DEA) registered and licensed laboratory in Pennsylvania authorized to test such substances*

*(a) Intoxicating Hemp products shall be certified by such laboratory as:*

*(.1) Having a total tetrahydrocannabinols concentration (including tetrahydrocannabinolic acid) of not more than 0.3 percent on a dry weight basis; and*



Case ID: 261101288
Control No.: 26112521

*(.2) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(.3) Being free from any poisonous or otherwise deleterious ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.4) Being free from any substance that affects the quality or strength of the intoxicating hemp product to such a degree as to render the product injurious to a consumer.*

*(b) Kratom products shall be certified by such laboratory as:*

*(.1) Being free from any substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer.*

*(.2) Being free from any poisonous or otherwise deleterious nonkratom ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.3) Containing a kratom extract with levels of residual solvents below the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.4) Containing a level of 7-hydroxymitragynine in the alkaloid fraction of not more than 2 percent of the overall alkaloid composition of the kratom product.*

*(.5) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(5) Labeling Required. Any intoxicating substance sold by a permitted intoxicating substance retailer shall be labeled, in accordance with regulations adopted by the Department, in a manner that identifies to consumers that the product meets the criteria established in this Section, and otherwise complies with all applicable hemp and kratom and consumer protection laws and regulations:*

*(a) Intoxicating Hemp products shall be labeled as:*

*(.1) Having a total tetrahydrocannabinols concentration (including tetrahydrocannabinolic acid) of not more than 0.3 percent on a dry weight basis; and*

*(.2) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*(.3) Being free from any poisonous or otherwise deleterious ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.4) Being free from any substance that affects the quality or strength of the intoxicating hemp product to such a degree as to render the product injurious to a consumer.*

*(b) Kratom products shall be labeled as:*

*(.1) Being free from any substance that affects the quality or strength of the kratom product to such a degree as to render the kratom product injurious to a consumer.*



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



*(.2) Being free from any poisonous or otherwise deleterious nonkratom ingredient, including, but not limited to, any of the following:*

*(.a) A controlled substance listed under section 4 of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-104).*

*(.b) A controlled substance listed under 28 Pa. Code Ch. 25 Subch. A (relating to controlled substances, drugs, devices and cosmetics).*

*(.c) A substance that is temporarily scheduled as a controlled substance by the Secretary of Health pursuant to section 3(d) of The Controlled Substance, Drug, Device and Cosmetic Act (35 P. S. § § 780-103(d)).*

*(.3) Containing a kratom extract with levels of residual solvents below the standards specified in the edition of the United States Pharmacopeia/National Formulary 467 that is current on the effective date of this paragraph.*

*(.4) Containing a level of 7-hydroxymitragynine in the alkaloid fraction of not more than 2 percent of the overall alkaloid composition of the kratom product.*

*(.5) Being free from heavy metals, pesticides, solvents, mycotoxins, microbials and other contaminants.*

*§ 9-6704. Penalties and Enforcement.*

*A violation of any provision of this Chapter shall be classified as a Class III offense subject to the maximum fine set forth in subsection 1-109(3) of the Code, in addition to the penalties authorized pursuant to Section A-505.1 of the Philadelphia Administrative Code. Each day a violation continues shall constitute a separate offense.*

*§ 9-6705. Severability.*

*If a court of competent jurisdiction declares any part of this Chapter 9-6700 to be invalid, such judgment shall not affect the validity of this Section as a whole or any remaining part thereof. It is the intention of City Council that the remaining provisions of this Section would have been adopted as if such part found to be invalid had not been enacted.*

* * *

SECTION 2. This Ordinance shall be effective November 12, 2026, except that Section 9-6703 ("Permitted Sale of Intoxicating Substances") shall take effect upon the issuance of regulations by the Department.



Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



---

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.



Case ID: 261101288
Control No.: 26112521

Case ID: 261101288
Control No.: 26112521

# City of Philadelphia



CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on June 4, 2026. The Bill was Signed by the Mayor on September 15, 2026.

Elizabeth McCollum
Chief Clerk of the City Council



Case ID: 261101288
Control No.: 26112521

# Exhibit C

**AFFIDAVIT OF CRAIG KATZ IN SUPPORT OF PLAINTIFFS' EMERGENCY PETITION FOR SPECIAL AND PRELIMINARY INJUNCTION**

I, Craig Katz, state as follows:

## I. BACKGROUND OF AFFIANT

1. I am the Government Relations and Compliance Manager of Plaintiff MNG 2005, Inc. d/b/a CBD Kratom ("MNG"). I am also the President at Plaintiff Pennsylvania Healthy Alternatives Association ("PAHAA"). I am over eighteen years of age and competent to make this Affidavit. I am authorized to make it on behalf of MNG, and PAHAA in this case.

2. I make this Affidavit on personal knowledge and on my review of MNG's business records, which are kept in the ordinary course of MNG's business. In my position I am responsible for, or have direct knowledge of, MNG's retail operations, product sourcing, product testing and labeling, age-verification policies, employment, leases, and licensing. If called as a witness, I could and would testify to the facts stated here.

3. MNG is a Missouri corporation with its principal place of business at 12400 Olive Blvd, Suite 100, St Louis, MO 63141. MNG is a member of Plaintiff Pennsylvania Healthy Alternatives Association ("PAHAA"). PAHAA is a registered Pennsylvania domestic non-profit corporation engaged in advocacy and legal action to protect access to hemp and kratom products.

4. I submit this Affidavit in support of Plaintiffs' Emergency Petition for Special and Preliminary Injunction regarding Bill No. 260163, which creates Chapter 9-6700 of The Philadelphia Code, "Intoxicating Substances" (the "Ordinance"), with an effective date of November 12, 2026.

## II. MNG'S BUSINESS AND HISTORY

5. The "CBD Kratom" retail concept was founded in 2016. MNG's founders identified a need in the marketplace while searching for natural, non-pharmaceutical ways to address a relative's chronic pain.

6. MNG has been in business for over ten (10) years. MNG and its affiliates own and operate over fifty (50) "CBD Kratom" retail stores across the United States and employ over 300 people. Those stores are generally located in established commercial districts, including Rittenhouse Square in Philadelphia, Media in Delaware County, the Financial District in New York City, and River North in Chicago.

7. MNG has served hundreds of thousands of customers. Its mission is to provide adult customers with safe, tested products that offer alternative approaches to individual wellness, so that, as MNG's motto says, they can "sleep well, wake well, and live well."

8. In more than ten (10) years of operation, across more than fifty (50) stores, MNG has never been found liable for selling an unsafe product or for any injury caused by a product it sold.



Case ID: 261101288
Control No.: 26112521

## III. THE PRODUCTS MNG SELLS

A. *Hemp-Derived Products*

9. MNG sells hemp-derived products at its Philadelphia stores, including creams and other topicals, tinctures, and smokeables. These include products containing CBD (cannabidiol) and other cannabinoids derived from hemp.

10. "Hemp" since 2018 has been defined as the plant Cannabis sativa L., and any part or derivative of it, with a delta-9-tetrahydrocannabinol ("delta-9 THC") concentration of not more than 0.3 percent on a dry-weight basis. Every hemp-derived product MNG sells contains a delta-9 THC concentration of not more than 0.3 percent on a dry-weight basis.

B. *Natural-Leaf Kratom Products*

11. MNG also sells products made from the natural leaf of kratom (Mitragyna speciosa), a tree native to Southeast Asia. There, the leaf has been used for generations, traditionally as a tea. Adult customers commonly use natural-leaf kratom for wellness purposes, including pain relief.

12. MNG sells only natural-leaf kratom products. MNG does not sell any product containing concentrated or synthetic 7-hydroxymitragynine ("7-OH"), synthetic mitragynine, or any other synthetic kratom alkaloid. MNG does not sell kratom products adulterated with other drugs or substances.

## IV. MNG'S SAFETY, TESTING, LABELING, AND AGE-VERIFICATION PRACTICES

A. *Independent Laboratory Testing*

13. Independent accredited third-party laboratories test every hemp-derived product MNG sells for cannabinoid content, including CBD and delta-9 THC levels.

14. Accredited third-party laboratories also test the natural-leaf kratom products MNG sells for kratom alkaloid content. Not all labs are DEA registered or Pennsylvania licensed but they are all accredited, most are DEA licensed and or registered in some state, and provide accurate and competent results that MNG routinely relies on as part of its business safety protocols. The certificates of analysis for all of MNG's products are located on Shop CBD Kratom website test results webpage: https://shopcbdkratom.com/pages/test-results?srsltid=AYCX9vLntxWL06uzFlitxqOisGVkM7vfhsSLYDJne8Qx5uWXvqfHhXng. By way of example, a copy of the Certificate of Analysis ("COA") for THC CO Marionberry Sleep Gummies is attached as Exhibit A. A copy of the COA for Der Kratom Brewski is attached as Exhibit B.

B. *Labeling: Ingredients, Dosage, and Warnings*

15. The products MNG sells display ingredient labels. Where appropriate, they also display dosage information and warnings.

16. Most products carry a QR code. A customer can scan it with a smartphone to view the product's Certificate of Analysis, which typically runs three to five pages of laboratory test

results. A customer can therefore see, before purchasing, what the product contains and what it was tested for. By way of example, a copy of the label for CBN THC unflavored infuser is attached as Exhibit C.

C. *Minimum Age and Identification Requirements*

17. MNG does not sell hemp or kratom products to anyone under eighteen (18) or twenty-one where legally required (such as smokable products) .

18. MNG's sales consultants must request identification from any customer who does not appear to be at least thirty (30) years old.

D. *Store Operations and Employee Training*

19. MNG trains its sales consultants for several weeks before they work independently, with continuing education afterward. Training covers product knowledge, age verification, and how to consult with each customer about which product, if any, suits that customer's needs.

20. MNG's stores are renovated, well lit, clean, and secure. Products are kept out of customers' reach, most of them in locked glass cases. A customer needs the help of a sales consultant to access them.

## V. MNG'S PHILADELPHIA STORES, LICENSES, AND PERMITS

21. MNG operates the following retail stores in the City of Philadelphia (the "Stores"):

| Store | Address |
|---|---|
| 1 | 212 S. 17th Street, Philadelphia, PA |
| 2 | 524 South Street, Philadelphia, PA |
| 3 | 4040 City Avenue, Suite 2B, Philadelphia, PA |

22. MNG has operated in Philadelphia for five years. Its first Philadelphia Store opened in 2021.

23. MNG holds every license and permit required to operate each Store at its current locations. Each required license and permit is current and in good standing.

24. Each Store operates at a fixed, lawful retail location under a written lease. To my knowledge, no Philadelphia Store has been cited for a nuisance or criminal activity, or for selling any product to a minor.

## VI. THE IMMEDIATE AND IRREPARABLE HARM THE ORDINANCE WILL CAUSE

25. I have reviewed the Ordinance. As I understand it, beginning November 12, 2026:

- it prohibits the sale of hemp-derived and kratom products that are not recognized by the U.S. Food and Drug Administration as dietary supplements or safe food additives, or

approved under the federal Food, Drug, and Cosmetic Act (§ 9-6702(3)). To my knowledge, no such recognition or approval exists for the products MNG sells;

- the permit provisions (§ 9-6703) do not take effect until the Department of Licenses and Inspections issues regulations. To my knowledge, none have been issued, so MNG cannot apply for or obtain a permit; and
- each day of a violation is a separate Class III offense subject to fines (§ 9-6704).

26. Based on MNG's review, each of the three Stores is either within 500 feet of a use listed in § 9-6703(1)(c)(.7), or within one of the 184 designated exclusion areas where the Ordinance bars a permit. That includes South Street, City Avenue, and the Center City District. Even if permits became available, none of the Stores could obtain one at its current location.

*A. Loss of Substantially All Sales and Profit*

27. Intoxicating hemp-derived and natural-leaf kratom products make up approximately 90 % of the Stores' sales. In 2025 the Stores generated approximately several million in combined gross sales. If the Ordinance takes effect, MNG will lose substantially all of those sales, and with them substantially all of the Stores' profit.

28. The Stores cannot operate profitably selling only products that the Ordinance does not cover. Without the hemp and kratom products, the Stores have no viable business.

*B. Forced Closure of the Stores*

29. If the Ordinance takes effect on November 12, 2026, MNG will be forced to close all three Stores. It cannot continue selling its core products without risking daily fines and nuisance enforcement. It has no permit pathway, and it has nowhere to relocate in the City.

30. Closing the Stores threatens the existence of MNG's Philadelphia business.

*C. Imminent Threat of Workforce Displacement*

31. MNG employs a dedicated team of approximately 20 individuals across the Stores, consisting of 15 full-time and 5 part-time staff, all of whom completed MNG's extensive multi-week training program. A forced closure would jeopardize the continued employment of 19 team members, causing immediate workforce displacement. Such an outcome would permanently dissipate MNG's substantial investment in training this workforce, and MNG would face severe, likely insurmountable hurdles in reassembling this trained team should relief be granted later.

*D. Lease Defaults and Lost Investments*

32. Each Store occupies leased premises. The leases run for several more years , with remaining obligations exceeding $1,500,000 . If the Stores close and stop generating revenue, MNG will be unable to perform under the leases. The leases will go into default, exposing MNG to acceleration, damages claims, and loss of its leasehold interests and the improvements it made to each Store.

33. MNG has invested hundreds of thousands of dollars in buildouts, fixtures, secure display cases, signage, and equipment at the Stores. These investments are specific to each location and cannot be recovered if the Stores close.

34. MNG holds inventory for the Stores valued at approximately $100,000, bought through interstate channels for lawful retail sale. The Ordinance would strand that inventory.

*E. Loss of Customers and Goodwill*

35. The Stores have built relationships with thousands of regular adult customers who rely on MNG for tested, labeled products and individual consultation. If the Stores close, those customers will go to other sources, including unregulated online or out-of-City sellers, and MNG's goodwill in Philadelphia will be lost. That loss cannot be measured in dollars and cannot be restored by an award of money later.

## VII. MNG AND THE OTHER PAHAA MEMBERS WILL COMPLY WITH THE ORDINANCE'S REGULATORY PROVISIONS IF ALLOWED TO REMAIN OPEN

36. If the Court allows the Stores to remain open while this case is pending, MNG will comply with most of the Ordinance's regulatory safety provisions, including:

1. Minimum age (§ 9-6702(4)). MNG will raise its minimum age to twenty-one (21) for all intoxicating hemp-derived and kratom products, will not sell any covered product to anyone under 21, and will keep requiring identification from any customer who appears to be under thirty (30).
2. Kratom product standards (§ 9-6702(2)). MNG will not sell any kratom product that contains more than two percent 7-OH in the alkaloid fraction; or that contains a synthetic alkaloid or other synthetically derived kratom compound.
3. Hemp product standards. MNG will not sell any hemp product that contains more than 0.3 percent of Delta-9 THC on a dry-weight basis and/or will at all times comply with the definitions of hemp in the Agriculture Improvement Act of 2018,7 U.S.C. § 1639o(1), as amended from time to time.
4. Testing (§ 9-6703(4)). MNG will continue accredited independent third-party laboratory testing of every product it sells using accredited laboratories that test for cannabinoids and alkaloids. Most laboratories, but not all, are DEA registered, but all are accredited.
5. Labeling (§ 9-6703(5)). MNG will continue to label every product with its ingredients, dosage information, and warnings and to provide QR-code access to Certificates of Analysis. It will meet any reasonable additional labeling requirements in Department regulations once they are issued.

37. MNG already meets most of these requirements voluntarily. Complying with them in full imposes no undue burden on MNG and fully addresses the product-safety and youth-access concerns the Ordinance identifies.

## VIII. CONCLUSION

38. Without immediate injunctive relief, MNG will be forced to close the Stores on or about November 12, 2026. MNG will lose substantially all of its Philadelphia sales and profit, displace its Philadelphia employees, default on its leases, strand its inventory and investments,



Case ID: 261101288
Control No.: 26112521

and lose its customers, employees and goodwill. A later award of money cannot undo those harms.

[REMAINDER OF PAGE LEFT BLANK]



Case ID: 261101288
Control No.: 26112521

II verify that the statements made in this Affidavit are true and correct to the best of my knowledge, information, and belief. I understand that false statements in this Affidavit are subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Date: 11/9, 2026

Craig Katz
Government Relations and Compliance
Manager of MNG 2005, Inc. d/b/a CBD Kratom



Case ID: 261101288
Control No.: 26112521

# Exhibit A

KCA Laboratories
232 North Plaza Drive
Nicholasville, KY 40356
+1-833-KCA-LABS
https://kcalabs.com
KDA Lic.# P_0058

**Certificate of Analysis**



# THC CO Marionberry Sleep 1mg D9/1mg CBN/1mg CBD/1mg Melatonin

Sample ID: SA-230908-26847
Batch: 063023THC1
Type: Finished Product - Ingestible
Matrix: Edible - Gummy
Unit Mass (g): 2.40002

Received: 09/08/2023
Completed: 09/12/2023

**Client**
Lifted Made
5511 95th Ave
Kenosha, WI 53144
USA



## Summary

| Test | Date Tested | Status |
|---|---|---|
| Cannabinoids | 09/12/2023 | Tested |

| 0.0401 % | 0.0480 % | 0.128 % | Not Tested | Not Tested | Yes |
|---|---|---|---|---|---|
| Total Δ9-THC | CBD | Total Cannabinoids | Moisture Content | Foreign Matter | Internal Standard Normalization |

## Cannabinoids by HPLC-PDA, LC-MS/MS, and/or GC-MS/MS

| Analyte | LOD (%) | LOQ (%) | Result (%) | Result (mg/unit) |
|---|---|---|---|---|
| CBC | 0.00095 | 0.00284 | ND | ND |
| CBCA | 0.00181 | 0.00543 | ND | ND |
| CBCV | 0.0006 | 0.0018 | ND | ND |
| CBD | 0.00081 | 0.00242 | 0.0480 | 1.15 |
| CBDA | 0.00043 | 0.0013 | ND | ND |
| CBDV | 0.00061 | 0.00182 | ND | ND |
| CBDVA | 0.00021 | 0.00063 | ND | ND |
| CBG | 0.00057 | 0.00172 | ND | ND |
| CBGA | 0.00049 | 0.00147 | ND | ND |
| CBL | 0.00112 | 0.00335 | ND | ND |
| CBLA | 0.00124 | 0.00371 | ND | ND |
| CBN | 0.00056 | 0.00169 | 0.0402 | 0.966 |
| CBNA | 0.0006 | 0.00181 | ND | ND |
| CBT | 0.0018 | 0.0054 | ND | ND |
| Δ8-THC | 0.00104 | 0.00312 | ND | ND |
| Δ9-THC | 0.00076 | 0.00227 | 0.0401 | 0.961 |
| Δ9-THCA | 0.00084 | 0.00251 | ND | ND |
| Δ9-THCV | 0.00069 | 0.00206 | ND | ND |
| Δ9-THCVA | 0.00062 | 0.00186 | ND | ND |
| **Total Δ9-THC** | | | **0.0401** | **0.961** |
| **Total** | | | **0.128** | **3.08** |

ND = Not Detected; NT = Not Tested; LOD = Limit of Detection; LOQ = Limit of Quantitation; RL = Reporting Limit; Δ = Delta; Total Δ9-THC = Δ9-THCA * 0.877 + Δ9-THC; Total CBD = CBDA * 0.877 + CBD;

Generated By: Ryan Bellone
CCO
Date: 09/12/2023

Tested By: Nicholas Howard
Scientist
Date: 09/12/2023

ISO/IEC 17025:2017 Accredited
Accreditation #108651

This product or substance has been tested by KCA Laboratories using validated testing methodologies and an ISO/IEC 17025:2017 accredited quality system. Values reported relate only to the product or substance tested. The reported result is based on a sample weight. Unless otherwise stated, results of tests performed on all quality control samples met criteria for acceptance established by KCA Laboratories. KCA Laboratories makes no claims as to the efficacy, safety or other risks associated with any detected or non-detected amounts of any substances reported herein. This Certificate of Analysis shall not be reproduced except in full, without the written approval of KCA Laboratories. KCA Laboratories can provide measurement uncertainty upon request.

# Exhibit B

11455 Pearl St Northglenn, CO 80233 (303) 296-026

MURRAY-BROWN LABORATORIES, INC.
Beyond the Raw Data

# Certificate of Analysis for

MNG 2005 Inc
12400 Olive Blvd, Ste 100
Saint Louis, MO 63141
Phone: (314) 614-8957

Received: 10/7/2025 @ 20.3 °C
Report ID: 2510304

## Sample ID: 2510304-001 Der Kratom Brewski

**MIT.2: Kratom Alkaloids via HPLC-DAD Analyzed 10/10/25**

| | | | | | |
|---|---|---|---|---|---|
| 7-Hydroxymitragynine | < 0.100 | mg/12 fl. oz. | Isorhynchophylline | < 0.100 | mg/12 fl. oz. |
| Mitragynine | 29.7 | mg/12 fl. oz. | Mitraphylline | < 0.100 | mg/12 fl. oz. |
| Paynantheine | 0.953 | mg/12 fl. oz. | Speciociliatine | < 0.100 | mg/12 fl. oz. |
| Speciogynine | 0.599 | mg/12 fl. oz. | Total Alkaloids | 31.2 | mg/12 fl. oz. |

Jake Hedges

Reported By Jake S Hedges, Chemistry Laboratory Supervisor, 10/15/2025

This document is confidential and is meant solely for the individual or entity designated above. MBL Terms and Conditions apply.
This Certificate of Analysis should only be reproduced in full. Results contained herein are representative of and only apply to the sample portion submitted to or collected by MBL.

# Exhibit C




3.539 in

2.32 in

LOW DOSE · LOW DOSE · LOW DOSE · LOW DOSE ·

| SUPPLEMENT FACTS<br>1 servings per container<br>Serving Size 5ML |
|---|
| **Calories** 0, **Total Fat** 0g (0% DV), **Sat. Fat** 0g (0% DV), **Cholesterol** 0mg (0% DV), **Sodium** 0mg (0% DV), **Total Carbs.** 0g (0% DV), **Total Sugars** 0g, Added Sugars 0g (0% DV), **Protein** 0g |
| Cannabinol (CBN) 10mg |
| Delta-9 THC 5mg |
| Not a significant source of Vitamin D, Calcium, Iron, Potassium or other nutrients. |

**INGREDIENTS:** Water, Nano-encapsulated CBN Extract, Nano-encapsulated Delta-9 THC Extract

8 10159 41180 6

**POUR, STIR AND RELAX.**
**STORE IN A COOL, DRY PLACE.**

This product contains less than 0.3% Delta-9 THC on a dry weight basis and is 2018 Farm Bill compliant.

**WARNING** For adult use only. Pregnant and breastfeeding women, and those with a medical condition or taking any medications should consult with a physician prior to use. Do not operate heavy machinery while using or experiencing the effects of this product. Use may result in a non-passing drug test. These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

**KEEP OUT OF REACH OF CHILDREN AND PETS.**

**That smile looks great on you.**

Share it on social!

@beezbee_thehive

B Z B

**DISTRIBUTED BY:**
MNG BRANDS
12400 OLIVE BLVD.
ST. LOUIS, MO 63141

3.539 in

2.32 in

Case ID: 261101288
Control No.: 26112521




2.32 in

Control No.: 26112521

LOW DOSE · LOW DOSE · LOW DOSE · LOW DOSE ·

| SUPPLEMENT FACTS<br>1 servings per container<br>Serving Size 5ML |
|---|
| **Calories** 0, **Total Fat** 0g (0% DV), **Sat. Fat** 0g (0% DV), **Cholesterol** 0mg (0% DV), **Sodium** 0mg (0% DV), **Total Carbs.** 0g (0% DV), **Total Sugars** 0g, Added Sugars 0g (0% DV), **Protein** 0g |
| Cannabinol (CBN) 10mg |
| Delta-9 THC 5mg |
| Not a significant source of Vitamin D, Calcium, Iron, Potassium or other nutrients. |

**INGREDIENTS:** Water, Nano-encapsulated CBN Extract, Nano-encapsulated Delta-9 THC Extract

8 10159 41180 6

**POUR, STIR AND RELAX.**
**STORE IN A COOL, DRY PLACE.**

This product contains less than 0.3% Delta-9 THC on a dry weight basis and is 2018 Farm Bill compliant.

**WARNING** For adult use only. Pregnant and breastfeeding women, and those with a medical condition or taking any medications should consult with a physician prior to use. Do not operate heavy machinery while using or experiencing the effects of this product. Use may result in a non-passing drug test. These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

**KEEP OUT OF REACH OF CHILDREN AND PETS.**

**That smile looks great on you.**

Share it on social!

@beezbee_thehive

BZB

**DISTRIBUTED BY:**
MNG BRANDS
12400 OLIVE BLVD.
ST. LOUIS, MO 63141

3.539 in

2.32 in

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

Filed and Attested by the
Office of Judicial Records
10 NOV 2026 01:18 pm
A. MALONIS

PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION and MNG 2005, INC. d/b/a CBD KRATOM,

*Plaintiffs,*

v.

CITY OF PHILADELPHIA; CHERELLE PARKER, in her official capacity as Mayor of the City of Philadelphia; RALPH DIPIETRO, in his official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections; and BRIDGET COLLINS-GREENWALD, in her official capacity as Co-Commissioner of the Philadelphia Department of Licenses and Inspections,

*Defendants.*

________ TERM, 2026

No. ______________

CIVIL ACTION — EQUITY

Assigned to: ______________

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY PETITION FOR A SPECIAL INJUNCTION AND PRELIMINARY INJUNCTION**

Plaintiffs Pennsylvania Healthy Alternatives Association ("PAHAA") and MNG 2005, Inc. d/b/a CBD Kratom ("MNG") (together, "Plaintiffs"), by their undersigned counsel, submit this Memorandum of Law in support of their Emergency Petition, under Pa. R. Civ. P. 1531, for a special injunction and preliminary injunction against enforcement of Bill No. 260163 (the "Ordinance"), which creates Chapter 9-6700 of The Philadelphia Code, "Intoxicating Substances," and takes effect November 12, 2026.

## I. INTRODUCTION

The City of Philadelphia has thrown out the baby with the bathwater. City Council set out to stop three harms: (1) sales of intoxicating products to minors, (2) the sale of products



Case ID: 261101288
Control No.: 26112521

containing 7-hydroxymitragynine ("7-OH"), and (3) the sale of adulterated products. Plaintiffs share every one of those goals. They sell only to adults. They do not sell 7-OH products; the only 7-OH in their natural-leaf kratom is the trace amount that occurs naturally in the leaf, well within the Ordinance's own 2% limit. Every product they sell is tested by an accredited third-party laboratory for its cannabinoid or alkaloid content and is labeled. The Ordinance does not distinguish between conscientious, law-abiding retailers like Plaintiffs and the bad actors who sell dangerous products to anyone willing to pay. It bans both through two independent de facto bans.

*First*, the Ordinance bans any sale of kratom outright and bans hemp-derived consumer products for at least two years. Section 9-6702(3) makes it unlawful to sell any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application approved under the cited sections of the Federal Food, Drug, and Cosmetic Act. Every kratom product, including smokable kratom, and every hemp product sold to consumers, such as drinks and gummies, is an "Intoxicating Substance." Smokable kratom is not a food, drug, or cosmetic, and no FDA application exists that could apply to it. Hemp has never been approved as a food additive, and the only useable FDA path in the Ordinance, the food additive petition process, takes about two years. See - Guidance for Industry: Questions and Answers About the Food Additive or Color Additive Petition Process | FDA - https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-questions-and-answers-about-food-additive-or-color-additive-petition-process. Council was told this before it voted. It passed the condition anyway.



Case ID: 261101288
Control No.: 26112521

*Second*, even for a retailer that could somehow clear the FDA hurdle, the Ordinance's 500-foot setbacks and 184 exclusionary zones leave virtually no commercially viable location anywhere in Philadelphia. That includes the locations where Plaintiffs operate today.

The Ordinance's own text shows that a ban was never necessary. The Ordinance itself:

- caps 7-OH;
- prohibits synthetic and adulterated products;
- requires testing and labeling; and
- sets a minimum age of 21.

These provisions are aimed squarely at each harm the Ordinance sponsor identified. They prove that the City knew how to protect the public through regulation. Instead, it chose prohibition, wiping out lawful businesses that already sell only to adults, test their products' cannabinoid and alkaloid content, label them, and stand ready to comply with the Ordinance's age, product-content, testing, and labeling requirements.

Under Article I, Section 1 of the Pennsylvania Constitution, an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the harms they seek to address, and its means must have a real and substantial relation to the objects sought to be attained. The Ordinance fails that test on every count. A law that destroys a lawful industry to reach its unlawful fringe, when its own core regulatory provisions would fully achieve the stated goals, is the definition of "patently beyond the necessities of the case." The Ordinance is unconstitutional and void.

Plaintiffs ask the Court to stay enforcement of the Ordinance against Plaintiffs and PAHAA’s members before it closes every lawful hemp and kratom retailer in Philadelphia on November 12, 2026. In return, MNG and PAHAA’s members will comply during the pendency of this action with the Ordinance’s core regulatory components: the twenty-one-and-over age limit, § 9-6702(4); the 2% 7-OH cap on kratom products and the synthetic-alkaloid ban for kratom, § 9-



Case ID: 261101288
Control No.: 26112521

6702(2)(c)–(d); continue to comply with the 2018 Farm Bill's definition of hemp (0.3% delta-9 THC limit) 7 USC 1639o(1), as amended from time to time; continue to accredited third-party laboratory testing for cannabinoid and alkaloid content, § 9-6703(4); and ingredient, pdosage, and warning labels with QR-code access to Certificates of Analysis, § 9-6703(5).[1]

## II. QUESTIONS PRESENTED

1. Whether Plaintiffs are likely to succeed on their claim that the Ordinance violates substantive due process under Article I, Section 1 of the Pennsylvania Constitution because it bans a lawful occupation where regulation would suffice and is "patently beyond the necessities of the case." Suggested answer: Yes.

2. Whether Plaintiffs are likely to succeed on their claim that the Ordinance denies equal protection under Article I, Sections 1 and 26 of the Pennsylvania Constitution by treating hemp and kratom as "Intoxicating Substances" while exempting alcohol. Suggested answer: Yes.

3. Whether Plaintiffs are likely to succeed on their claim that the Ordinance is void for vagueness because its prohibitions and daily penalties take effect while the permit, labeling, and eligibility standards depend on Department regulations that do not exist. Suggested answer: Yes.

4. Whether Plaintiffs are likely to succeed on their claim that the Ordinance's 500-foot setbacks and 184 designated-area exclusions are de facto zoning enacted outside the procedures that govern zoning in Philadelphia. Suggested answer: Yes.

5. Whether Plaintiffs satisfy the remaining prerequisites for a special and preliminary injunction. Suggested answer: Yes.

---

[1] Section 9-705 of the Ordinance is a severability provision.

## III. STATEMENT OF FACTS

### A. Plaintiffs and Their Products

PAHAA is a Pennsylvania nonprofit corporation whose members are retailers, manufacturers, and wholesalers of hemp-derived products, including at least six retail establishments in Philadelphia. MNG, a PAHAA member, operates three Philadelphia stores at 212 S. 17th Street, 524 South Street, and 4040 City Avenue, Suite 2B, where it sells hemp products and natural-leaf kratom to adults. (Compl. ¶¶ 11–14.)

PAHAA's members do not sell to anyone under eighteen, or under twenty-one for smokeables; require identification from any customer who appears younger than thirty; do not sell 7-OH products; and have their products tested by accredited third-party laboratories, labeled, and linked by QR code to laboratory results. (*Id.* ¶¶ 15, 50–52, 62-65.) That testing measures cannabinoid content (including delta-9 THC) for hemp products and alkaloid content for kratom products. (*Id.* ¶¶ 51, 142.)

Plaintiffs only sell hemp products that comply with the current definition of hemp in the 2018 Farm Bill (a **delta-9 tetrahydrocannabinol (THC) concentration of not more than 0.3% on a dry weight basis**) 7 U.S. Code § 1639o(1**).** (*Id.* ¶ 49.) The kratom Plaintiffs sell is natural-leaf. (*Id.* ¶¶ 12, 62-63.) Natural-leaf kratom contains a trace amount of naturally occurring 7-OH, and the Ordinance itself permits kratom products with up to 2% 7-OH in the alkaloid fraction. § 9-6702(2)(c); (*Id.* ¶ 63.) Plaintiffs' natural leaf kratom products fall within that limit as a naturally occurring trace amount. (*Id.*) The presence of that trace does not mean Plaintiffs sell 7-OH products: the concentrated and synthetic



Case ID: 261101288
Control No.: 26112521

7-OH products that prompted the Ordinance are a different category altogether, and Plaintiffs do not sell them.

**B. The Ordinance**

The Ordinance defines "Intoxicating Substance" as "[a]ny Intoxicating Hemp Product or Kratom Product." *See* Phila., Pa., Bill No. 260163 § 9-6701(9) (June 4, 2026) (signed Sept. 15, 2026), attached hereto as Ex. A. Alcohol is not included. It makes it unlawful to sell any substance within the federal "Exclusions" from the definition of hemp, § 9-6702(1); to sell kratom products that are adulterated, contain excess residual solvents, exceed 2% 7-OH in the alkaloid fraction, or contain synthetic alkaloids, § 9-6702(2); to sell "any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved" under specified sections of the Federal Food, Drug, and Cosmetic Act, § 9-6702(3); and to sell to anyone under twenty-one, § 9-6702(4).

Section 9-6703 requires a permit for each retail location and declares unpermitted retailing "a nuisance as a matter of law." § 9-6703(1)(a). It repeats the FDA condition as a permit criterion, § 9-6703(1)(c)(.1); requires a medical marijuana permit "if required," § 9-6703(1)(c)(.4); bars permits within 500 feet of schools, playgrounds, pools, parks, recreation centers, libraries, child care, and regulated uses, and in 184 enumerated corridors and districts, including the Center City District and South Street, § 9-6703(1)(c)(.7); and adds "[a]ny other requirement adopted by the Department by regulation," § 9-6703(1)(c)(.9). Products must be tested by a DEA-registered Pennsylvania laboratory, § 9-6703(4), and "labeled, in accordance with regulations adopted by the Department," § 9-6703(5). Each violation is a Class III offense, and "[e]ach day a violation continues shall constitute a separate offense." § 9-6704.



Case ID: 261101288
Control No.: 26112521

> Section 2 provides: This Ordinance shall be effective November 12, 2026, except that Section 9-6703 ('Permitted Sale of Intoxicating Substances') shall take effect upon the issuance of regulations by the Department.

No regulations have been issued, and the Ordinance sets no deadline for them. (Compl. ¶¶ 101-02.) The Ordinance contains no grandfathering, transition period, variance, or nonconforming-use protection. (Compl. ¶ 103.) Every PAHAA member store in Philadelphia, including MNG's three stores, falls within a setback or exclusion zones.

(Compl. ¶ 11103.)

### C. The Legislative Record

The sponsor described the target as "illegal smoke shops" that operate without community or zoning approval and "fuel" crime. (Compl. ¶¶ 68.) The physicians who testified were concerned about unregulated sales, concentrated 7-OH, and youth-targeted products, and supporters and opponents alike called for regulation rather than a ban. (Compl. ¶¶ 135-36, 139, , 133-34.) Council was informed that the FDA condition could never be met and would operate as a de facto ban. (Compl. ¶ 140.) The Department of Public Health answered "Not currently" when asked whether it had resources to implement the Bill. (Compl. ¶¶ 141, 145.) Council passed the Bill 16–0 without removing the FDA conditions. (Compl. ¶ 147.)

## IV. ARGUMENT

### A. The Standard for a Special and Preliminary Injunction

Pa. R. Civ. P. 1531(a) provides:

> A court shall issue a preliminary or special injunction only after written notice and hearing unless it appears to the satisfaction of the court that immediate and irreparable injury will be sustained before notice can be given or a hearing held, in which case the court may issue a preliminary or special injunction without a hearing or without notice. In determining whether a preliminary or special injunction should be granted and whether notice or a hearing should be required, the court may act on



Case ID: 261101288
Control No.: 26112521

> the basis of the averments of the pleadings or petition and may consider affidavits of parties or third persons or any other proof which the court may require.

A party seeking a preliminary injunction must show: (1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; (2) that greater injury would result from refusing the injunction than from granting it; (3) that the injunction will restore the parties to their status immediately prior to the alleged wrongful conduct; (4) that the activity sought to be restrained is actionable, the right to relief is clear, and the wrong is manifest, i.e., that the party is likely to prevail on the merits; (5) that the injunction is reasonably suited to abate the offending activity; and (6) that the injunction will not adversely affect the public interest. *Shogan v. Commonwealth*, 938 A.2d 1132 (Pa. Cmwlth. 2007) (citing *Warehime v. Warehime*, 860 A.2d 41, 46–47 (Pa. 2004)); *Summit Towne Ctr., Inc.*, 828 A.2d 995 (Pa. 2003) (every prerequisite must be established). Pa. R. Civ. P. 1531 authorizes a special injunction where immediate and irreparable injury will be sustained before notice can be given or a hearing held.

Plaintiffs need not prove their case absolutely; they must establish a prima facie right to relief. *Synthes USA Sales, LLC v. Harrison*, 83 A.3d 242, 249 (Pa. Super. 2013); *See Sovereign Bank v. Harper*, 674 A.2d 1085, 1092 (Pa. Super. 1996).

### B. Plaintiffs Are Likely to Prevail on the Merits

#### 1. The Ordinance Violates Substantive Due Process Under Article I, Section 1 of the Pennsylvania Constitution Because It Bans Lawful Retailers Where at the same time the Ordinance itself acknowledges Regulation Would Suffice

Article I, Section 1 of the Pennsylvania Constitution protects the "inherent and indefeasible rights" of "acquiring, possessing and protecting property" and "of pursuing their own happiness," which include the right to engage in a lawful occupation. Due process challenges under the Pennsylvania Constitution are analyzed "more closely" under the rational basis test than federal challenges. *Haveman v. Bureau of Prof'l & Occupational Affairs*, 238 A.3d 567, 573–74 (Pa.



Case ID: 261101288
Control No.: 26112521

Cmwlth. 2020) (quoting *Peake v. Commonwealth*, 132 A.3d 506, 518-19 (Pa. Cmwlth. 2015) and *Nixon v. Commonwealth*, 839 A.2d 277, 287-88 n.15 (Pa. 2003) ). The governing test is the one announced in *Gambone v. Commonwealth*, 101 A.2d 634, 637 (Pa. 1954):

> [A] law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.

Under *Gambone*, "the legislature can curtail the right to engage in a chosen occupation for an important reason, but it may not do so in a way that is overly broad, i.e., 'patently beyond the necessities of the case.'" *Haveman*, 238 A.3d at 574. Unlike federal review, a court does not uphold the law merely because it "can conceive of any plausible reason" for it. *Id.* Pennsylvania "balances the rights of the individual against the public interest." *Id.* (quoting Germantown Cab Co. v. Philadelphia Parking Auth., 206 A.3d 1030, 1044-45 (Pa. 2019)). The same means-end scrutiny applies to municipal land-use restrictions, which "must not be unreasonable, unduly oppressive or patently beyond the necessities of the case." *Gross v. New Britain Twp.*, 75 Pa. D. & C.4th 76, 98 (C.P. 2005), *aff'd*, 896 A.2d 26 (Pa. Cmwlth. 2006) (quoting *Mahony v. Twp. of Hampton*, 651 A.2d 525, 527 (Pa. 1994)).

**a. The stated objectives are specific and narrow.**

The legislative record identifies the harms precisely: illegal smoke shops operating without approval, concentrated and synthetic 7-OH products, mislabeled products, and youth access through products disguised as children's treats. (Compl. ¶¶ 68-70.) The sponsor admitted she had no concern with the actual health and wellness benefits of the products. (Compl. ¶ 71.)



Case ID: 261101288
Control No.: 26112521

**b. The Ordinance's own regulatory provisions address each concern.**

Each harm has a narrower answer, and the Ordinance itself supplies it. Youth access is addressed by the twenty-one-and-over limit, § 9-6702(4). Concentrated and synthetic 7-OH is addressed by the 2% cap and the synthetic-alkaloid ban, § 9-6702(2)(c)–(d). Contamination and adulteration are addressed by § 9-6702(2)(a)–(b) and the mandatory laboratory testing in § 9-6703(4). Mislabeling is addressed by § 9-6703(5). Unlicensed, transient shops are addressed by the permit, fixed-location, and commercial activity license requirements, § 9-6703(1)(c)(.5)–(.6).

PAHAA's members already meet the core concerns of the Ordinance. Theysell only to age-verified adults, keep their natural-leaf kratom within the 2% 7-OH limit, sell no synthetic alkaloids, comply with the 2018 Farm Bill regarding their hemp products, test every product for cannabinoid or alkaloid content, and label their products, and they will comply with the age, product-content, testing, and labeling terms set out in Section V during this action. (Compl. ¶ 160-62.)

**c. The Ordinance operates as a total prohibition.**

Three features convert this regulatory scheme into a ban. First, § 9-6702(3) conditions every sale on federal recognition as an appropriate dietary supplement, safe food additive, or approved application, a status the FDA has not given to any kratom product and has refused to CBD, and which no botanical product has a practical path to obtain. (Compl. ¶¶ 80-84.) Council was told this and passed the Bill unchanged. (Compl. ¶¶ 147-50.) Second, the prohibitions and daily penalties take effect November 12, 2026, while the only permit pathway waits indefinitely on Department regulations. *See* Ex. A § 2. Third, even if permits become available, the setbacks and 184 exclusions eliminate virtually every viable retail location, including every PAHAA member's current store. (Compl. ¶¶ 106, 113, 185.) Section 9-6702(1) also bans every



Case ID: 261101288
Control No.: 26112521

"Intoxicating Hemp Product" outright, rendering the hemp testing and labeling provisions of § 9-6703(4)(a) and (5)(a) a nullity. (Compl. ¶¶ 90–91.)

The FDA condition works as a ban in a straightforward way. Section 9-6702(3) provides: "It shall be unlawful for any person to sell or offer for sale any intoxicating substance that is not considered appropriate for use as a dietary supplement or a safe food additive or the subject of an application that has been approved in accordance with under Sections 201, 301, 402, 409, or 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 321, 331, 342, 348, or 355)." The Ordinance treats anything containing kratom, including smokable products, as an Intoxicating Substance. It likewise treats anything made from hemp and sold to consumers, such as drinks or gummies, as an Intoxicating Substance. Under § 9-6702(3), such a product may be sold only if it is (1) appropriate for use as a dietary supplement, (2) appropriate for use as a safe food additive, or (3) the subject of an approved FDA application.

None of these routes is available. Smokable kratom is not regulated by the FDA because it is not a food, drug, or cosmetic, and no FDA application process could apply to it. Of the federal provisions the Ordinance cites, the only one dealing with applications for food additives is section 409 (21 U.S.C. § 348), which governs petitions to permit the use of a food additive. The FDA has never approved hemp as a food additive. A business selling hemp drinks or gummies that needed prior FDA approval would therefore have to proceed through the food additive petition process, which the FDA says takes about two years.

The Ordinance is therefore a ban on the sale of kratom and hemp.

**d. The additional prohibition serves no stated objective.**

Whatever the ban forbids beyond the age limit, the 7-OH and synthetic limits, testing, and labeling, only natural leaf kratom, Farm Bill compliant hemp product sold to an age-verified adult in a licensed, fixed-location store, is excessive. Prohibiting that sale advances none of the City's



Case ID: 261101288
Control No.: 26112521

stated objectives. The City's own witnesses distinguished natural-leaf kratom from "highly concentrated extracts" (Compl. ¶ 145), and the Department of Public Health admitted it lacked resources to implement regulation. *Id.* A preference for prohibition because regulation is inconvenient is not a "real and substantial relation" between means and ends. *Gambone*, 101 A.2d at 637. A ban does not merely burden the business; it eliminates it. *Gambone*'s warning against "unusual and unnecessary restrictions upon lawful occupations" applies with special force when the restriction is total and the legislature itself enacted the lesser alternative. The Ordinance is therefore "patently beyond the necessities of the case."

### 2. The Ordinance Denies Equal Protection by Exempting Alcohol From a Law Directed at "Intoxicating Substances."

An ordinance is arbitrary and irrational where it results in disparate treatment of similar persons without a reasonable basis for such disparate treatment. *Hopewell Twp. Bd. of Supervisors v. Golla*, 452 A.2d 1337, 1343–44 (Pa. 1982). The first inquiry is whether the complaining party is similarly situated to others treated more favorably; if so, the burden shifts to the municipality to show the classification is rationally related to a legitimate interest in public health, safety, morals, and general welfare. *Muhaiyaddeen Fellowship v. Phila. Zoning Bd. of Adjustment*, 19 A.3d 36, 42–43 (Pa. Cmwlth. 2011). "Similarly situated" means "alike in all relevant respects." *Hoy v. Borough of Cochranton*, No. 1005 C.D. 2015, 2016 WL 7406807, at *7 (Pa. Cmwlth. Dec. 21, 2016) (*relying on Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008)).

#### a. Alcohol retailers are similarly situated.

The Ordinance's classification is product-based: it regulates "Intoxicating Substances" and defines that term to exclude the most widely used intoxicant of all. Ex. A § 9-6701(9). Relative to the Ordinance's stated purposes, alcohol and Plaintiffs' products are alike in every relevant respect. Both are lawful under federal and Pennsylvania law. Both are sold to adults and restricted for



Case ID: 261101288
Control No.: 26112521

minors. Both can have intoxicating effects. Both raise the asserted concerns about youth access and misuse, and both can be addressed through licensing, testing, labeling, and enforcement. (Compl. ¶ 204.)

The Ordinance's own sponsor, Councilwoman Richardson acknowledged that the aim of the Intoxicating Substances Ordinance was to the sale of align hemp and kratom with the City's "current rules on intoxicating substances with FDA Guidelines," presumably a reference to alcohol-albeit misguided because while alcohol is an "Intoxicating Substance" is not FDA approved. (Compl. ¶ 71.); *see also CommCan, Inc. v. Baker*, No. 2084CV00808-BLS2, 2020 WL 1903822, at *10 (Mass. Super. Apr. 16, 2020)(sellers of alcohol and marijuana were treated as similarly situated).

The CDC reports that young people ages 12–20 use alcohol more than other drugs and that excessive alcohol use causes about 4,000 deaths among people under twenty-one each year. (Compl. ¶¶ 119-21.) Alcohol, unlike Plaintiffs' products, carries no ingredient labels, certificates of analysis, or dosing information. (Compl. ¶ 123.) Yet alcohol may be sold throughout Philadelphia, including in nearly every one of the 184 exclusionary zones from which Plaintiffs are barred. (Compl. ¶ 128.)

Impurities testing is discriminatory (and expensive). Alcohol is not tested for impurities. By way of example, according to a recent study, PFAs (forever chemicals) have been found in many popular beers:

> Beer has been a popular beverage for millennia. As water is a main component of beer and the brewing process, we surmised that the polyfluoroalkyl substances (PFAS) presence and spatial variability in drinking water systems are a PFAS source in beers. This is the first study to adapt EPA Method 533 to measure PFAS in beer from various regions, brewery types, and water sources. Statistical analyses were conducted to correlate PFAS in state-reported drinking water, and beers were analyzed by brewing location. PFAS were detected in most beers, particularly from smaller scale breweries located near drinking water sources with known PFAS.



Case ID: 261101288
Control No.: 26112521

> Perfluorosulfonic acids, particularly PFOS, were frequently detected, with PFOA or PFOS above U.S. EPA's Maximum Contaminant Limits in some beers.

Jennifer Hoponick Redmon et al., *Hold My Beer: The Linkage Between Municipal Water and Brewing Location on PFAS in Popular Beverages*, 59 Env't Sci. & Tech. 8368 (2025)

According to another study, alcohol products can contain pesticides, illegal additives and environmental contaminats:

> The presence of chemical contaminant in alcoholic beverages is a widespread and notable problem with potential implications for human health. With the complexity and wide variation in the raw materials, production processes, and contact materials involved, there are a multitude of opportunities for a diverse host of undesirable compounds to make their way into the final product—some of which may currently remain unidentified and undetected. This review provides an overview of the notable contaminants (including pesticides, environmental contaminants, mycotoxins, process-induced contaminants, residues of food contact material [FCM], and illegal additives) that have been detected in alcoholic products thus far based on prior reviews and findings in the literature, and will additionally consider the potential sources for contamination, and finally discuss and identify gaps in current analytical strategies.

Nancy Xiaohe He & Stéphane Bayen, *An Overview of Chemical Contaminants and Other Undesirable Chemicals in Alcoholic Beverages and Strategies for Analysis*, 19 Compr. Rev. Food Sci. Food Safety 3916 (2020).

Plaintiffs are not advocating for products with contaminants. Its history shows its products are safe. However, to require such testing is expensive and discriminatory.

**b. The City cannot justify the distinction on lack of authority over alcohol.**

Pennsylvania law does not disable municipalities from restricting alcohol. The Liquor Code's local-option provision permits the electors of a municipality to prohibit liquor and malt beverage licenses and State liquor stores, 47 P.S. § 4-472(a), and the Code preserves municipal authority to regulate zoning and enforce health and welfare ordinances, 47 P.S. § 4-493.1(a).



Case ID: 261101288
Control No.: 26112521

Approximately 675 Pennsylvania municipalities are fully or partially "dry." (Compl. ¶¶ 127.) The City chose to single out hemp and kratom.

#### c. The classification rests on fear of other sellers, not Plaintiffs.

A classification may not be based on mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *W. Easton Two, LP v. Borough Council of W. Easton*, 489 F. Supp. 3d 333, 370 (E.D. Pa. 2020). Basing a land-use decision on "irrational public sentiment composed of, 'mere negative attitudes, or fear'" violates substantive due process. *Bell Atl. Mobile Sys., Inc. v. Zoning Hearing Bd. of O'Hara Twp.*, 676 A.2d 1255, 1266–67 (Pa. Cmwlth. 1996), *aff'd sub nom. Crown Commc'ns v. Zoning Hearing Bd. of Glenfield*, 705 A.2d 427 (Pa. 1997). *Cleburne* rejected "vague, undifferentiated fears" as a basis to treat similarly situated parties differently. 473 U.S. at 449.

Here the sponsor described the targets as "illegal smoke shops" that "fuel" crime and operate without zoning approval. (Compl. ¶ 68.) None of that describes PAHAA's members, which are licensed, fixed-location retailers selling tested, labeled products to age-verified adults. (Compl. ¶¶ 142, 207.) Sweeping compliant sellers into a prohibition aimed at others, while exempting the more harmful product, lacks any reasonable ground of difference with a fair and substantial relationship to the Ordinance's purpose.

### 3. The Ordinance Is Void for Vagueness Because Its Penalties Take Effect Before the Regulations That Define Compliance Exist.

"As a matter of due process, a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or that is so indefinite that it encourages arbitrary and erratic arrests and convictions is void for vagueness." *Commonwealth v. Stein*, 546 A.2d 36, 40 (Pa. 1988). A law must define the objectionable conduct "with sufficient definiteness, that ordinary people can understand what conduct is prohibited and



Case ID: 261101288
Control No.: 26112521

in a manner that does not encourage arbitrary and discriminatory enforcement." *Dep't of Envtl. Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 979 (Pa. 2014) (quoting *Commonwealth v. Bullock*, 913 A.2d 207, 212 (Pa. 2006)). "The principle aspect of the doctrine is the requirement that legislation establish minimal guidelines to govern law enforcement." *Commonwealth v. Parker White Metal Co.*, 515 A.2d 1358, 1367(Pa. 1986). The doctrine applies to municipal ordinances: "an enactment that requires men of common intelligence to guess at its meaning violates due process." *Boron v. Pulaski Twp. Bd. of Supervisors*, 960 A.2d 880, 886 (Pa. Cmwlth. 2008) (interpreting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

*Stein* is particularly apt. There the Supreme Court held that "[s]pecial care must be taken by our courts when criminal penalties may be imposed … for violations of an administrative rule or regulation," and that such regulations "must be written so that they fill in the details of what is otherwise a broad statutory proscription," must "describe with particularity what is permitted and what is forbidden," and "must create standards that eliminate vagueness and uncertainty, not create it." *Stein*, 960 A.2d 40. The Ordinance inverts that principle. It enacts a broad proscription backed by daily Class III penalties, and leaves the details of what is permitted to regulations that have not been written:

- Section 9-6703 in its entirety, including the only pathway to lawful sale, takes effect only "upon the issuance of regulations by the Department," with no deadline. Ordinance § 2.
- Labeling must be "in accordance with regulations adopted by the Department." § 9-6703(5). None exist.
- Permit eligibility includes "[a]ny other requirement adopted by the Department by regulation." § 9-6703(1)(c)(.9). A retailer cannot know what those requirements will be.
- Permit fees may be altered "by regulation." § 9-6703(3).

Beginning November 12, 2026, a retailer will therefore face a nuisance declaration and a new offense every day, §§ 9-6703(1)(a), 9-6704, with no means of knowing, and no means of



Case ID: 261101288
Control No.: 26112521

satisfying, the standards that would make its conduct lawful. That is the absence of the "minimal guidelines" *Parker White Metal* requires, and it leaves enforcement to the unguided discretion of the Department. The regulation-dependent structure compounds the facial ambiguities pleaded in the Complaint: § 9-6702(3) prohibits substances "not considered appropriate" without stating who does the considering or by what standard; § 9-6701(4) incorporates federal hemp "Exclusions" that may change, without saying which version governs; and § 9-6703(1)(c)(.4) requires a medical marijuana dispensary permit "if required," without saying when. (Compl. ¶ 94.)

Pennsylvania courts also treat regulations not lawfully promulgated as having no force: "[a] regulation not promulgated in accordance with the statutory requirements will be declared a nullity." *Corman v. Acting Sec'y of Pa. Dep't of Health*, 267 A.3d 561, 572 (Pa. Cmwlth. 2021), *aff'd*, 671 Pa. 345 (2021); *Cary v. Bureau of Prof'l & Occupational Affairs*, 153 A.3d 1205, 1210 (Pa. Cmwlth. 2017). If regulations that are improperly adopted cannot bind the public, regulations that have not been adopted at all cannot supply the fair notice the Ordinance lacks.

**4. The Setbacks and Designated-Area Exclusions Are De Facto Zoning Enacted Outside Philadelphia's Zoning Procedures.**

An ordinance that regulates "a zoning principle" must comply with the procedural safeguards that govern zoning, and an ordinance that does not is void. *Dean v. City of Harrisburg*, 563 A.2d 965, 968–69 (Pa. Cmwlth. 1989), *appeal denied*, 526 Pa. 640 (1990); *Bd. of Supervisors of Franklin Twp. v. Meals*, 426 A.2d 1200, 1202 (Pa. Cmwlth. 1981). Zoning ordinances dictate where a use is permitted. *MarkWest Liberty Midstream & Res., LLC v. Cecil Twp. Zoning Hearing Bd.*, 184 A.3d 1048, 1060–61 (Pa. Cmwlth. 2018). A setback is a "zoning concept." *Bd. of Supervisors of Upper Frederick Twp. v. Moland Dev. Co.*, 339 A.2d 141, 143 (Pa. Cmwlth. 1975). Zoning ordinances need not create districts to regulate the use of land. *Borough of Edgeworth v. MacLeod*, 456 A.2d 682, 684 (Pa. Cmwlth. 1983). This Ordinance, however, does both.



Case ID: 261101288
Control No.: 26112521

**a. The framework applies in Philadelphia, through the City's own zoning procedures.**

Unlike the Radnor and Harrisburg ordinances in the earlier cases, Philadelphia's zoning power does not arise under the Municipalities Planning Code. The governing principle, however, is the same: when a municipality exercises its zoning power, it must follow the procedures that its enabling law and its own code require, and it may not evade them by placing a land-use restriction in a licensing title. The Philadelphia Zoning Code, Title 14, prescribes those procedures, including review and recommendation by the Philadelphia City Planning Commission. Phila. Code § 14-301(3)(c)(.2). The Ordinance was enacted as an amendment to Title 9, not Title 14, and, on information and belief, was not referred to the Planning Commission or processed as zoning legislation. (Compl. ¶ 114.)

**b. The Ordinance regulates where a use may occur on land.**

Section 9-6703(1)(c)(.7) does nothing but dictate on which parcels a retail use may operate. It bars permits within 500 feet of ten categories of uses, including "any regulated use, as set forth in subsection 14-603(13)" of the Zoning Code itself, and in 184 named streets, corridors, business improvement districts, and special services districts. It even requires that the location not be in "[a] zoning district where such use is not expressly allowed." § 9-6703(1)(c)(.7)(.a)–(.b). An ordinance that cross-references the Zoning Code's use classifications and maps a citywide grid of permitted and forbidden locations is zoning in substance. The sponsor confirmed the land-use purpose, targeting shops that "operate without community zoning approval" in what she called "a cat-and-mouse game." (Compl. ¶ 183.)

In *Dean*, Harrisburg enacted a licensing ordinance for "bring your own bottle" clubs that regulated operations within 500 feet of a residence or church; the entire ordinance was declared invalid because the buffer regulated land use and the zoning procedures were not followed. *Dean*



Case ID: 261101288
Control No.: 26112521

563 A.2d at 969. In *Meals*, a building-permit ordinance containing a 35-foot highway setback was invalid for the same reason. *Meals*, 426 A.2d at 1202. The Ordinance's 500-foot buffers and the exclusion zones are indistinguishable from *Dean*'s.

**c. The "primary objective" cases do not save the Ordinance.**

The City may rely on *Land Acquisition Servs., Inc. v. Clarion Cnty. Bd. of Comm'rs*, 605 A.2d 465 (Pa. Cmwlth. 1992), *IA Constr. Corp. v. Twp. of Bradford*, 598 A.2d 1347 (Pa. Cmwlth. 1991), and *Mt. Joy Twp. v. Davies Used Auto Parts*, 472 A.2d 1172 (Pa. Cmwlth. 1984). Those ordinances were comprehensive regulatory schemes adopted under specific enabling legislation for the subject regulated, and in *Mt. Joy* the setbacks did not apply to businesses in existence when the ordinance passed. *Mt. Joy*, 472 A.2d at 1173–74. Here there is no enabling legislation for local regulation of hemp or kratom, and the Ordinance has no grandfathering, variance, or nonconforming-use protection. (Compl. ¶¶ 105, 187, 227, 254.) Its regulatory provisions are largely inoperative, and its operative effect is to remove the use from the map.

**d. The Ordinance extinguishes existing lawful uses without the protections zoning requires.**

Because zoning restricts constitutionally protected property rights, it "can be sustained only if it is clearly necessary to protect the health or safety or morals or general welfare of the people." *Hopewell Twp.*, 452 A.2d at 1342. Municipalities "may not by virtue of the zoning power curtail the offensive uses of land existing at the date of the enactment of the zoning legislation." *Exton Quarries, Inc. v. Zoning Bd. of Adjustment*, 228 A.2d 169, 175 (Pa. 1967). Each PAHAA member's Philadelphia store is an existing lawful use that the exclusions would terminate without amortization, variance, or any hearing. By routing a zoning restriction through Title 9, the City avoided the very protections that would have preserved those uses.

### C. Plaintiffs Will Suffer Immediate and Irreparable Harm.

Absent relief, on November 12, 2026 PAHAA's members must close their Philadelphia stores or incur daily penalties and nuisance enforcement. (Compl. ¶¶ 112-13.) The resulting losses (customers, goodwill, trained employees, lease value, stranded inventory, and market position) cannot be measured by an accurate pecuniary standard. An injury is irreparable "if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard," and the disruption of customer relationships constitutes irreparable harm. *Synthes USA Sales, LLC v. Harrison*, No. 2012-12021, 2014 WL 11210394, at *14 (C.P. May 19, 2014). Interference with contractual rights to use land is irreparable harm. *Porter v. Chevron Appalachia, LLC*, 204 A.3d 411, 417 (Pa. Super. 2019). The violation of constitutional rights compounds that harm.

The record bears this out. MNG has operated in Philadelphia for five years, since opening its first store in 2021, and holds every license and permit required to operate its three Stores, each of which is current and in good standing. (See Ex. B, Katz Aff. ¶¶ 22–23.) Intoxicating hemp-derived products as defined by the OPrdinance and natural-leaf kratom products make up approximately 90% of the Stores' sales, which totaled several million dollars in 2025. (*Id.* ¶ 27.) The Stores cannot operate profitably selling only products the Ordinance does not cover. (*Id.* ¶ 28.) If the Ordinance takes effect, MNG will lose substantially all of the Stores' sales and profit and will be forced to close all three Stores. (*Id.* ¶¶ 27, 29.)

**Employees and training.** MNG employs approximately 20 people at the Stores, 15 full-time and 5 part-time, all of whom completed MNG's multi-week training program, which covers product knowledge, age verification, and individual customer consultation, followed by continuing education. (*Id.* ¶¶ 19, 31.) Closure would jeopardize the employment of 19 of them. (*Id.* ¶ 31.) MNG's investment in training that workforce would be permanently lost, and MNG would face



Case ID: 261101288
Control No.: 26112521

severe, likely insurmountable obstacles in reassembling a trained team if relief were granted later. (*Id.*) A dispersed, trained workforce cannot be restored by a later damages award.

**Leases, buildouts, and inventory.** Each Store occupies leased premises under leases that run for several more years, with remaining obligations exceeding $1,500,000. (*Id.* ¶¶ 24, 32.) Once the Stores stop generating revenue, MNG will be unable to perform, and the leases will go into default, exposing MNG to acceleration, damages claims, and loss of its leasehold interests and improvements. (*Id.* ¶ 32.) MNG has invested hundreds of thousands of dollars in location-specific buildouts, fixtures, secure display cases, signage, and equipment that cannot be recovered if the Stores close. (Id. ¶ 33.) The Ordinance would also strand approximately $100,000 of inventory purchased through interstate channels for lawful retail sale. (*Id.* ¶ 34.) This loss of the right to use leased premises is precisely the interference with contractual rights to use land that Porter recognizes as irreparable.

**Customers and goodwill**. The Stores have built relationships with thousands of regular adult customers who rely on MNG for tested, labeled products and individual consultation. (*Id.* ¶ 35.) If the Stores close, those customers will turn to other sources, including unregulated online and out-of-City sellers, and MNG's Philadelphia goodwill will be lost, a loss that cannot be measured in dollars or restored by a later award of money. (Id.) That is the disruption of customer relationships that *Synthes* holds irreparable.

The harm is irreparable for a second, independent reason: the Ordinance threatens the very existence of Plaintiffs' Philadelphia businesses. Pennsylvania courts recognize that "[o]nly when there is proof that the threatened monetary loss is so great as to threaten the existence of the business is a preliminary injunction properly granted." *Three County Servs., Inc. v. Phila. Inquirer*, 486 A.2d 997, 1002 (Pa. Super. 1985). This Court has applied the same principle, holding that



Case ID: 261101288
Control No.: 26112521

"even when monetary damages are fully calculable, a preliminary injunction may be granted when there is proof that the threatened monetary loss is so great that it threatens the existence of a business." *Franklin Cap. Partners, Inc. v. Moosecorp II, Inc.*, No. 3660 MAY TERM 2006, 2006 WL 2663732 at *2 (Pa. Com. Pl. Sept. 11, 2006). That standard is met here many times over. The Ordinance does not merely reduce Plaintiffs' revenue; it ends their Philadelphia operations. Every PAHAA member store in the City, including MNG's three stores, falls within a 500-foot setback or one of the 184 designated-area exclusions, and no permit can issue in any event because the Department has not adopted the regulations on which § 9-6703 depends. (Compl. ¶¶ 6, 96-99, 113; Katz Aff. ¶¶ 25–26.) Beginning November 12, 2026, each day of continued operation is a separate Class III offense. § 9-6704. MNG has no permit pathway and nowhere in the City to relocate, and closing the Stores threatens the existence of its Philadelphia business. (Katz Aff. ¶¶ 29–30.) A loss that eliminates the business is, by definition, one that threatens its existence.

Finally, the averment of a violation of the state constitution, as found in the pending Complaint, is *per se* irreparable harm. *Stilp v. Com.,* 910 A.2d 775, 787 (Pa. Commw. Ct. 2006), aff'd sub nom. *Stilp v. Com., Gen. Assembly,* 601 Pa. 429, 974 A.2d 491 (2009)("For purposes of preliminary objections, Stilp's averment of violation of organic law is a sufficient specification of irreparable injury").

**D. Greater Injury Would Result From Refusing the Injunction.**

An injunction preserves operations that have existed lawfully for years under age-verification, Farm Bill compliant hemp products, only natural leaf kratom products, cannabinoid and alkaloid testing, and labeling practices that address the Ordinance's core concerns. The City suffers no cognizable harm from a stay while the Court resolves substantial constitutional questions, particularly where the City has not issued the regulations that its own permit scheme



Case ID: 261101288
Control No.: 26112521

requires and its Department of Public Health conceded it lacks current resources to implement the Ordinance. (Compl. ¶ 141.) And the relief requested below conditions the stay on Plaintiffs' compliance with the Ordinance's age, product-content, testing, and labeling requirements.

**E. The Injunction Restores the Status Quo and Is Reasonably Suited to Abate the Offending Activity.**

The status quo is the last peaceable, noncontested status preceding the controversy: lawful retail operation before the Ordinance's effective date. A preliminary injunction preserves the status quo until the litigation is decided on the merits. *Gwynedd Props., Inc. v. Lower Gwynedd Twp.*, 615 A.2d 836, 128 (Pa. Super. 1992). The requested relief is tailored: it stays enforcement against Plaintiffs and PAHAA's members, the no-permit trap, and the geographic exclusions, on the condition that they comply with the Ordinance's age limit, 7-OH and synthetic-alkaloid limits, Farm Bill compliant hemp THC limit, testing, and labeling requirements as set out in Section V.

**F. The Injunction Will Not Adversely Affect the Public Interest.**

The requested injunction protects the public rather than harming it. Maintaining the status quo "will protect, rather than harm the public" where it assures that lawful goods and services "will continue to be available to the recipients of those services." *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 510 (Pa. 2014). Here, the status quo is a lawful marketplace in which adults buy 2018 Farm Bill compliant hemp and natural-leaf kratom products that are tested by accredited third-party laboratories for their cannabinoid or alkaloid content, labeled with their ingredients, linked by QR code to laboratory results, and sold only after age verification to adults. (Compl. ¶¶ 14–15, 50-52, 118.) Those products, and the retailers who sell them, have a reputation for safety and quality, and the public interest is served when consumers keep access to such products. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 695 (9th Cir. 2022). Removing them does not eliminate demand. It pushes adult consumers toward the unregulated,



Case ID: 261101288
Control No.: 26112521

untested products and unlicensed sellers that prompted the Ordinance in the first place. (Compl. ¶¶ 135-36.)

Plaintiffs' stores are neither public nuisances nor threats to public safety. This Court has held, in a case against the City, that where an establishment "was neither a public nuisance nor a threat to public safety," its "continued operation … would not adversely affect the public interest." *SPTR, Inc. v. The City of Philadelphia*, No. 15070872, 2015 WL 6407491 at *8 (Pa.Com.Pl. Oct. 02, 2015). That reasoning applies with greater force here. PAHAA's members operate licensed, fixed-location stores, sell no 7-OH products, sell only natural leaf kratom and Fram Bill compliant hemp products, and sell only lab-tested, labeled products to age verified adults. (Compl. ¶¶ 62-66, 142.) Restricting citizens' lawful choices without a legitimate public purpose does not serve the public. *See EmergyCare, Inc. v. Millcreek Twp.*, 68 A.3d 1, 5 (Pa. Cmwlth. 2013) (ordinance "exceed[ed] its justification" by "limiting citizens' choice of medical care").

Nor does the public have any interest in enforcing an invalid ordinance. "[T]he argument that a violation of law can be a benefit to the public is without merit." *Dillon v. City of Erie*, 83 A.3d 467, 474 (Pa. Cmwlth. 2014) (quoting *Pa. Pub. Util. Comm'n v. Israel*, 52 A.2d 317, 321 (Pa. 1947)). An injunction against an unlawful and unenforceable ordinance "will not adversely affect the public interest." *Id.*; *accord City of Philadelphia v. Armstrong*, 271 A.3d 555, 565 (Pa. Cmwlth. 2022).

Finally, the relief Plaintiffs request addresses the Ordinance's core concerns. Plaintiffs and PAHAA's members, will comply:

- the twenty-one-and-over age limit, § 9-6702(4);
- the 2% 7-OH cap and the synthetic-alkaloid ban for kratom, § 9-6702(2)(c)–(d);
- the 0.3% delta-9 THC limit for hemp products;
- accredited third-party laboratory testing for cannabinoid and alkaloid content, § 9-6703(4); and

- ingredient, dosage, and warning labels with QR-code access to Certificates of Analysis, § 9-6703(5).

The public keeps the Ordinance's core safety concerns. What it loses is only a prohibition that serves no stated objective.

## V. RELIEF REQUESTED

Plaintiffs respectfully request that the Court enter a special injunction and, after hearing, a preliminary injunction staying enforcement of the Ordinance against Plaintiffs and PAHAA's members pending the outcome of this case and, in return, Plaintiffs and PAHAA's members shall

1. Minimum age (§ 9-6702(4)). Raise their minimum age to twenty-one (21) for all intoxicating hemp-derived and kratom products, and will keep requiring identification from any customer who appears to be under thirty (30).
2. Kratom product standards (§ 9-6702(2)). Sell only natural leaf kratom products.
3. Hemp product standards. Sell only hemp products that comply with the definitions of hemp in the Agriculture Improvement Act of 2018,7 U.S.C. § 1639o(1), as amended from time to time.
4. Testing (§ 9-6703(4)). Continue accredited independent third-party laboratory testing of every product it sells using accredited laboratories that test for cannabinoids and alkaloids. Most laboratories, but not all, are DEA registered, but all are accredited.
5. Labeling (§ 9-6703(5)). Will continue to label every product with its ingredients, dosage information, and warnings and to provide QR-code access to Certificates of Analysis.
6. Bond. Setting bond in a nominal amount under Pa. R. Civ. P. 1531(b), given the constitutional nature of the claims and the absence of harm to the City; and
7. Granting such other relief as the Court deems just.



Case ID: 261101288
Control No.: 26112521

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By: */s/ Patrick C. Campbell, Jr.*

Patrick C. Campbell, Jr., Esquire
PA Attorney I.D. No. 53350
565 E. Swedesford Road, Suite 303
Wayne, Pennsylvania 19087
Tel. 215.977.4100
Fax 215.977.4101
Patrick.Campbell@lewisbrisbois.com
*Attorneys for Plaintiffs*

Dated: November 10, 2026



Case ID: 261101288
Control No.: 26112521

# EXHIBIT C

**CITY OF PHILADELPHIA LAW DEPARTMENT**
BAILEY AXE, SENIOR ATTORNEY
ATTORNEY IDENTIFICATION NO. 309686
1515 ARCH STREET – 15TH FLOOR
PHILADELPHIA, PA 19102-1595
(215) 683-5024 – Telephone
(215) 683-5299 – Fax

*Attorney for Defendants*

| | |
|---|---|
| **PENNSYLVANIA HEALTHY ALTERNATIVES ASSOCIATION, *et al.*,** | PHILADELPHIA COUNTY COURT OF COMMON PLEAS |
| Plaintiffs, | November Term 2026 |
| | No. 1288 |
| v. | |
| **THE CITY OF PHILADELPHIA, *et al.*,** | |
| Defendants. | |

**NOTICE OF FILING OF NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. § 1446(d), Defendants the City of Philadelphia, Cherelle Parker, Ralph Dipietro, Bridget Collins-Greenwald (the "Defendants"), by and through undersigned counsel, hereby gives notice that it has filed in the United States District Court for the Eastern District of Pennsylvania the attached Notice of Removal (attached here without exhibits) of the above-captioned action.

Pursuant to 28 U.S.C. § 1446, the filing of this Notice effects the removal of this action to the federal court, and this Court is directed to "proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d).

Respectfully submitted,

CITY OF PHILADELPHIA
LAW DEPARTMENT

Dated: November 12, 2026

BY: */s/ Bailey E. Axe*
Bailey E. Axe, Senior Attorney